# Exhibit 8

12/16/2022 9:29 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 71110393
By: cassie combs
Filed: 12/16/2022 9:29 PM

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 1 of 74

Cause No. 2022-48417

| | |
|---|---|
| JANICE JACKSON, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF HER LATE HUSBAND MICHAEL WAYNE JACKSON; ARLENE GALLIEN, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF CARL WILEY JR.; CAMILA SIMPSON AS NEXT FRIEND OF XXXXXXX XXXXX, GYNELL HENDERSON, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF RASHAD HENDERSON, AND JOHN HENDERSON JR., INDIVIDUALLY | IN THE DISTRICT COURT OF |
| | HARRIS COUNTY, TEXAS |
| V. | |
| CITY OF HOUSTON, | |
| Defendant | 113th JUDICIAL DISTRICT |

## PLAINTIFFS' FIRST AMENDED PETITION

### I.
### A long, violent history of targeting by HPD

1.     Driving while Black in a predominately Black neighborhood should not create ongoing risk to innocent citizens, Houston Police Department (HPD) officers, and public property of unjustified, unreasonably dangerous, and often tragic death and mayhem resulting from HPD high speed pursuit tactics. This is particular true, as revealed by HPD's own internal data outlined further below, when deaths and serious injuries result from HPD approving consistently dangerous chases after "criminals" engaged in such potential

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 2 of 74

offenses as violation of open container laws and minor traffic violations. A careful and fair analysis of what happened to Plaintiffs herein, and others, points to not just unfortunate accidents from HPD's chosen tactics in select neighborhoods in the City of Houston, but more directly, to wholly expected consequences of the same approved tactics resulting in the same consequences to public safety.

2.      This lawsuit is based on the violations of the constitutional rights of innocent bystanders Michael Wayne Jackson, Carl Lee Wiley Jr., and Rashad Henderson, among others unfortunate enough to be driving Black in predominately Black neighborhoods in the City of Houston as HPD officers embarked upon yet another dangerous, unnecessary, and unjustifiable high-risk operation of HPD vehicles.  For years, the policymakers within City of Houston adopted a custom, practice, pattern, and usage of authorizing police officers to profile Black drivers and racially target predominantly Black neighborhoods when engaging in high-speed pursuits.  Ultimately, this policy, custom, practice, and usage was the moving force that caused the death of Jackson, Wiley, and Henderson.

3.      For example, in 2020, the City engaged in approximately 963 high speed chases where HPD reported the race of the driver.  For that year, Black citizens made up 22% of the population and 38% of traffic stops. Yet, for high-speed pursuits involving HPD, Black drivers made up 56.39% of the chases.  Even worse, during the day time hours – meaning, when the officers could more easily identify the race of drivers — high-speed pursuits of Black drivers made up 65.01% of HPD's chases.  But at night – only after visibility and identification of the race of the driver is limited – HPD's chases of Black drivers dropped

2

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 3 of 74

to 52.07%.  This statistically significant difference provides important evidence of the intent and animus of HPD officers in engaging in pursuits and its ongoing approval by the City of Houston's decisionmakers.

4.      Similarly, when determining whether to engage in a pursuit, HPD officers also target Black neighborhoods with these particularly dangerous tactics.  Indeed, high-speed pursuits are significantly more likely to occur in neighborhoods that have more Black residents than the general population of Houston.  In contrast, HPD shields white neighborhoods – meaning neighborhoods that have more white residents than the general population of Houston – from similar chases.  Put simply, HPD has an unwritten but very real, and deadly policy, practice, custom, or usage to target Black neighborhoods and Black drivers with the risk of high-speed vehicle tactics.

5.      Consistent with this targeting, HPD has admitted that "[c]ollisions are a predictable outcome of police pursuits."[1]  High-speed pursuits present substantial risk to the public and minimal risk to HPD officers – indeed, officers suffer only approximately .4% of high-speed chase related injuries in Houston, which might explain why City employees so readily engage in such tactics.[2]  And while HPD has dramatically dropped traffic stops and violations over the last 20 years, HPD has tripled its high-speed pursuits during that same period.

6.      As high-speed chases have increased in the last decade, HPD continues to train,

---

[1] Exhibit A, 2016 "Instructor's Lesson Plans" for HPD driving.
[2] St. John Barned-Smith, *Houston police to start using new driving tactic to end vehicle pursuits,* HOU. CHRON., Nov. 17, 2017.

supervise, and discipline its officers consistent with a pattern of approving racially motivated, dangerous high-speed pursuits. By example, as part of its training to evaluate when to initiate a high-speed chase, HPD teaches its officers to evaluate the "social image" of the chase, weigh "urban factors," and evaluate this with their "stresses, attitudes, emotions, prejudices, [and] bias."[3]

7.      HPD's handling of and customs regarding disciplinary matters, further encourages and establishes its pattern of racial profiling.  Put bluntly, HPD applies different rules to evaluating potential misconduct by its officers than the public at large, including: (1) HPD does not question the officer until the officer has spoken with an attorney; (2) the officer is allowed to do an unrecorded "walkthrough" of the scene while accompanied by an attorney; (3) the officer is given forty-eight hours to answer written questions with an attorney's assistance, and (4) the officer is provided all written statements and body camera footage prior to giving his or her statement.  This process allows and authorizes officers to adapt their after-the-fact excuses to conceal the racially motivated conduct and, thus, avoid any real discipline.

8.      Not surprisingly, in at least the last 10 years, HPD has never sustained a complaint about racial profiling— much less a high-speed chase complaint related to racial profiling. Based on the data available, HPD has received approximately 47 complaints regarding racial profiling since 2010.[4]  Of those complaints, HPD concluded that 28 were

---

[3] Exhibit A.

[4] *See* Annual racial profiling data. For the year 2017, HPD did not identify any complaint for racial profiling. It is unclear if HPD either did not identify the complaints or that no complaints were

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 4 of 74

"unfounded," 2 were "pending," 3 were "exonerated," 8 were "not sustained," and 0 were "sustained."  In contrast to the zero sustained findings for racial profiling complaints, HPD generally has sustained approximately 25% of complaints made against officers.  By example, in 2021, HPD sustained 160 of the 654 complaints.

9.     Plaintiffs, the families of Michael Wayne Jackson, Carl Wiley Jr., and Rashad Henderson, file this lawsuit under 42 U.S.C. §1983 and §1988 for the violations of their constitutional rights. Prior to Mr. Jackson, Mr. Wiley, and Mr. Henderson's deaths, the City had created a longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying the use of racial profiling in high-speed pursuits and violating Wiley, Jackson, and Henderson's substantive due process. The final policymakers of the City have communicated to officers, that such violations are authorized and even expected. The City has also communicated that the supervisory and municipal apparatus of the City will defend or cover up this exact type of conduct. Because Houston has tolerated – and even encouraged – this unlawful conduct, it has become customary among HPD police officers to racially profile and violate the right of substantive due process. This conduct was the moving force and cause of Michael Wayne Jackson, Carl Wiley Jr. and Rashad Henderson's deaths.

## II.
## Discovery Control Plan

10.     Pursuant to Rule 190, Discovery Limitations, this lawsuit is governed by Rule 190.3,

---

made.

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562872 - Page 5 of 74

Discovery Control Plan Level 2.

## III.
## Jurisdiction and Venue

11.     This Court has jurisdiction over the parties, as the City is a governmental entity in located within Harris County, Texas. All statutory prerequisites to this suit against the City, including the provision of written notice, have been satisfied.

12.     Venue in Harris County is proper in this cause under Section 15.002(a)(l) of the Tex. Civ. Prac. & Rem. Code because all or a substantial part of the events or omissions giving rise to this lawsuit occurred in this county.

## IV.
## Parties

13.     Plaintiff Janice Jackson is a resident of Harris County Texas. Ms. Jackson is the surviving wife of Michael Wayne Jackson, and no Administrator of the Estate of Michael Wayne Jackson is necessary, nor has one been appointed. Ms. Jackson has standing to maintain this action, including for wrongful death, under Texas Civil Practice & Remedies Code §§ 71.001-71.004 and 71.021.  Ms. Jackson thus brings this action pursuant to section 71.021 of the Texas Civil Practice & Remedies Code, commonly known as the "survival statute," as well as pursuant to the common laws of the State of Texas, for her own benefit as heir of the Estate of Michael Wayne Jackson and on behalf of the Estate of Michael Wayne Jackson, as well as individually under the Texas Wrongful Death Act.

14.     Plaintiff Gynell Henderson is a resident of Texas. Ms. Henderson, is the surviving mother of Rashad Henderson, and no Administrator of the Estate of Rashad Henderson is

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 6 of 74

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562672 - Page 7 of 74

necessary, nor has one been appointed.  Ms. Henderson has standing to maintain this action, including for wrongful death, under Texas Civil Practice & Remedies Code §§ 71.001-71.004 and 71.021.  Ms. Henderson thus brings this action pursuant to section 71.021 of the Texas Civil Practice & Remedies Code, commonly known as the "survival statute," as well as pursuant to the common laws of the State of Texas, for her own benefit as heir of the Estate of Rashad Henderson and on behalf of the Estate of Rashad Henderson, as well as individually under the Texas Wrongful Death Act.

15.     John Henderson Jr. is a resident Texas. Mr. Henderson is the surviving father of Rashad Henderson. John Henderson Jr. has standing to maintain this action, including for wrongful death, under Texas Civil Practice & Remedies Code §§ 71.001-71.004.   Mr. Henderson thus brings this action as individually under the Texas Wrongful Death Act.

16.     Plaintiff, Arlene Gallien, is a resident Texas. Ms. Gallien, is the surviving mother of Carl Wiley Jr. Ms. Gallien is the administrator of the estate of Carl Wiley Jr.  Ms. Gallien has standing to maintain this action, including for wrongful death, under Texas Civil Practice & Remedies Code §§ 71.001-71.004 and 71.021.  Ms. Gallien thus brings this action pursuant to section 71.021 of the Texas Civil Practice & Remedies Code, commonly known as the "survival statute," as well as pursuant to the common laws of the State of Texas, for her own benefit as heir of the Estate of Carl Wiley Jr. and on behalf of the Estate of Carl Wiley Jr., as well as individually under the Texas Wrongful Death Act.

17.     Camilla Simpson, as Next Friend of Xxxxxxx Xxxxx, is a resident Texas. Xxxxxxx Xxxxx is the surviving child of Carl Wiley Jr. Camilla Simpson as Next Friend of Xxxxxxx

Xxxxx has standing to maintain this action, including for wrongful death, under Texas Civil Practice & Remedies Code §§ 71.001-71.004. Camilla Simpson as Next Friend of Xxxxxxx Xxxxx thus brings this action as individually under the Texas Wrongful Death Act.

18.     Defendant, the City of Houston, is a Texas municipal corporation that operates HPD, which in turn sets city-wide policy for police officers it employs.

**V.**
**Conditions Precedent**

19.     All conditions precedent for Plaintiffs obtaining the relief sought in this cause have been performed or have occurred.

**VI.**
**Factual Background**

**A.  The known danger of high-speed pursuits in the United States**

20.     Law enforcement within the United States, including the City of Houston, have long been aware of the substantial risk of harm caused by high-speed chases. Since 1979, "[m]ore than 5,000 bystanders and passengers have been killed in police car chases" throughout the United States.[5] Even worse, "[p]olice across the USA chase tens of thousands of people each year -- usually for traffic violations or misdemeanors -- often causing drivers to speed away recklessly."[6] As a result, "far more police vehicle chases occur each year than police shootings."[7]

---

[5] Thomas Frank, *High-speed police chases have killed thousands of innocent bystanders*, USA Today, July 30, 2015.
[6] Id.
[7] Id.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 8 of 74

21.     Undeniably, high-speed chases present a clear risk to the public. Innocent bystanders account for 27% of high-speed chase fatalities.[8] In contrast, law enforcement only account for 1% of fatalities.[9] In other words, law enforcement officers bear only a miniscule amount of the risk of a high-speed chase compared to innocent bystanders or the occupants of the chased vehicles.



22.     Recognizing the "major public concern" of high-speed chases, in 1990 the Department of Justice labeled pursuits "the most dangerous of all ordinary police activities" and urged police departments to adopt policies to reduce the incredible risk of

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 9 of 74

---

[8] A Review of Police Pursuit Fatalities in the United States from 1982-2004, 11 Prehospital Emergency Care 278, 280 (2007)
[9] Id.
[10] Id.

harm.[11]  "[N]umerous other government and private studies from 1969 through 1988 have concluded that the incidence of pursuit-related death, injury and property damage is disproportionately high to justify an immediate high-speed chase of a fleeing suspect, particularly where the suspected offense is a misdemeanor or non-violent minor felony."[12]

23.     Ultimately, the Department of Justice made specific recommendations for police departments regarding high-speed chases. The DOJ suggested that the department should "nam[e] the types of offenses for which high-speed pursuit is allowed or not allowed. Pursuit for traffic offenses? Pursuit for any criminal offense? Pursuit for felonies only? Pursuit for violent felonies only?"[13] The DOJ further noted:

> The essential purpose of pursuit is to apprehend a traffic law violator or criminal offender. If this apprehension can be accomplished by means other than high-speed pursuit, then law enforcement should try to use them. When offenders are known, they can probably be apprehended, without chases, in their homes or in places they frequent. Whether or not to engage in a high-speed chase then becomes a question of weighing the danger to the public of the chase itself against the danger to the public of the offender remaining at large. For anyone other than a violent felon, the balance weighs against the high-speed chase.
>
> It is important, then, that a law enforcement agency equip itself with means of identifying a suspect without high-speed pursuit. The most obvious solution is to take a photo of the fleeing vehicle, which entails having a camera available and an officer capable of taking a useful photo with it.[14]

---

[11] National Institute of Justice, U.S. Dept. of Justice, Restrictive Policies for High-Speed Police Pursuits 6-10 (1989)
[12] *Id.*
[13] *Id.*
[14] *Id.*

For Official Governmental Use Only - Do Not Disseminate to the Public: 10526872 - Page 10 of 74

24.     The DOJ further concluded that "development of legally sound police vehicle pursuit policies lags behind development of deadly force policies involving firearms." Furthermore, "the most important reason for effective pursuit policies is not minimization of liability. It is to protect life and property-the basic police mission."[15]

**B.  HPD's policies and customs related to high-speed chases**

25.     The City is well aware of the dangers and risks of high-speed chases.  In 2017, the Houston Chronicle noted that approximately five people a year are killed in high-speed chases by HPD.[16] Between 2012 and 2017, HPD high-speed chases caused injuries to 1,000 innocent victims, 6,000 fleeing drivers, and 32 officers.  In other words, HPD's high-speed chases present substantial risk to the public, while presenting a minimal risk to HPD officers – indeed, only approximately .4% of high-speed chase related injuries in Houston.[17]

26.     At the same time, HPD has established – through its general orders – policies and training related to high-speed chases. In General Order 600-04, the City has defined a pursuit or chase as:

> [W]hen an officer operating an emergency vehicle attempts to stop or apprehend a suspect who refused to stop while operating a motor vehicle. The suspect must exhibit one of the following types of conduct:
>
> a. A willful disregard for personal safety or the safety of others in an attempt

---

[15] *Id.*

[16] St. John Barned-Smith, *Houston police to start using new driving tactic to end vehicle pursuits,* Hou. Chron., Nov. 17, 2017.

[17] *Id.*

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 11 of 74

to avoid arrest.[18]

b. A refusal to obey an officer's repeated signal to stop.

In that same order, HPD mandated that the field supervisor tracks these high-speed chases by completing a "Houston Police Department Vehicle Pursuit" form and submitting the form into HPD's chase database. HPD further requests that even when the officer can identify the suspect and PC for criminal activity, HPD may continue a high-speed chase if the nature of criminal activity "is such that the need to immediately take the suspect into custody justifies the possible risks to the public resulting from the pursuit."[19]

27.    Despite this policy, HPD is well aware of the inherent danger to the public of high-speed chases. As part of its training material, HPD has noted that "[c]ollisions are a predictable outcome of police pursuits."[20]  And the "more police cars involved in a pursuit, the more likely a collision will result."[21]  HPD additionally acknowledged in its 2016 training that "38.7% of police pursuits" resulted in a crash.[22]  Furthermore, HPD's rate of high-speed chases "ending in collisions" is higher than the county law enforcement agencies.[23] Put differently, HPD knows that its policies, customs, and training encourage officers to engage in riskier and more dangerous high-speed chases than other greater Houston area law enforcement.

---

[18] Exhibit B, General Order 600-04.
[19] *Id.*
[20] Exhibit A.
[21] *Id.*
[22] *Id.*
[23] *Id.*

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 12 of 74

28.     Despite these policies and general knowledge of the incredible risk of high-speed chases, HPD has dramatically increased the number of high-speed chases over the past two decades.  Based on the available data, the following chart summarizes the high-speed pursuits, as documented by HPD:

| Year | Chases |
|------|--------|
| 2000 | 445 |
| 2011 | 685 |
| 2012 | 572 |
| 2018 | 928 |
| 2020 | 1168 |

29.     Based on HPD's records, high-speed chases have doubled since 2002, and nearly tripled since 2000.  When reviewing these pursuits in 2017, the Houston Chronicle noted that HPD has engaged "more than 4,000 vehicle pursuits" between 2012 and 2017 – an average of approximately 650-675 per year during that time period.[24] Five years later, HPD has nearly doubled these dangerous pursuits.

---

[24] St. John Barned-Smith, *Houston police to start using new driving tactic to end vehicle pursuits,* HOU. CHRON., Nov. 17, 2017.

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562687 2 - Page 13 of 74

30.     At the same time that chases have sky-rocketed, HPD has dramatically reduced its traffic stop rate. Based on HPD's documented records for traffic stops, HPD cut traffic stops from 533,858 in 2008 to 217,288 in 2021.[25]



In sum, over the last 13 years, HPD has consistently reduced its traffic stop rate, while doubling its high-speed pursuit rate.

31.     As high-speed chases have increased in the last decade, HPD continues to train, supervise, and discipline its officers consistent with a pattern of approving racially motivated, dangerous high-speed pursuits. By example, as part of its training to evaluate when to initiate a high-speed chase, HPD teaches its officers to evaluate the "social image" of the chase, weigh "urban factors," and evaluate this with their "stresses, attitudes,

---

[25] As of December 8, 2022, HPD has conducted 231,720 traffic stops. This is based on the available information provided by the City of Houston "Police Transparency Hub," available at https://policetransparency-mycity.hub.arcgis.com/.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 14 of 74

emotions, prejudices, [and] bias." [26]



Through this, HPD trains its officers when evaluating whether to engage in a high-speed chase, to consider the neighborhood – implicitly, including the racial demographics of the neighborhood – and social image – implicitly, including the race of the drivers.

## C.  As part of its custom, practice, and training, HPD racially profiles and targets Black drivers

32.     Following the foundation above, HPD has created a custom, pattern, and practice of targeting Black drivers and predominantly Black neighborhoods when engaging in dangerous high-speed chases. By example in 2020, the City engaged in approximately 963 high speed chases where the City reported the race of the driver.  For that year, Black citizens made up 22% of the population and 38% of traffic stops. Yet, for high-speed

---

[26] Exhibit A.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 15 of 74

pursuits involving HPD, Black drivers made up 56.39% of the chases.  Similarly, in 2018, 58.64% of the high-speed pursuits by HPD targeted Black drivers.[27]

33.    Even more telling, during the day in 2020 – indeed, when HPD officers are more likely to be able to identify a driver's race prior to a chase – high-speed pursuits of Black drivers made up 65.01% of HPD's chases. But at night in 2020 – only after visibility and identification of the race of the driver is limited – HPD's chases of Black drivers dropped to 52.07%. This difference was more than three times the standard deviation. As a result, the variation between night and day pursuits is statistically significant and not due to random variation. HPD's chases of Hispanic drivers increase during the night and drop during the day, while chases involving white and Asian drivers stay relatively the same.

| 2020 Data | | | | | |
|---|---|---|---|---|---|
| Race of the Driver | Percentage of chases by race in the day | Percentage of chases by race in the night | Difference between day and night | Total Percentage of chases by race | Actual demographics of the City of Houston |
| White | 9.84% | 10.99% | -1.15% | 10.6% | 24% |
| Black | 64.48% | 51.79% | 12.70% | 56.03% | 22% |
| Hispanic | 22.68% | 35.85% | -13.17% | 31445% | 44% |
| Asian | 2.19% | 0.82% | 1.36% | 1.28% | 7% |

[27] Plaintiffs have not yet received the high-speed pursuit forms for the years 2019 and 2021, despite making a public records request in June 2022.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 16 of 74

Similarly, in 2018, HPD's pursuit rate dropped for Black drivers during the night. Again, this variation was more than two times the standard deviation – meaning the difference was statistically significant and not due to random variation. Likewise, HPD's pursuit rate for Hispanic drivers increased at night, while decreased during the day.

| 2018 Data | | | | | |
|---|---|---|---|---|---|
| Race of the Driver | Percentage of chases by race in the day | Percentage of chases by race in the night | Difference between day and night | Total percentage of chases by race | Actual demographics of the City of Houston for 2018 |
| White | 12.58% | 9.43% | 3.01% | 10.57% | 25% |
| Black | 64.47% | 55.34% | 9.13% | 58.64% | 23% |
| Hispanic | 21.07% | 33.45% | -12.38% | 28.98% | 44% |
| Asian | 1.26% | 1.42% | .16% | 1.36% | 7% |

In all, the data from 2018 and 2020[28] confirms that HPD racially profiles Black drivers as part of their decision-making and evaluation prior to initiating a high-speed chase.

34.     This pattern is consistent with other racial profiling studies throughout the United

---

[28] To date, HPD has only provided the complete pursuit forms for the years 2018 and 2020. HPD has provided part of 2017.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 17 of 74

States that have concluded that the "veil of darkness" reveals racial profiling by policy.[29]

By example, in May 2020, a Stanford-University-led study determined that "Black drivers

get pulled over by police less at night when their race is obscured by 'veil of darkness.'"[30]

The study also found that "when drivers were pulled over, officers searched the cars of

[B]lacks and Hispanics more often than whites."[31] Importantly, "[t]his dataset provided a

statistically valid sample with two important variables – the race of the driver being

stopped, and the darkness of the sky at around 7 p.m. The analysis left no doubt that the

darker it got, the less likely it became that a [B]lack driver would be stopped. The reverse

was true when the sky was lighter."[32]

35.     As a result, HPD, through its custom, training, lack of discipline, and supervision,

has created a pattern, practice, custom, or usage that authorizes and encourages officers to

profile Black drivers, when evaluating whether to initiate a high-speed pursuit.

### D.  HPD's pattern and practice of targeting Black Neighborhoods

36.     In addition to the data regarding profiling by race of the driver, the City also has

created a pattern, practice, custom, or usage to target Black neighborhoods, as opposed to

predominantly white or Hispanic neighborhoods.  Based on the City's responses to public

records requests, the City completed approximately 1,141 chase forms in 2020.  After

---

[29] Emma Pierson, Camelia Simoiu, Jan Overgoor, Sam Corbett-Davies, Daniel Jenson, Amy Shoemaker, Vignesh Ramachandran, Phoebe Barghouty, Cheryl Phillips, Ravi Shroff, and Sharad Goel, *A large-scale analysis of racial disparities in police stops across the United States*, Nature Human Behaviour, March, 6, 2020.
[30] *Id.*
[31] *Id.*
[32] *Id.*

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 18 of 74

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 19 of 74

filtering and removing chases that either (1) occurred on a freeway or highway (and not a neighborhood), (2) occurred outside the boundaries of the Houston Super Neighborhoods, or (3) where HPD did not (or was unable to) report the race of the driver, the totality of the reports make it clear – HPD engages in significantly more chases in predominantly Black neighborhoods.

37.     The City has divided its population into 88 Super Neighborhoods.  Based on the population reported by the City, the City has 2,310,432 residents living in Houston and approximately 2,262,077 residents live withing the boundaries of the 88 Super Neighborhoods. The boundary of the City's Super Neighborhoods is as follows:



38.     Of the pursuits in 2020, twelve neighborhoods had a standard deviation of more

than three times between the percentage of actual chases and the percentage of its population within the Super Neighborhoods. In totality, those neighborhoods, made up 10% of the population, yet at over 31% of all high-speed chases in the dataset. Ten of the twelve neighborhoods were predominantly Black. And notably, two of the neighborhoods, Northside/Northline and Eastex-Jensen directly border majority Black neighborhoods.

| Super Neighborhood ("SN") | High speed chases per 10k (Houston Average 3.61) | Black population of the SN | Difference between SN and the average Black population |
|---|---|---|---|
| Acres Home | 10.90 | 60% | 38% |
| East Little York / Homestead | 7.61 | 68% | 46% |
| Eastex-Jensen | 10.57 | 18% | -4% |
| Greater Fifth Ward | 9.80 | 43% | 21% |
| Greater OST / South Union | 19.79 | 77% | 55% |
| Greater Third Ward | 10.89 | 59% | 37% |
| Independence Heights | 13.25 | 33% | 11% |
| Kashmere Gardens | 10.08 | 59% | 37% |
| Northside / Northline | 6.83 | 8% | -14% |
| South Park | 11.46 | 64% | 42% |
| Sunnyside | 15.17 | 75% | 53% |
| Trinity / Houston Gardens | 14.87 | 63% | 41% |

39.     In addition, a closer look at the predominantly Black neighborhoods of Houston further reveals HPD's pattern of targeting Black communities. As part of that evaluation, this Petition relies on the review of the following groups of neighborhoods:

**Group 1: Super Neighborhoods with a Black population greater than 50%[33]**

---

[33] This group of neighborhoods makes up approximately 11.33% of the City's super neighborhood population.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 20 of 74

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562687 - Page 21 of 74

- Acres Homes,
- East Houston,
- East Little York / Homestead,
- Fort Bend Houston,
- Greater OST / South Union,
- Greater Third Ward,
- Kashmere Gardens,
- MacGregor,
- Settegast,
- South Acres / Crestmont,
- South Main,
- South Park,
- Sunnyside, and
- Trinity / Houston Gardens



**Group 2: Super Neighborhoods with a with a majority/plurality Black population[34]**

- The Super Neighborhoods from Group #1,
- Brays Oaks,
- IAH/Airport Area,
- Pleasantville,
- Westchase,
- and Willowbrook



**Group #3: Super Neighborhoods with a with a Black population greater than 30%[35]**

---

[34] This group of neighborhoods makes up approximately 17.35% of the City's super neighborhood population.

[35] This group of neighborhoods makes up approximately 22.96% of the City's super neighborhood population.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 22 of 74

- • The Super Neighborhoods from Groups #1 and #2;
- • Central Southwest,
- • Clinton Park Tri-Community
- • Greater Fifth Ward,
- • Independence Heights, and
- • Minnetex



40.    Notably, Super Neighborhoods in Group #1 – areas with a Black population greater than 50% of the population of the neighborhood– make up approximately 11.52% of the population of the City's super neighborhood in 2020.   Despite that, approximately 30.18% of high-speed chases occurred in these neighborhoods – an amount over 18.66% more than the baseline population.  Tellingly, based on this evaluation, the City has 3.61 high-speed chases per 10,000 residents. Yet in Group #1, the Black majority neighborhoods have 9.46 high-speed chases per 10,000 residents – over 2.5 times the average rate. Further confirming this data, the chases withing Group #1 were 16.96 standard deviations from the average chase for the city of Houston based on the population of Group #1.

41.    Similarly, neighborhoods in Group #2 – neighborhoods with a majority/plurality Black population – make up approximately 16.76% of the population of the City's Super Neighborhoods. Despite that, approximately 34.23% of high-speed chases occurred in these neighborhoods – an amount over 17.47% more than the baseline population.  Even worse, the neighborhoods in Group #2 have 7.38 high-speed chases per 10,000 residents.

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562687 2 - Page 23 of 74

Further, the chases within Group #2 were 13.35 standard deviations from the average chase for the city of Houston based on the population of Group #2.

42.     Finally, Group #3 — neighborhoods with a Black population greater than 30% of the population of the neighborhood – also mirrors the same pattern as Groups #1 and #2. More pointedly, Groups #3 makes up 22.21% of the population of the City's Super Neighborhoods.  Yet again, approximately 41.47% of high-speed chases occurred in these neighborhoods – an amount over 19.26% more than the percentage of the population.  The neighborhoods in Group #3 have 6.74 high-speed chases per 10,000 residents – more than double the city's average.  Further confirming this data, the chases within Group #2 were 13.23 standard deviations from the average chase for the City based on the population of Group #2.

| Super Neighborhood Group | High speed chases per 10k (Houston Average 3.59) | The number of standard deviations between (a) the chases and (b) the expected chases based on the mean of the population of the neighborhoods |
|---|---|---|
| Super Neighborhoods where Black residents make up more than 50% of the neighborhood | 9.46 | 16.69 |
| Super Neighborhoods where Black residents make up the largest demographic | 7.38 | 13.36 |
| Super Neighborhoods where Black residents make up more than 30% of the neighborhood | 6.74 | 13.23 |

43.     In comparison to the treatment of Black neighborhoods, Houston's predominantly white neighborhoods were targeted with far fewer chases. Indeed, these neighborhoods saw

23

two to three times less than the average number of chases in the City. More pointedly, the

complaint also relies on the following white neighborhoods:

| Group 1: Super Neighborhoods with a white population greater than 50% [36] | |
|---|---|
| <ul><li>Afton Oaks / River Oaks,</li><li>Braeswood,</li><li>Clear Lake,</li><li>Greater Heights,</li><li>Greater Uptown,</li><li>Greenway / Upper Kirby,</li><li>Kingwood Area,</li><li>Lake Houston,</li><li>Medical Center Area,</li><li>Memorial,</li><li>Meyerland Area,</li><li>Midtown,</li><li>Museum Park,</li><li>University Place, and</li><li>Washington Avenue Coalition / Memorial Park.</li></ul> |  |
| Group 2: Super Neighborhoods with a with a majority/plurality white population [37] | |

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562 6872 - Page 24 of 74

---

[36] This group of neighborhoods makes up approximately 20.08% of the City's super neighborhood population.

[37] This group of neighborhoods makes up approximately 30.31% of the City's super neighborhood population.

- The Super Neighborhoods from Group #1,
- Addicks Park Ten,
- Briar Forest,
- Central Northwest,
- Eldridge / West Oaks,
- Fourth Ward,
- Lazybrook / Timbergrove
- Neartown – Montrose, and
- Near Southwest.



### Group 3: Super Neighborhoods with a with a white population greater than 30% [38]

- The Super Neighborhoods from Groups #1 and #2;
- Astrodome Area,
- Downtown,
- Spring Branch East,
- Spring Branch North,
- Spring Branch West,
-  and Westbury.



---

[38] This group of neighborhoods makes up approximately 36.21% of the City's super neighborhood population.

25

44.     Super Neighborhoods in Group #1 – areas with a white population greater than 50% of the population of the neighborhood– make up approximately 20.08% of the population of the City's super neighborhood. Despite that, approximately 7.61% of high-speed chases occurred in these neighborhoods – an amount of 12.47% less than the population.  In contrast to the Black neighborhoods, Black majority neighborhoods have 1.37 high-speed chases per 10,000 residents – over 2.5 times less than the average rate.  Further confirming this data, the chases withing Group #1 were 8.89 standard deviations less than the average chase for the City based on the population of Groups #1. Likewise, neighborhoods with a white population greater than 50% neighborhoods were 7 times less likely than neighborhoods with a Black population greater than 50%.

45.     Like Group #1, Super Neighborhoods in Group #2 – neighborhoods with a majority/plurality white population –make up approximately 30.31 % of the population of the City's Super Neighborhoods.   Despite that, approximately 13.5% of high-speed chases occurred in these neighborhoods – an amount over 16.81% more than the baseline population.  Even worse, the neighborhoods in Group #2 have 1.60 high-speed chases per 10,000 residents.  As a result, chases within Group #2 were 10.44 standard deviations less than the average chase for Houston, based on the population of Group #2.

46.     Group #3 — neighborhoods with a white population greater than 30% of the population of the neighborhood –makes up 36.21% of the population of the City's Super Neighborhoods.  Yet again, approximately 18.16% of high-speed chases occurred in these neighborhoods – an amount over 18.05% less than the percentage of the population.  The

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 26 of 74

neighborhoods in Group #3 have a 1.81 chase rate per 10,000 residents. Further confirming this data, the chases within Group #2 was 10.72 standard deviations less than the average chase for Houston, based on the population of Group #2.

| Super Neighborhood Group | High speed chases per 10k (Houston Average 3.59) | Standard Deviation between chases and actual population of the neighborhoods |
|---|---|---|
| Super Neighborhoods where white residents make up the largest demographic | 1.60 | -10.44 |
| Super Neighborhoods where white residents make up more than 50% of the neighborhood | 1.37 | -8.89 |
| Super Neighborhoods where white residents make up more than 30% of the neighborhood | 1.81 | -10.72 |

47.     In contrast, to the white and Black neighborhoods, the Hispanic population – in particular, neighborhoods with greater than 50% Hispanic residents – tracks the numbers of chases for the demographic percentages of those neighborhoods. This is based on the following Super Neighborhoods:

| Group 1: Super Neighborhoods with a Hispanic population greater than 50%[39] |
|---|
| Alief, Braeburn, Carverdale, Clinton Park Tri-Community, Denver Harbor / Port Houston, Eastex - Jensen Area, Edgebrook Area, Eldridge / West Oaks, Fairbanks / Northwest Crossing, Fondren Gardens, Golfcrest / Bellfort / Reveille, Greater Eastwood, Greater Fifth Ward, Greater Greenspoint, Greater Hobby Area,  Greater Inwood, Gulfgate Riverview / Pine Valley, Gulfton, Harrisburg / Manchester, Hidden Valley, Hunterwood, Independence Heights, Langwood, Lawndale / Wayside, Magnolia Park, Meadowbrook / Allendale, Near Northside, Northside/Northline, Park Place, Pecan Park, Pleasantville Area, Second Ward, Sharpstown, South Belt / Ellington, Spring Branch |

---

[39] This group of neighborhoods makes up approximately 44.17% of the City's super neighborhood population.

27

Central, Spring Branch East, Spring Branch West, and Westwood.



48.   Next, Super Neighborhoods with a Hispanic population greater than 50% of the population of the neighborhoods make up approximately 42% of the population of the City's super neighborhood. Despite that, approximately 44.02% of high-speed chases occurred in these neighborhoods – an amount of approximately 1/10 of the standard deviation.   Similarly, these Super Neighborhoods have 3.76 high speed chases per 10,000 residents, while the average rate for the City of Houston is 3.59. As a result, HPD chases track the exact demographics and population for these neighborhoods.

| Super Neighborhood Group | High speed chases per 10k | Standard Deviation between chases and |
|---|---|---|

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562672 - Page 28 of 74

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 29 of 74

|  | (Houston Average 3.59) | actual population of the neighborhoods |
|---|---|---|
| Super Neighborhoods where Hispanic residents make up more than 50% of the neighborhood | 3.77 | 1.06 |

49.    In addition, the high-speed chases tracked over the maps of the city of Houston – in particular the Southwest, East, and Northeast Houston areas – also virtually mirror the Black population patterns for those areas. The data below include comparisons of the Black population of Houston on the left compared to the high-speed chases for those same areas to the right.



29

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562687.2 - Page 30 of 74



Put simply, HPD's high-speed pursuits in 2020 occurred largely in the exact same areas as the Black population of Houston.

50.    As a result, HPD, through its custom, training, lack of discipline, and supervision, has created a pattern, practice, custom, or usage that authorizes and encourages officers to profile Black neighborhoods when evaluating whether to initiate a high-speed pursuit.  This

includes evaluating the social image and the population base – an explicit part of HPD's training.

**E. HPD encourages its officers to racially profile by (1) failing to ever take disciplinary action against officers for allegations of racial profiling, (2) establishing a disciplinary process that encourages profiling, and (3) limiting any meaningful review of allegations of racial profiling**

51.     Combined with the data above, HPD, through its Chief of Police, has established inadequate policies and customs of investigating, punishing, supervising, and disciplining police officers who racially profile either drivers or neighborhoods. As a result, HPD's policy of authorizing racial profiling in high-speed chases has become a persistent and widespread practice of the city and its employees and thus constitutes a custom that represents the City of Houston's policy. In addition, this failure has become a "moving force" behind an unconstitutional use of high-speed chases and deadly vehicle crashes caused by police officers.

52.     This pattern and practice of unconstitutional use of racial profiling is not an accident. Rather, through its policies, enforcement, and investigations of racial profile allegations, HPD has deliberately created and encouraged a pattern of racial profiling by its officers. For example, for any complaints or charges regarding racial profiling and collisions caused by high-speed chases, (1) HPD does not question the officer until the officer has spoken with an attorney; (2) the officer is allowed to do an unrecorded "walkthrough" of the scene, while accompanied by an attorney; (3) and the officer is given forty-eight hours to answer written questions with an attorney's assistance.  Notably, this process is "entirely different" from how HPD investigates vehicle crashes/crimes of

31

civilians or charges regarding racial related crimes.  As explained by HPD's Corporate

Representative in a different matter:

> 76
> 20   Q.   Now, the way the Houston Police Department
> 21   investigates officers involved in serious injury or
> 22   death cases is entirely different from the way it
> 23   investigates civilians?
> 25      A.   That's correct.
>
> 77
> 1   Q.   (BY MR. DOYLE) What are some of the
> 2   differences, custom and practices, in the way police
> 3   officer serious injury or death incidents are
> 4   investigated that you can share with us?
> 5      A.   We are required to give them 48 hours notice
> 6   to be able to respond.  And so they are required to get
> 7   that time frame to discuss with their lawyers before
> 8   they give us a statement of what happened.
> 9      Q.   So, absolutely, positively one custom and
> 10   practice that you can share with us is, you do not even
> 11   attempt to interview officers involved in serious
> 12   injuries or deaths?
> 14      A.   Not until they are served with a 48.
> 15   Q.   (BY MR. DOYLE) At the scene, absolutely,
> 16   positively do not even attempt to interview officers
> 17   involved in a serious injury or death vehicular
> 18   investigation?
> 20      A.   Only when they have the 48.  The only thing
> 21   we're allowed to ask them is what lane they were in and
> 22   the direction of travel.[40]

Furthermore, as part of the "walkthrough," HPD further authorizes the involved officers to

review the body camera footage prior to making a statement. Indeed, before asking written

questions, investigators provide the officers with all of the evidence that HPD has so the

officer can explain away the evidence in the written response, including any written witness

---

[40] Exhibit C.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 32 of 74

statements.  In addition, if HPD requests an investigation interview, HPD must conduct the interview either during normal working hours or HPD Must pay the officer overtime.[41]   In other words, unlike civilians, HPD pays its officer when they participate in investigations, including providing interviews to HPD.

53.    Following the above, HPD's handling and customs regarding disciplinary matters, further encourages and establishes the pattern of racial profiling.  Based on this process, police officers are able to modify their version of the story prior to ever making a statement. In contrast, civilians accused of similar misconduct – whether racial crimes or traffic crashes – are certainly not given these evidentiary advantages that HPD provides its law enforcement.

54.    Furthermore, HPD also limits the amount of time that it can impose terms of suspensions on its officers. More pointedly, HPD may only suspend officers if they acted within 180 days from the date it discovered or became aware of the misconduct.  Even worse, for an indefinite suspension HPD is limited to 180 days regardless of when it discovered or became aware of the misconduct.

55.    Not surprisingly, HPD has failed to ever meaningfully discipline any officer for racial profiling related charges. More specifically, in evaluating discipline, HPD includes determinization regarding the "disposition of complaints" as follows:

- Exonerated:  Incident occurred but wawas lawful and proper;

- Never Formalized: Complainants did not submit a formal sworn statement;

---

[41] General order 200-03

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 33 of 74

- Not Sustained: the evidence was insufficient to either prove or disprove the allegation;

- Sustained: Evidence is sufficient to prove the allegation. Any sustained allegation, regardless of its classification, may form the basis for disciplinary action.

- Unfounded: Evidence is false or not factual.[42]

Yet, in the last 10 years, HPD has never sustained a claim of racial profiling, much less a high-speed chase complaint related to racial profiling. Based on the data available, HPD has received approximately 47 complaints regarding racial profiling since 2010.[43]  Of those complaints, HPD concluded that 28 were "unfounded," 2 were "pending," 3 were "exonerated," 8 were "not sustained," and 0 were "sustained."   In contrast to the zero sustained findings for racial profiling complaints, HPD generally has sustained approximately 25% of complaints made against officers.   By example, in 2021, HPD sustained 160 of the 654 complaints.

56.    In addition, as part of its legal obligation under Texas and federal law, HPD mandates that the Chief of Police review the compilation of data regarding racial profiling. In other words, the City's final policy maker is responsible for reviewing and confirming the data regarding racial profiling. This includes the rate of traffic stops and the final

---

[42] *See* HPD General Order 200-03.
[43] *See* HPD's Annual racial profiling data. For the year 2017, HPD did not identify any complaint for racial profiling. It is unclear if HPD either did not identify the complaints or that no complaints were made.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 34 of 74

determinations regarding racial profiling complaints made against HPD officers. As part of that, HPD has represented that "there is no substantial, statistically significant evidence of racial profiling against any race/ethnic group represented in Houston." Even further, "there exists neither evidence of systemic bias in the practices of Houston police officers nor evidence that individual officers in the department have engaged in racial profiling."

57.     The City's final policy maker, HPD's Chief of Police, has reviewed and confirmed the custom, policy, practice, and usage that authorizes and encourages officers to engage in racial profiling. Indeed, HPD's final policymakers are aware that HPD has never sustained a claim of racial profiling. Combined with that, the final policymakers are also aware that the disciplinary process at HPD encourages officers to racially profile drivers and neighborhoods because officers know that they will never be punished for racial profiling.

**F.  HPD's racial profiling causes the death of Carl Wiley**

58.     Just after midnight on February 7, 2022, HPD patrol officers were patrolling near 10400 Richmond Avenue, Houston, Texas – an area in the predominantly Black neighborhood of Westchase.  HPD Officers Trevino and Salazar then spotted a white Cadillac STS parked at a gas station.  HPD saw that the vehicle was operated by a Black man – Cameron Rogers – with another Black man and a Hispanic woman present. The officer then allegedly spotted an open container. Profiling Rogers, the HPD officers turned on their emergency lights and approached the vehicle.  In response, Rogers fled.  HPD then initiated a high-speed chase of the vehicle on Richmond and headed north on Wilcrest.

35

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562872 - Page 35 of 74

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 36 of 74

59.     Instead of taking precaution in light of the minor violation, HPD profiled the driver

based on his race (Black) and the neighborhood based on its racial demographics (majority

Black). As a result, HPD initiated a chase of the suspects based on an open containers

violation – a minor criminal violation. As HPD chased the driver, the suspect ran through

a red light and struck Carl Wiley Jr.'s vehicle. In all, HPD's racial profiling caused the

death of Mr. Wiley.



44

60.     Prior to the chase, HPD knew that nature of criminal activity was not the type of

conduct that required "immediately tak[ing] the suspect into custody," when weighed

against the "possible risks to the public resulting from the pursuit." Likewise, HPD and

other officers driving the vehicle also knew that "[c]ollisions are a predictable outcome of

police pursuits."  And that a large portion of pursuits end in collisions, including harm to

---

44     https://www.khou.com/article/news/crime/innocent-driver-dies-in-police-chase-on-wilcrest-houston/285-a57e3d84-2bf1-46f0-874b-68a9e7c1db8e

third parties.   Despite that knowledge, HPD intentionally decided to profile the neighborhood and suspect, knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury. Put differently, HPD maintained a purpose to cause harm – racially profiling the driver and suspect – unrelated to the legitimate object of arrest.  Based on that, HPD's conduct shocks the conscience.

### G. **HPD's racial profiling causes the death of Michael Wayne Jackson**

61.    On December 4, 2021, HPD had initiated a high-speed chase of five Black suspects under the age of 18 who had allegedly, stolen a vehicle at 3313 Tangerine Street. Specifically, the suspects stole a women's car at 7510 Belfort Avenue in the parking lot of a Fiesta grocery.  Through the internal GPS on the vehicle, the owner was able to identify to the police that the vehicle was located at Tangerine Street. Ultimately, HPD spotted the truck at 9100 Scott Street, and a chase shortly ensued.

62.    Although the initial chase in pursuit of the suspects had ended, HPD Officer Orlando Hernandez and his partner initiated their own pursuit to join the chase. Notably, Hernandez did not have a visual on the vehicle and was not part of the primary pursuit. Rather, Hernandez was a "participating unit" as defined by general order 600-04.  Even worse, HPD and its field supervisor had not authorized or assigned Hernandez to engage in the pursuit.  And Hernandez had not sought permission to engage in the pursuit. Despite not being in a close proximity to the suspect and not being the primary or secondary response unit, Hernandez still drove his cruiser between 80 to 100 miles per hour down Reed Road in the predominantly Black neighborhood of Sunnyside. In that area, the speed limit is 40

37

miles per hour. Hernandez recklessly drove at these high speeds despite the slippery condition from a recent rain shower. And although Hernandez activated his windshield wipers as he drove, Hernandez's driving was seriously dangerous based on the conditions of the road.  Furthermore, the primary drivers had already flagged that the chase involved four-five Black suspects.  As a result, Hernandez knew that he was pursing Black suspects and in a predominantly Black neighborhood.

63.     At that same time, Michael Wayne Jackson was walking on a public sidewalk to get a haircut near the intersection of Reed Road and Scott. As Hernandez dangerously and intentionally approached Scott Street at a speed double the legal limit, Hernandez violently swerved at the intersection and veered the car onto the sidewalk. Hernandez then struck and killed Mr. Jackson, who was walking on the sidewalk to his barber. Hernandez then slammed the vehicle into a dumpster.



For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 38 of 74

64.     HPD's internal records confirmed that Hernandez was "traveling at a[n] unsafe speed," "performed a faulty evasive action," which caused him to go "on the sidewalk."



Because of this incident, Hernandez received thirty days suspension and one-year probation.

65.     Prior to the chase, Hernandez understood that he was not the pursuing officer and that driving recklessly in the rain would endanger innocent bystanders. Hernandez also knew that the officers had GPS tracking for the vehicle and that officers were already following the suspects. Put differently, Hernandez did not need to drive at unsafe and reckless rates of speed because he knew the location of the vehicle and knew that the conditions did not justify his conduct.  Despite that knowledge, Hernandez intentionally drove recklessly based on his profiling of the suspects and the neighborhood.

66.     Likewise, HPD and Hernandez knew that "[c]ollisions are a predictable outcome of

39

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 39 of 74

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 40 of 74

police pursuits." In addition, Hernandez knew that a large portion of pursuits end in collisions, including harm to third parties. Despite that knowledge, Hernandez and his partner intentionally decided to profile the neighborhood and suspect, knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury. Put differently, HPD maintained a purpose to cause harm – racially profiling the driver and suspect – unrelated to the legitimate object of arrest. Based on that, the City's conduct shocks the conscience.

## H.  **HPD's racial profiling causes the death of Rashad Henderson**

67.     On December 17, 2020, HPD officers received a call a mother reporting that her teenage daughter, a Black 16-year-old girl, had taken her car and was running away from home.  HPD also learned that the teenager may be suffering from a mental breakdown. HPD then spotted the teenager approximately 6 miles north of El Dorado at Highway 3. Knowing the situation, the police saw the car take off at a high rate of speed. Importantly, because the vehicle was owned by the mother, the officers could have simply tracked the car via GPS.  Instead, HPD sent multiple units to chase the 16-year-old in a high-speed pursuit.  HPD's chase lasted approximately one hour. During the unsafe chase, the teenager drove hazardously while also speeding at approximately 100 miles per hour. Also, during the chase, to avoid the officers, the teenager continuously turned her headlights on and off.

68.     At the end of the chase, HPD officer finally accepted what they should have known at the beginning– they had created an incredibly dangerous situation that presented a substantial risk to the public.  Indeed, an HPD officer noted that they were going to stop

the chase because "it's not worth it to me. She's driving too crazy."  Another officer further

noted "[I]f we can get her while she's stopped, we'll get her while she's stopped."  Despite

this knowledge, HPD failed to disclose the call-off notice to officers in assisting

jurisdictions, which caused the teenager to continue to drive in an unsafe, erratic manner.

69.     Ultimately, the teenager turned north on Galveston Road, where she struck Rashad

Henderson's vehicle at a high rate of speed, thereby pushing Mr. Henderson's vehicle off

the road and into a tree. According to HPD, the teenager "was going at such a high rate of

speed that when she hit the vehicle, there was a lot of damage. She hit them going very

fast." Ultimately, the wreckage and damage to the vehicle displays the severity of the

collision.



As a result, HPD's pattern, practice, custom, or usage caused the death of Mr. Henderson.

70.     Prior to the chase, HPD knew that this chase would endanger innocent bystanders.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 41 of 74

The officers also knew that HPD had GPS tracking for the vehicle and that a helicopter was already following the suspects. Put differently, HPD did not need to pursue the teenager and cause her to drive at unsafe and reckless rates of speed. Despite that knowledge, HPD intentionally chose to pursue the vehicle based on their profiling of the driver.

71.     Likewise, HPD and the other officers driving the vehicle also knew that "[c]ollisions are a predictable outcome of police pursuits."  Indeed, the officers involved in the chase knew from HPD's training that the more vehicles that are part of a high-speed chase, the more likely a crash will occur. In addition, HPD knew that a large portion of pursuits end in collisions, including harm to third parties. Despite that knowledge, the officers intentionally decided to profile the driver while knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury.  Put differently, HPD maintained a purpose to cause harm – racially profiling the driver and suspect – unrelated to the legitimate object of arrest.  Based on that, the City's conduct shocks the conscience.

### VII.
### First Cause of Action: 42 U.S.C. § 1983 – Municipal liability for a policy, custom usage, or ratification against the City of Houston for Violations of the 14th Amendment Substantive Due Process Clause

72.     At all times relevant to the allegations in this First Amended Petition, the HPD officers identified in this Petition acted under color of state law and within the course and scope of their official duties and employment in their capacities as officers of the Houston Police Department.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 42 of 74

73.     Under the Fourteenth Amendment to the United States Constitution, Mr. Jackson, Mr. Wiley, and Mr. Henderson had an established constitutional right to substantive due process under the Fourteenth Amendment.

74.     The City's violation of the Mr. Jackson, Mr. Wiley, and Mr. Henderson's substantive due process rights caused their deaths. As a direct and proximate result of the violation of the constitutional rights by the City, Mr. Jackson, Mr. Wiley, and Mr. Henderson suffered general and special damages as alleged in this Petition and are entitled to relief under 42 U.S.C. §1983, 1988.

75.     The City took its actions based on the policy, practice, custom, and usage of the City, such that the City of Houston is liable. As a matter of both policy and practice, the City – through its final policymakers, including the chiefs of police – encourages and is thereby the moving force behind the very type of misconduct described in this Petition by failing to adequately supervise, control, and discipline its officers such that its failure to do so manifests deliberate indifference.

76.     As a matter of policy, custom, and practice, the City of Houston facilitates the very type of misconduct at issue in this Petition, by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe their actions will never be meaningfully scrutinized. In that way, the City of Houston directly encourages future racial profiling in high-speed chases and violations of subsntiative due process, such as those alleged in this lawsuit.

77.     Generally, as a matter of widespread practice so prevalent as to constitute municipal

43

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 44 of 74

policy, HPD officers violate – in a manner similar to those alleged by Jackson, Wiley, and Henderson – the constitutional rights of individuals on a regular basis.  Nevertheless, the City only investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases and never finds that officers engaged in this misconduct.

78.     It was the custom, practice, or usage of HPD to racially profile drivers and neighborhoods when engaging (or deciding not to engage) high speed chases.  In addition, it was the custom, practice, or usage of HPD to engage in high-speed pursuits and risking harm to innocent by-standers because, officers know that officers have little to no risk of harm when the engage in a high-speed pursuit.

79.     The City's conduct was egregious, deliberately indifferent, and so outrageous that it shocked – and continues to shock – the contemporary conscience. Specifically, the City made the decision to initiate high-speed chases based on racial bias and racial profiling of the drivers and neighborhoods in which its officers were driving. The City also made the decision to initiate the high-speed chases based on the miniscule risk to the officers while knowing that the high-speed chases placed a considerable risk on innocent third-parties like Plaintiffs.  This conduct shocks the conscience.

80.     The City, through its officers, knew that HPD officers had a miniscule risk of harm from the risk of a vehicle crash during a highspeed chase. The City, through its officers, also knew that high speed pursuits created a substantial risk of harm to the public and to the fleeing drivers. Indeed, the City knew that approximately one-third of HPD's pursuits

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 45 of 74

resulted in crashes. By initiating a highspeed chase based on HPD's racial profiling of the fleeing drivers and demographics of the neighborhoods, the City consciously intended to harm the rights of Plaintiffs and others within the community.  Indeed, the City intended to worsen Plaintiffs' legal rights and the legal rights of the drivers by racial profiling them. Likewise, HPD – and by extension, the City – intentionally acted to initiate high-speed chases for reasons that violated the Constitution, knowing that there was a high probability of harm.

81.     Based on the City's history, the City, through its officers, knew that racially profiling and violating subsntiative due process would exact no consequence for their actions. Indeed, the officers knew that the City frequently turned a blind eye to any allegations of racial profiling or unconstitutional high-speed pursuits.

82.     The City's conduct was not incidental to any legitimate objective of arresting or pursuing the fleeing drivers.  Rather, the City intended to profile and target the fleeing drivers, the neighborhoods, and Michael Wayne Jackson, Carl Wiley Jr. and Rashad Henderson based on their race and the City's racial profiling.

83.     Under Section 34-22 and 34-23 of the Houston City Ordinance, the Chief of Police, is one of the final policy makers for HPD. The Chief of Police ratified, affirmed, and approved this conduct by failing to take disciplinary action for claims of racial profiling or violations of subsntiative due process.

84.     As a result of the City's policies and practices, and the unjustified and unreasonable conduct of the City, Plaintiffs have suffered the injuries identified in this Petition, including

severe emotional distress, pain, and ultimately death.

## VIII.
## Second Cause of Action: 42 U.S.C. § 1983 – Municipal liability for a policy, custom usage, or ratification against the City of Houston for Violations of the 14th Amendment Equal Protection Clause and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.

85.     At all times relevant to the allegations in this Petition, the HPD officers identified in this Petition, acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers of the HPD.

86.     Under the Fourteenth Amendments, Jackson, Wiley, and Henderson had an established constitutional right to equal protection under the 14th amendment and to be free from racial discrimination under Title VI.

87.     Defendants' violation of their rights caused Jackson, Wiley, and Henderson's death. As a direct and proximate result of the violation of the constitutional rights by the Defendant, Plaintiffs suffered general and special damages as alleged in this Petition and are entitled to relief under 42 U.S.C. §1983, 1988.

88.     Defendant took their actions based on the policy, practice, custom, and usage of the City of Houston, such that Defendant City of Houston is liable.  As a matter of both policy and practice, the City of Houston, through its final policymakers, including the chiefs of police, encourages, and is thereby the moving force behind, the very type of misconduct described in this Petition, by failing to adequately supervise, control and discipline its officers such that its failure to do so manifests deliberate indifference and intentional conduct.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 46 of 74

89.    As a matter of policy, custom, and practice, the City of Houston facilitates the very type of misconduct at issue in this Petition, by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe their actions will never be meaningfully scrutinized. In that way, the City of Houston directly encourages future racial profiling in high-speed chases and violations of equal protection, such as those alleged in this lawsuit.

90.    Generally, as a matter of widespread practice so prevalent as to constitute municipal policy, HPD officers violate the constitutional rights of individuals in a manner similar to that alleged by Jackson, Wiley, and Henderson on a regular basis.  Nevertheless, the City of Houston only investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases and never finds that officers engaged in this misconduct.

91.    It was the custom, practice, or usage of HPD to racially profile drivers and neighborhoods when engaging (or deciding not to engage) high speed chases.  In addition, it was the custom, practice, or usage of HPD to engage in high-speed pursuits in neighborhoods that were predominantly Black, while not engaging in high-speed pursuits in neighborhoods that were predominantly white. Therefore, HPD treated similarly situated residents of the city of Houston differently.

92.    Defendant, through its officers, knew that HPD officers had a miniscule risk of harm from the risk of a vehicle crash during a highspeed chase. Defendant, through its officers, also knew that high speed pursuits created a substantial risk of harm to the public and to

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 47 of 74

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 48 of 74

the fleeing drivers. Indeed, Defendant knew that approximately one-third of pursuits resulted in crashes. By initiating a highspeed chase based on Defendant's racial profiling of the fleeing drivers and demographics of the neighborhoods, Defendant was consciously intended to harm the rights of Plaintiffs and others within the community.  Defendant intended to worsen Plaintiffs' legal rights and the legal rights of the drivers by racial profiling them. Likewise, Defendant intentionally acted to initiate high-speed chases for reasons that violated the Constitution, knowing that there was a high probability of harm.

93.    Defendant's conduct was not incidental to any legitimate objective of arresting or pursuing the fleeing drivers.  Rather, Defendant intended and targeted the fleeing drivers, the neighborhoods, and Plaintiffs based on their race and Defendant's racial profiling.

94.    Defendant treated Plaintiffs and Black residents and drivers of Houston differently from white drivers.  Specifically, Defendant profiled Black drivers when it decided whether to engage or not engage in a high-speed pursuit. Similarly, Defendant profiled Black neighborhoods in Houston, when it decided whether to engage or not engage in a high-speed pursuit.

95.    Under Section 34-22 and 34-23 of the Houston City Ordinance, the Chief of Police, is one of the final policy makers for HPD. The Chiefs of Police ratified, affirmed, and approved this conduct by failing to take disciplinary action for claims of racial profiling or violations of subsntiative due process.

96.    As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendants, Plaintiffs have suffered the injuries identified in this

48

Petition, including severe emotional distress, pain, and ultimately death. Defendant's discriminatory intent and pattern, practice, custom, or usage authorizing that discriminatory intent, was the moving force that caused their injuries.

## IX.
## Third Cause of Action: Municipal liability for a policy, custom usage, or ratification against the City of Houston for Violations of 42 USC § 1982

97.     At all times relevant to the allegations in this Petition, the HPD officers identified in this Petition, acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers of the HPD.

98.     Under the Fourteenth Amendments, Jackson, Wiley, and Henderson had an established right under 42 USC § 1982 to be free from discrimination and be treated equally and the right to use public and private property, including the use of their vehicles, sidewalks, and roads in their neighborhoods.  Defendants intentionally discriminated against Jackson, Wiley, and Henderson's right under 42 USC § 1982 to be free from discrimination and be treated equally and the right to use public and private property, including the use of their vehicles, sidewalks, and roads in their neighborhoods. Specifically, HPD's policies were the motivating factor in the death of Jackson, Wiley, and Henderson based on HPD's treating of Jackson, Wiley, and Henderson's right to use property differently, including racial profiling of drivers, vehicles, neighborhoods, and roads.

99.     Defendants' violation of their rights caused Jackson, Wiley, and Henderson's death. As a direct and proximate result of the violation of the constitutional rights by the

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 49 of 74

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 50 of 74

Defendant, Plaintiffs suffered general and special damages as alleged in this Petition and are entitled to relief under 42 U.S.C. §1983, 1988.

100.   Defendant took their actions based on the policy, practice, custom, and usage of the City of Houston, such that Defendant City of Houston is liable.  As a matter of both policy and practice, the City of Houston, through its final policymakers, including the chiefs of police, encourages, and is thereby the moving force behind, the very type of misconduct described in this Petition, by failing to adequately supervise, control and discipline its officers such that its failure to do so manifests deliberate indifference and intentional conduct.

101.   As a matter of policy, custom, and practice, the City of Houston facilitates the very type of misconduct at issue in this Petition, by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe their actions will never be meaningfully scrutinized. In that way, the City of Houston directly encourages future racial profiling in high-speed chases and violations of equal protection, such as those alleged in this lawsuit.

102.   Generally, as a matter of widespread practice so prevalent as to constitute municipal policy, HPD officers violate the constitutional rights of individuals in a manner similar to that alleged by Jackson, Wiley, and Henderson on a regular basis.  Nevertheless, the City of Houston only investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases and never finds that officers engaged in this misconduct.

103.   It was the custom, practice, or usage of HPD to racially profile drivers and neighborhoods when engaging (or deciding not to engage) high speed chases.  In addition, it was the custom, practice, or usage of HPD to engage in high-speed pursuits in neighborhoods that were predominantly Black, while not engaging in high-speed pursuits in neighborhoods that were predominantly white. Therefore, HPD treated similarly situated residents of the city of Houston differently.

104.   Likewise, Defendant's conduct was based on racial animus, in that Defendant intended to treat Plaintiffs and members of the Black population differently than other residents and occupants of the city of Houston. Defendant treated Plaintiffs and Black residents and drivers of Houston differently from white drivers.  Specifically, Defendant profiled Black drivers when it decided whether to engage or not engage in a high-speed pursuit. Similarly, Defendant profiled Black neighborhoods in Houston, when it decided whether to engage or not engage in a high-speed pursuit.

105.   Similarly, Defendant intended to discriminate against Plaintiffs. Defendant, through its officers, knew that HPD officers had a miniscule risk of harm from the risk of a vehicle crash during a highspeed chase. Defendant, through its officers, also knew that high speed pursuits created a substantial risk of harm to the public and to the fleeing drivers. Indeed, Defendant knew that approximately one-third of pursuits resulted in crashes. By initiating a highspeed chase based on Defendant's racial profiling of the fleeing drivers and demographics of the neighborhoods, Defendant was consciously intended to harm the rights of Plaintiffs and others within the community.  Defendant intended to worsen

51

Plaintiffs' legal rights and the legal rights of the drivers by racial profiling them. Likewise, Defendant intentionally acted to initiate high-speed chases for reasons that violated the Constitution, knowing that there was a high probability of harm.

106.    Defendant's conduct was not incidental to any legitimate objective of arresting or pursuing the fleeing drivers.  Rather, Defendant intended and targeted the fleeing drivers, the neighborhoods, and Plaintiffs based on their race and Defendant's racial profiling.

107.    Under Section 34-22 and 34-23 of the Houston City Ordinance, the Chief of Police, is one of the final policy makers for HPD. The Chiefs of Police ratified, affirmed, and approved this conduct by failing to take disciplinary action for claims of racial profiling or violations of subsntiative due process.

108.    As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendants, Plaintiffs have suffered the injuries identified in this Petition, including severe emotional distress, pain, and ultimately death. Defendant's discriminatory intent and pattern, practice, custom, or usage authorizing that discriminatory intent, was the moving force that caused their injuries.

## X.
### Fourth Cause of Action:  42 U.S.C. § 1983 – Municipal liability for failure to train, supervise, and discipline, and failure to create policies mandating training, supervision, and discipline against the City of Houston for Violations of the 14th Amendment Substantive Due Process Clause

109.    At all times relevant to the allegations in this Petition, HPD officers in the complaint acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers of the HPD. Under the Fourteenth Amendments,

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 52 of 74

Jackson, Wiley, and Henderson had an established constitutional right to substantive due process under the 14th amendment.

110.   Defendants' violation of their substantive due process rights caused Jackson, Wiley, and Henderson's death. As a direct and proximate result of the violation of the constitutional rights by the Defendant, Plaintiffs suffered general and special damages as alleged in this Petition and are entitled to relief under 42 U.S.C. §1983, 1988.

111.   In carrying out this misconduct, the City of Houston failed to train, supervise, and discipline, as well as failed to create policies mandating training, supervision, and discipline of officers related to racially profiling neighborhoods and drivers when evaluating whether to engage in a high-speed pursuit. Specifically, Defendant should have mandated that officers not engage in racially motivated factors, including evaluating the neighborhood and evaluating the race of the driver, when deciding to engage in a high-speed chase.  Likewise, Defendant should have mandated and trained regarding safer alternatives regarding high-speed pursuits, including utilizing pursuit reduction technology and limiting pursuits to primary and secondary vehicles responding to violent felonies. As a result of HPD's failure to train above, HPD officers repeatedly racially profiled drivers and neighborhoods and repeatedly utilized high-speed pursuits, despite safer alternatives.

112.   Instead of following these important procedures, HPD created a wide-spread custom and unwritten policy of encouraging racial profiling of neighborhoods and drivers when officers evaluated whether to engage a high-speed chase.

113.   By ignoring these egregious failures, including its lack of adequate policies,

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 53 of 74

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 54 of 74

supervision, oversight, and training, HPD, through the Chief of Police, was deliberately indifferent that its failure would be the moving force for Constitutional violations. In particular HPD, including the Chief of Police, knew that high-speed pursuits presented substantially greater risk of crashes.  HPD, including the Chief of Police, also knew that officers were more likely to escalate or instigate high speed chases based on racial profiling, even where such a high-speed chase was not reasonable or safer alternatives existed. HPD also knew that mandating the rules and procedures identified above, would prevent the deaths of innocent by-standers of high-speed pursuits, including Jackson, Wiley, and Henderson.

114.   Because of HPD's approval and ratification of these clear violations was consistent with the HPD policy to refuse to enforce any disciplinary measures and ratification of similar conduct, HPD's approval was also the moving force behind, the violations of subsntiative due process.

115.   Similarly, the City's past ratification, approval, and toleration of similar illegal conduct, caused and was the moving force behind the HPD Defendants' violation of substantive due process against Jackson, Wiley, and Henderson. As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendant, Plaintiffs have suffered the injuries identified in this Petition, including severe emotional distress, pain, and ultimately death. As a result of the City of Houston's failure, Plaintiffs have suffered the injuries identified in this Petition, including severe emotional distress, pain, and ultimately death.

## XI.
### Fifth Cause of Action:  42 U.S.C. § 1983 – Municipal liability for failure to train, supervise, and discipline, and failure to create policies mandating training, supervision, and discipline against the City of Houston for Violations of the 14th Amendment Equal Protection Clause and Title VI of the Civil Rights Act of 1964

116.    At all times relevant to the allegations in this Petition, HPD officers at issue in the complaint acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers of the HPD. Under the Fourteenth Amendment and Title VI of the Civil Rights Act, Jackson, Wiley, and Henderson had an established constitutional right to equal protection and to be free from discrimination.

117.    Defendants' violation of their rights caused Jackson, Wiley, and Henderson's death. As a direct and proximate result of the violation of the constitutional rights by the Defendant, Plaintiffs suffered general and special damages as alleged in this Petition and are entitled to relief under 42 U.S.C. §1983, 1988.

118.    In carrying out this misconduct, the City of Houston failed to train, supervise, and discipline, as well as failed to create policies mandating training, supervision, and discipline of officers related to racially profiling neighborhoods and drivers when evaluating whether to engage in a high-speed pursuit. Specifically, Defendant should have mandated that officers not engage or evaluate racially motivated factors, including evaluating the neighborhood and evaluating the race of the driver, when deciding to engage in a high-speed chase.  Likewise, Defendant should have mandated and trained regarding safer alternatives regarding high-speed pursuits, including utilizing pursuit reduction technology and limiting pursuits to primary and secondary vehicles responding to violent

55

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 55 of 74

felonies. As a result of HPD's failure to train above, HPD officers repeatedly racially profiled drivers and neighborhoods and repeatedly utilized high-speed pursuits, despite safer alternatives.

119.    Instead of following these important procedures, HPD created a wide-spread custom and unwritten policy of encouraging racial profiling of neighborhoods and drivers when officers evaluated whether to engage a high-speed chase.  By ignoring these egregious failures, including its lack of adequate policies, supervision, oversight, and training, HPD, through the Chief of Police, was deliberately indifferent that its failure would be the moving force for Constitutional violations. In particular HPD, including the Chief of Police, knew that high-speed pursuits presented substantially greater risk of crashes.  HPD, including the Chief of Police, also knew that officers were more likely to escalate or instigate high speed chases based on racial profiling, even where such a high-speed chase was not reasonable or safer alternatives existed. HPD also knew that mandating the rules and procedures identified above, would prevent the deaths of innocent by-standers of high-speed pursuits, including Jackson, Wiley, and Henderson.

120.    Because of HPD's approval and ratification of these clear violations was consistent with the HPD policy to refuse to enforce any disciplinary measures and ratification of similar conduct, HPD's approval was also the moving force behind, the violations of equal protection and the right to be free from discrimination.

121.    Similarly, the City's past ratification, approval, and toleration of similar illegal conduct, caused and was the moving force behind the HPD Defendants' violation of equal

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 56 of 74

protection and the right to be free from discrimination against Jackson, Wiley, and Henderson. As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendant, Plaintiffs have suffered the injuries identified in this Petition, including severe emotional distress, pain, and ultimately death. As a result of the City of Houston's failure, Plaintiffs have suffered the injuries identified in this Petition, including severe emotional distress, pain, and ultimately death.

## XII.
### Sixth Cause of Action:  42 U.S.C. § 1983 Municipal liability for failure to train, supervise, and discipline, and failure to create policies mandating training, supervision, and discipline against the City of Houston for Violations of 42 USC § 1982

122.   At all times relevant to the allegations in this Petition, HPD officers at issue in the complaint acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers of the HPD. Under 42 USC § 1982, Jackson, Wiley, and Henderson had a right to be free from discrimination and be treated equally and the right to use public and private property, including the use of their vehicles, sidewalks, and roads in their neighborhoods. Defendants intentionally discriminated against Jackson, Wiley, and Henderson's right under 42 USC § 1982 to be free from discrimination and be treated equally and the right to use public and private property, including the use of their vehicles, sidewalks, and roads in their neighborhoods. Specifically, HPD's policies were the motivating factor in the death of Jackson, Wiley, and Henderson based on HPD's treating of Jackson, Wiley, and Henderson's right to use

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 57 of 74

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 58 of 74

property differently, including racial profiling of drivers, vehicles, neighborhoods, and roads.

123. Defendants' violation of their rights caused Jackson, Wiley, and Henderson's death. As a direct and proximate result of the violation of the constitutional rights by the Defendant, Plaintiffs suffered general and special damages as alleged in this Petition and are entitled to relief under 42 U.S.C. §1983, 1988.

124. In carrying out this misconduct, the City of Houston failed to train, supervise, and discipline, as well as failed to create policies mandating training, supervision, and discipline of officers related to racially profiling neighborhoods, roads, streets, cars, and drivers when evaluating whether to engage in a high-speed pursuit. Specifically, Defendant should have mandated that officers not engage or evaluate racially motivated factors, including evaluating the neighborhood and evaluating the race of the driver, when deciding to engage in a high-speed chase. Likewise, Defendant should have mandated and trained regarding safer alternatives regarding high-speed pursuits, including utilizing pursuit reduction technology and limiting pursuits to primary and secondary vehicles responding to violent felonies. As a result of HPD's failure to train above, HPD officers repeatedly racially profiled drivers and neighborhoods and repeatedly utilized high-speed pursuits, despite safer alternatives.

125. Instead of following these important procedures, HPD created a wide-spread custom and unwritten policy of encouraging racial profiling of neighborhoods, roads, streets, sidewalks, and drivers when officers evaluated whether to engage a high-speed chase. By

ignoring these egregious failures, including its lack of adequate policies, supervision, oversight, and training, HPD, through the Chief of Police, was deliberately indifferent that its failure would be the moving force for Constitutional violations. In particular HPD, including the Chief of Police, knew that high-speed pursuits presented substantially greater risk of crashes.  HPD, including the Chief of Police, also knew that officers were more likely to escalate or instigate high speed chases based on racial profiling, even where such a high-speed chase was not reasonable or safer alternatives existed. HPD also knew that mandating the rules and procedures identified above, would prevent the deaths of innocent by-standers of high-speed pursuits, including Jackson, Wiley, and Henderson.

126.    Because of HPD's approval and ratification of these clear violations was consistent with the HPD policy to refuse to enforce any disciplinary measures and ratification of similar conduct, HPD's approval was also the moving force behind, the violations of Section 1982.

127.    Similarly, the City's past ratification, approval, and toleration of similar illegal conduct, caused and was the moving force behind the HPD Defendants' violation of the right to be free from discrimination against Jackson, Wiley, and Henderson. As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendant, Plaintiffs have suffered the injuries identified in this Petition, including severe emotional distress, pain, and ultimately death. As a result of the City of Houston's failure, Plaintiffs have suffered the injuries identified in this Petition, including severe emotional distress, pain, and ultimately death.

59

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 59 of 74

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 60 of 74

## XIII.
## Seventh Cause of Action: Wrongful Death

128.    As described in the preceding paragraphs, Defendants' actions toward Jackson, Henderson, and Wiley violated their constitutional rights and wrongfully caused their deaths, and without those actions, their deaths would not have occurred.

129.    Prior to their deaths, Jackson, Henderson, and Wiley suffered serious personal injuries including but not limited to severe pain and emotional distress during the period after the vehicle crash but before they died. In addition, Plaintiffs suffered from pecuniary loss as a result of the wrongful death of Jackson, Henderson, and Wiley. In addition, Plaintiffs suffered loss of companionship and mental anguish as a result of the wrongful death of Jackson, Henderson, and Wiley.

130.    Plaintiffs have standing to assert this claim pursuant to Tex. Civ. Prac. & Rem. Code § 71.004.

## XIV.
## Eighth Cause of Action: Survival claim

131.    As described in the preceding paragraphs, Defendants' actions toward Jackson, Henderson, and Wiley violated their constitutional rights and wrongfully caused their deaths, and without those actions, their deaths would not have occurred.

132.    Prior to their death, Jackson, Henderson, and Wiley suffered serious personal injuries including but not limited to severe pain and emotional distress during the period after the vehicle crashes but before they died. In addition, Plaintiffs suffered from pecuniary loss as a result of the wrongful death of Jackson, Henderson, and Wiley.

133.    Plaintiffs, the Estates of Jackson, Henderson, and Wiley, through the administrators of their estates, have standing to assert this claim pursuant to Tex. Civ. Prac. & Rem. Code § 71.021.

## XV.
## Ninth Cause of Action: Negligence brought by the Jackson Plaintiffs

134.    The Jackson Plaintiffs would show that the Incident was caused by the negligence of the City of Houston as detailed below.  The officer who struck and killed Mr. Jackson had a duty to exercise the same care as a reasonably careful driver would use to avoid harm to others under similar circumstances.  As a result of the collision between Michael Wayne Jackson, a pedestrian, and a motor vehicle operated by an officer employed by the City of Houston, Mr. Jackson was killed.  Thus, Mr. Jackson's death was proximately caused by the officer's negligent acts and/or omissions, including but not limited to one or more of the following actions taken with conscious indifference or reckless disregard for the safety of others:

a.    Failing to keep such a lookout as would have been kept by a person exercising ordinary care and prudence under the same or similar circumstances.

b.    Traveling at a faster rate of speed than a person exercising ordinary care and prudence would have traveled under the same or similar circumstances, in violation of the applicable provisions of V.T.C.A. Transportation Code, § 545.351 and 545.352 (2001 supp).

c.    Failing to make such a timely and proper application of the brakes as would have been made by a person exercising ordinary care and prudence under the same or similar circumstances.

d.    Failing to make such turning movements of the vehicle in question as would

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 61 of 74

have been made by a person exercising ordinary care and prudence under the same or similar circumstances.

     e.    Failing to yield the right-of-way to Mr. Jackson in violation of the applicable provisions of V.T.C.A. Transportation Code, § 545.151 and 545.153 (2001 supp.), which also constituted negligence, per se.

135.   All statutory prerequisites to this suit against the City, including the provision of written notice, have been satisfied. The City has waived sovereign immunity because (1) Defendant negligently operated publicly owned automobile and (2) Jackson's death arose out of use of governmental property.

136.   At the time of the crash and negligence of Defendant, Mr. Hernandez, on behalf of the City, did not obtain permission or have authority to engage in the pursuit.  As a result, Hernandez was in violation of HPD policy. At the time of the crash, Hernandez was acting recklessly because he (1) was driving at unsafe speeds for the conditions, (2) unlawfully and dangerously maneuvered the vehicle at a high rate of speed, onto the sidewalk, (3) knew that the suspects had abandoned their vehicle, (4) failed to slow down his vehicle, despite seeing brake lights, (5) failed to maintain visual contact with his surroundings, and (6) participated in the pursuit without receiving authority to engage, in violation of HPD policy.

## XVI.
## Tenth Cause of Action: Negligence brought by the Wiley/Gallien Plaintiffs

137.   In addition, and in the alternative to the claims for violations of Section 1983, the Wiley/Gallien Plaintiffs pleads that the Incident was caused by the negligence of the City of Houston as detailed above.  Specifically, the City of Houston created policies and procedures

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 62 of 74

mandating that an officer terminate unreasonably dangerous pursuits. The City owed Plaintiff a duty to not engage in dangerous and negligent pursuits in violation of City policy.

138.    Defendant breached that duty and Mr. Wiley's death was proximately caused by the officer's negligent acts and/or omissions, by acting with conscious indifference or reckless disregard for the safety of others.

139.    All statutory prerequisites to this suit against the City, including the provision of written notice, have been satisfied. The City has waived sovereign immunity because (1) Defendant negligently operated publicly owned automobile and (2) Wiley's death arose out of use of governmental property.

140.    At the time of the crash and negligence of Defendant, Defendant was acting recklessly because he (1) initiated and engaged the pursuit, based on the public consumption of alcohol – a minor crime, (2) targeted the vehicle based on the driver's race, and (3) targeted the neighborhood. Plaintiffs suffered damages due to the wrongful death of Mr. Wiley caused by Defendant's negligence.

## XVII.
## Damages to the Jackson Family

141.    Plaintiff Janice Jackson as Personal Representative of the Estate of Michael Wayne Jackson, sues for recovery for the physical pain, mental anguish, disfigurement, and physical impairment suffered by Michael Wayne Jackson prior to his death, and for any medical expenses and funeral expenses of last interment.

142.    Janice Jackson, as the surviving spouse, will show that she has incurred substantial

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 63 of 74

damages as a result of the death of her husband, Michael Wayne Jackson. There are certain elements of damages, provided by law that she is entitled to have a jury consider separately to determine the sum of money that will fairly and reasonably compensate her for the injuries, damages, and losses she has and will incur.  Those elements of damage from the date of Jackson's death until trial, which should be considered separately and individually for determining the sum of money that will fairly and reasonably compensate her are:

- The loss of companionship and society that she has suffered, including the loss of love, comfort, companionship and society that she would have received if Michael Wayne Jackson, had lived;

- The pecuniary losses that she has suffered, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value she would have received from Michael Wayne Jackson, had he lived;

- The mental anguish she has suffered, including the emotional pain, torment and suffering she experienced because of the death of Michael Wayne Jackson, and

- The loss of inheritance that she has suffered, including the loss of the present value of the assets that Michael Wayne Jackson, would have added to the estate and left to her at the time of his natural death.

143.   Jackson's injuries and damages, in reasonable probability, will continue into the future. Her future losses, from the date of trial and beyond, include:

- The loss of companionship and society that she will suffer, including the loss of love, comfort, companionship and society she would have received if Michael

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 64 of 74

Wayne Jackson, had lived;

- The pecuniary losses she will suffer, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributors of a pecuniary value she would have received from   Michael Wayne Jackson, had he lived;

- The mental anguish she will suffer, including emotional pain, torment and suffering, because of the death of Michael Wayne Jackson; and

- The loss of inheritance that she will suffer, including the loss of the present value of the assets that Michael Wayne Jackson, would have added to the estate and left to her at the time of his natural death.

144.    As a proximate result and/or producing cause of Defendant's violations, Michael Wayne Jackson suffered severe personal injuries, leading eventually to his death. Specifically, Michael Wayne Jackson, suffered pain; mental suffering and anguish; physical impairment; medical expenses; death; and funeral and burial expenses, for which Plaintiff Janice Jackson is entitled to recover.  Michael Wayne Jackson's action for these damages, as well as for exemplary damages, survives in favor of Plaintiff Janice Jackson pursuant to TEX.CIV. PRAC. & REM. CODE § 71.021, and therefore they seek those damages in this action. Plaintiffs are entitled to recover reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §1988 for the prosecution of their claims and this lawsuit against Defendants.

## XVII.
## Damages to the Henderson Family

145.    Plaintiff Gynell Henderson as Personal Representative of the Estate of Rashad

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562672 - Page 65 of 74

Henderson, sues for recovery for the physical pain, mental anguish, disfigurement, and physical impairment suffered by Rashad Henderson prior to his death, and for any medical expenses and funeral expenses of last interment.

146.    Gynell Henderson, as the surviving mother of Rashad Henderson, and John Henderson Jr., as the surviving father of Rashad Henderson, will show that they have incurred substantial damages as a result of the death of their son, Rashad Henderson. There are certain elements of damages, provided by law that they are entitled to have a jury consider separately to determine the sum of money that will fairly and reasonably compensate them for the injuries, damages, and losses they have and will incur.  Those elements of damage from the date of Henderson's death until trial, which should be considered separately and individually for determining the sum of money that will fairly and reasonably compensate them are:

- The loss of companionship and society that they have suffered, including the loss of love, comfort, companionship and society that she would have received if Rashad Henderson, had lived;

- The pecuniary losses that she has suffered, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value they would have received from Rashad Henderson, had he lived;

- The mental anguish they have suffered, including the emotional pain, torment and suffering they experienced because of the death of Rashad Henderson, and

- The loss of inheritance that they have suffered, including the loss of the present

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562672 - Page 66 of 74

value of the assets that Rashad Henderson, would have added to the estate and left to them at the time of his natural death.

147.   The Hendersons's injuries and damages, in reasonable probability, will continue into the future. Their future losses, from the date of trial and beyond, include:

- The loss of companionship and society that they have suffered, including the loss of love, comfort, companionship and society that she would have received if Rashad Henderson, had lived;

- The pecuniary losses that she has suffered, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value they would have received from Rashad Henderson, had he lived;

- The mental anguish they have suffered, including the emotional pain, torment and suffering they experienced because of the death of Rashad Henderson, and

- The loss of inheritance that they have suffered, including the loss of the present value of the assets that Rashad Henderson, would have added to the estate and left to them at the time of his natural death.

148.   As a proximate result and/or producing cause of Defendant's violations, Rashad Henderson suffered severe personal injuries, leading eventually to his death.  Specifically, Rashad Henderson, suffered pain; mental suffering and anguish; physical impairment; medical expenses; death; and funeral and burial expenses, for which the Henderson are entitled to recover.  Rashad Henderson's action for these damages, as well as for exemplary damages, survives in favor of Plaintiff Gynell Henderson pursuant to TEX.CIV. PRAC. &

67

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 67 of 74

REM. CODE § 71.021, and therefore they seek those damages in this action. Plaintiff is entitled to recover reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §1988 for the prosecution of their claims and this lawsuit against Defendants.

## XVIII.
## Damages to the Wiley/Gallien Family

149.   Plaintiff Arlene Gallien, as the Personal Representative of the Estate of Carl Wiley Jr., sues for recovery for the physical pain, mental anguish, disfigurement, and physical impairment suffered by Carl Wiley Jr., prior to his death, and for any medical expenses and funeral expenses of last interment.

150.   Arlene Gallien, as the surviving mother, will show that she has incurred substantial damages as a result of the death of her son, Carl Wiley Jr. There are certain elements of damages, provided by law that she is entitled to have a jury consider separately to determine the sum of money that will fairly and reasonably compensate her for the injuries, damages, and losses she has and will incur.  Those elements of damage from the date of Wiley's death until trial, which should be considered separately and individually for determining the sum of money that will fairly and reasonably compensate her are:

- The loss of companionship and society that she has suffered, including the loss of love, comfort, companionship and society that she would have received if Carl Wiley Jr., had lived;

- The pecuniary losses that she has suffered, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value she would have received from Carl Wiley Jr., had he lived;

68

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562672 - Page 68 of 74

- The mental anguish she has suffered, including the emotional pain, torment and suffering she experienced because of the death of Carl Wiley Jr. and

- The loss of inheritance that she has suffered, including the loss of the present value of the assets that Carl Wiley Jr., would have added to the estate and left to her at the time of his natural death.

151. Wiley's injuries and damages, in reasonable probability, will continue into the future. Her future losses, from the date of trial and beyond, include:

- The loss of companionship and society that she will suffer, including the loss of love, comfort, companionship and society she would have received if Carl Wiley Jr., had lived;

- The pecuniary losses she will suffer, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributors of a pecuniary value she would have received from Carl Wiley Jr., had he lived;

- The mental anguish she will suffer, including emotional pain, torment and suffering, because of the death of Carl Wiley Jr.; and

- The loss of inheritance that she will suffer, including the loss of the present value of the assets that Carl Wiley Jr., would have added to the estate and left to her at the time of his natural death.

152. As a proximate result and/or producing cause of Defendant's violations, Carl Wiley Jr. suffered severe personal injuries, leading eventually to his death. Specifically, Carl Wiley Jr., suffered pain; mental suffering and anguish; physical impairment; medical

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 69 of 74

expenses; death; and funeral and burial expenses, for which Plaintiff Arlene Gallien is entitled to recover.  Carl Wiley Jr.'s action for these damages, as well as for exemplary damages, survives in favor of Plaintiff Arlene Gallien pursuant to TEX.CIV. PRAC. & REM. CODE § 71.021, and therefore they seek those damages in this action. Plaintiffs are entitled to recover reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §1988 for the prosecution of their claims and this lawsuit against Defendants

153.    Xxxxxxx Xxxxx will show that she has incurred substantial damages because of the death of her father, Carl Wiley Jr. There are certain elements of damages, provided by law that she is entitled to have a jury consider separately to determine the sum of money that will fairly and reasonably compensate her for the injuries, damages, and losses she has and will incur. From Wiley's death, until the time of trial of this case, those elements of damage which should be considered separately and individually for determining the sum of money that will fairly and reasonably compensate her are:

- The loss of companionship and society that she has suffered, including the loss of love, comfort, companionship and society that she would have received if Carl Wiley Jr. had lived;

- The pecuniary losses that she has suffered, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value she would have received from Carl Wiley Jr. had he lived; and

- The loss of inheritance that she has suffered, including the loss of         the present value of the assets that Carl Wiley Jr. would have added to the estate and

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 70 of 74

left to her at the time of his natural death.

154.   Xxxxxxx Xxxxx's injuries and damages, in reasonable probability, will continue into the future. Her future losses, from the date of trial and beyond, include:

- The loss of companionship and society that she will suffer, including the loss of love, comfort, companionship and society that she would have received if Carl Wiley Jr. had lived;

- The pecuniary losses she will suffer, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributors of a pecuniary value she would have received from Carl Wiley Jr. had he lived;

- The mental anguish she will suffer, including emotional pain,      torment   and suffering, because of the death of Carl Wiley Jr.; and

- The loss of inheritance that she will suffer, including the loss of the present value of the assets that Carl Wiley Jr. would have added to the estate and left to her at the time of his natural death.

## XIX.
## Prayer for Relief

a.   For compensatory damages for past and future lost wages, reputational harm, mental and emotional distress, anxiety, loss of companionship, and all other general damages alleged and proved at the time of trial,

b.   Recovery of expert witness fees;

c.   Recovery of attorney fees;

d.   Taxable costs incurred herein;

71

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 71 of 74

e.   Pre- and post-judgment interest;

f.   punitive damages; and

g.    all such other and further relief, at law or in equity, to which Plaintiffs may be

entitled.

Respectfully submitted,

Doyle Dennis LLP

_____

MICHAEL PATRICK DOYLE (#06095650)
PATRICK M. DENNIS (#24045777)
JEFFREY I. AVERY (#24085185)
The Clocktower Building
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Phone: (713) 571-1146
Fax:  (713) 571-1148
Email: service@doylelawfirm.com
Counsel for Plaintiffs

Reginald E. McKamie, Sr.
Law Office Reginald E. McKamie, Sr., PC
2120 Welch St.
Houston, TX 77019
mckamie@mckamie.com
Co-Counsel for Camilla Simpson, as Next Friend
of Xxxxxxx Xxxxx and Arlene Gallien

72

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 72 of 74

## <u>CERTIFICATE OF SERVICE</u>

     I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this 16th day of December, 2022 via e-service; hand delivery, overnight courier, U.S. Mail, certified mail, return receipt request, electronic mail, or facsimile, pursuant to the Texas Rules of Civil Procedure:

     Jaqueline I. Leguizamon
     City of Houston Legal Department
     900 Bagby St., 4th Floor
     Houston, Texas 77002
     Jackie.Leguizamon@houstontx.gov
     **ATTORNEY FOR CITY OF HOUSTON**

                        _____
                        MICHAEL PATRICK DOYLE

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 73 of 74

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Jeffrey Avery on behalf of Michael Doyle
Bar No. 6095650
jeffavery@doylelawfirm.com
Envelope ID: 71110393
Status as of 12/19/2022 8:37 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Arturo G.Michel | | arturo.michel@houstontx.gov | 12/16/2022 9:29:15 PM | SENT |
| Kelly A.Dempsey | | kelly.dempsey@houstontx.gov | 12/16/2022 9:29:15 PM | SENT |
| MLiss McGee | | mliss.mcgee@houstontx.gov | 12/16/2022 9:29:15 PM | SENT |
| Jaqueline I.Leguizamon | | jackie.leguizamon@houstontx.gov | 12/16/2022 9:29:15 PM | SENT |
| Jaqueline I.Leguizamon | | jackie.leguizamon@houstontx.gov | 12/16/2022 9:29:15 PM | SENT |

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626872 - Page 74 of 74



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   January 3, 2023

Certified Document Number:        105626872 Total Pages:  74

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

Ex. A

# INSTRUCTOR'S LESSON PLAN

**III.    APPLICATION:**   (Planning for student to practice or apply new knowledge-where
applicable)

Students will participate in evaluating pursuit scenarios in classroom.

**IV.    EVALUATION:** (Final check of student's comprehension of material presented).

**V.    REFERENCES:**

Defensive Driving Course

General Order 600-01: Response Management / dated: 09-09-2011

General Order 600-04: Motor Vehicle Pursuits / dated: 12-20-2011

General Order 600-17: Use of Force / dated: 01-04-2008

HPD Circular No. 99-1130-264, "Use Of Tire Deflation Devices"

HPD Circular No. 12-1017-255, "Discipline for Employees Not Wearing Seat Restraints"

HPD Pursuit Review Data

HPD Vehicular Crimes Division: 2012 statistical information

HPD Video "Motor Vehicle Pursuit – Stopping Techniques"

National Highway Traffic Safety Administration

National Law Enforcement Driver's Training Reference Guide

National Safety Council

Police Pursuits Police Research Forum

Risk Management Workshop Reference Guide-1998

Texas Traffic Code

The Southwestern Legal Foundation

U. S. Department of Transportation

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626873 - Page 1 of 11

11/21/16

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626873 - Page 2 of 11

## Managing Police Pursuits

2014 Mandatory In-Service

HPD Driver Training

## Goal Statement

- To limit police pursuits to situations where the need to pursue outweighs the need to not pursue.

## Dilemma

- The basic dilemma associated with police pursuit of fleeing suspects is deciding whether the benefits of apprehension outweigh the risks of endangering police officers and the public.

## Dilemma

- On the one hand, too many restrictions placed on police pursuits could place the public at risk from dangerous individuals escaping apprehension. On the other hand, insufficient controls on pursuits could result in needless accidents and injuries.

## Objective

To provide the class with knowledge that can be applied to any pursuit situation. Students will be able to evaluate the circumstances regarding whether to initiate, continue, or terminate a pursuit.

## Objective

A basic understanding of the legal principles of liability will assist officers and supervisors in making proper driving decisions, and adjust their driving behavior to minimize the potential for liability in pursuit driving situations.

11/21/16

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626873 - Page 3 of 11

# Objectives

- Decision Making
- Risk Assessment
- Liability

# Lethal Situations

- Confrontation with an armed suspect
- Operation of police vehicle in a pursuit
- Statistics show that you are more likely to be in a pursuit than to confront an armed person

## Factors Affecting Initiation and Continuation of a Pursuit

Environmental Factors

Vehicular Factors

Human Factors

Legal Factors

## Factors Affecting Initiation and Continuation of a Pursuit

- Before initiating any pursuit, the officer must evaluate the known information.
- Officer should never assume that the violator is wanted for, or has committed an offense that the officer has not observed or received information to support.
- Pursuit should only be based on the seriousness of the violation as known by the officer at the initiation of the pursuit.

## Environmental Factors

- Weather conditions: rain, fog, sun glare
- Traffic conditions: density, rush hour, traffic patterns
- Population conditions: rural, urban, schools, churches, pedestrians
- Time of day
- Day of week
- Road design and surface conditions, construction
- Visibility: buildings, trees, vegetation, parked vehicles

# Vehicular Factors

- Emergency Equipment: lights and siren
- Mechanical Condition: brakes, steering, suspension, coolant
- Tires: tread depth, proper inflation
- Type of Police Vehicle: marked or unmarked
- Suspect Vehicle: High performance car or motorcycle

11/21/16

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626873 - Page 4 of 11

## Human Factors

- Psychological: stress, attitudes, emotions, prejudices, bias
- Physiological: vision, hearing, reaction time
- Ethical Considerations: Responsibility to protect public is foremost. Officer must never consider a pursuit a personal challenge and become emotionally involved

## Human Factors

- Decision Making: Emotions, peer pressure, social image, frustration.
- Pursuit conditions, such as elapsed time, distance, speed, type of violation, and conduct of suspect affect officer's mental state.
- Suspect: Is the suspect's identity known? Is the suspect a juvenile?

## Legal Factors – State Law Evading Arrest (38.04 PC)

- A person commits an offense if he intentionally flees from a person he knows is a peace officer attempting to lawfully arrest or detain him.
- State jail felony if actor uses a vehicle while in flight and the actor has not been previously convicted under this section.
- Third degree felony if previously convicted or another suffers serious bodily injury as a direct result.
- Second degree felony if another suffers death as a direct result.

## Law Enforcement Liability

- Officers must balance the seriousness of the pursuit against the possible damage or injury considering the existing circumstances.
- An officer's REASONABLENESS is what the courts will consider.

## Legal Considerations

- Officers must evaluate their decision to pursue against the possible civil litigation that could result. The civil litigation will be directly related to two issues:
  - Negligence
  - Willful Misconduct
- Your actions must be weighted heavily toward public safety

## Negligence

- The omission to do something which a reasonable man, guided by those ordinary considerations which ordinarily regulate human affairs, would do, or the doing of something which a reasonable and prudent man would not do.

11/21/16

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626873 - Page 5 of 11

# Willful Misconduct

- Conduct which is committed with an intentional or reckless disregard for the safety of others or with an intentional disregard of a duty necessary to the safety of another's property.

## Continually Ask Yourself These Questions

- Is the risk to the public greater if I continue the pursuit?

  Or,

- Is the risk greater to the public if I terminate the pursuit?

## Travis v. Mesquite

- Texas Supreme Court, December 30, 1990
- The issue before the court was whether police officers were exempt from liability for third party injuries caused by a fleeing suspect. The court ruled that if the decision to pursue the suspect was negligent and that decision was the proximate cause of the injury, then officers could be held liable.

## Dent v. City of Dallas

- Liability of the City and its police officer for fatal injuries to an innocent motorist
- Suit alleged that officer was negligent in (1) failing to arrest suspect, (2) instituting a high speed chase of suspect, and (3) pursuing suspect for part of the chase without his siren activated
- Suit also alleged that the City of Dallas was liable for enacting the policies under which the officers were acting
- Trial court rendered judgment against the City of Dallas and the officer in the amount of $100,000.00

## Factors that would indicate Termination of a Pursuit



## Additional Considerations – To Pursue or Not?



11/21/16

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626873 - Page 6 of 11

## Strategic Actions Affecting Pursuits

## Following Distance



## Vehicle Position



## Reaction to Fleeing Driver



## Department Policy and Procedure

- General Order 600-4 "Motor Vehicle Pursuits"

These phrases occur 9 times in General Order 600-4:

- "continually assess"
- "constantly evaluate"
- "continually evaluate"
- "constantly assess"
- "shall assess the reasonableness"
- "shall assess"

What does that tell you?

11/21/16

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626873 - Page 7 of 11

## Police Vehicles Authorized to Engage in Pursuits



## Emergency Equipment



## Pursuit may be Terminated by:



## Field Supervisor's Responsibilities

- Advise dispatcher if pursuit should continue based upon assessment of the circumstances
- Monitor radio and ensure only authorized response
- Will continually assess the pursuit and its changing circumstances.
- Order any response necessary, appropriate, and within department policy to terminate pursuit.
- Go to the scene of all pursuits

## Field Supervisor's Responsibilities

- May terminate pursuit immediately if it is determined officers have sufficient information to establish both PC for the criminal activity and the identity of the suspect, making filing of a to-be warrant feasible.
- This does not apply to a case in which the nature of the criminal activity (e.g., deadly weapon involved, serious bodily injury inflicted, hostage taken, or flagrant DWI) is such that the need to immediately take the suspect into custody justifies the possible risks to the public resulting from the pursuit.

## Field Supervisor's Responsibilities

- Complete Electronic Vehicle Pursuit Form
- This form is no longer completed by hand. Form is signed off electronically though your chain by your Assistant Chief.
- Per Circular 12-1189-284, "All classified supervisors are required to watch a mandatory training video relating to the *Vehicle Pursuit* form."
- You must register through LMS and view the video titled, "Electronic Vehicle Pursuit Form," within 60 days of promoting.

11/21/16

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626873 - Page 8 of 11



### Restrictions: Officers will NOT:



### Restrictions: Officers will NOT:



## Use of Helicopter



### Stopping Techniques

### CDR-Crash Data Recorder

- Member of my staff sits on CRB
- CDR capabilities: speed, acceleration, braking, seat belt status
- Circular # 12-1017-255, dated October 17, 2012, announced that the discipline category for employees not wearing a seat restraint while driving or riding in a city vehicle would be a minimum of a Category B. (days off, probably two)

# HPD Studies and Analysis

11/21/16

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626873 - Page 9 of 11

## Houston Police Department Pursuit Data (2000)

- There were 445 police pursuits
- 201 (45%) were initiated for traffic offenses
- 163 (37%) resulted in accidents
- 26 (6%) weapons were found

## Houston Police Department Pursuit Data (2011)

- There were 685 police pursuits
- 418 (61%) were initiated for traffic offenses
- 173 (25%) resulted in accidents
- 69 (10%) weapons were found

## Houston Police Department Pursuit Data (2012)

- There were 572 police pursuits
- 333 (58%) were initiated for traffic offenses
- 137 (24%) resulted in accidents
- 31 (5%) weapons were found

## The last two years confirms more than a decade of research with the following statistics

- Traffic offenses are the most common reason for the initiation of a vehicle pursuit
- 25% of police pursuits resulted in an accident.
- This is a rate of 1 accident for every 4 pursuits.
- Collisions are a predictable outcome of police pursuits.

## HPD Statistics

- Of all accidents, 64.5% involved only the fleeing suspect's vehicle.
- 15% of all accidents involved the suspect's vehicle and a citizen.

## HPD Statistics (Continued)

- 28% of police pursuits resulted in an injury.
- 3.5% of injuries involve law enforcement.
- 1.3% of police pursuits resulted in a fatality, including one HPD officer.

11/21/16

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626873 - Page 10 of 11

## Police agencies have adopted a variety of approaches to vehicular pursuits

- Approaches range from banning them altogether...

    to

- Allowing wide officer discretion...

## Police Executive Research Forum Case Studies

- As the level of policy restrictiveness increased, pursuits decreased.
- Metro-Dade adopted a "violent felony only" pursuit policy in 1992 and the number of pursuits decreased 82 % the following year.

## Case Studies (continued)

- Omaha 1993
- Changed to a more permissive pursuit policy, permitting pursuits for offenses that had previously been prohibited.
- The following year, the number of pursuits increased more than 600 %.

## General Data on Police Pursuits Fit Into the Following Categories

## #1: Length of Pursuit

- On average, vehicle pursuits are rather short, with the median varying between 3.2 minutes and 5 minutes.
- Two thirds of all pursuits were less than five minutes.

## #2: Light Conditions

- Pursuit accidents are more likely to occur during darkness than during daylight hours.
- Pursuit related fatalities occur more frequently during darkness than during daylight.

11/21/16

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626873 - Page 11 of 11

## #3: Factors of Engagement

- The offense committed by the suspect is the major factor determining whether the police should start or continue a chase.
- Violent felonies were viewed as the most important category justifying a pursuit.
- The second most important factor is the risk to the public.

## Factors of Engagement (Continued)

- 1994 CHP study concluded that 52% of pursuits began when an officer attempted to make a stop for a minor violation and the violator fled.
- Of those pursuits, 73% of the suspects apprehended where charged with felonies.
- The data suggest a number of explanations:
  - An undisclosed felony had already been perpetrated
  - A felony was committed during the course of the pursuit
  - A felony warrant for the suspect was outstanding
  - Felony contraband or weapons were hidden in the vehicle

## #4: Outcomes of Pursuits

- 38.7 % of police pursuits resulted in an accident.
- This is a rate of 1 accident for every 2.6 pursuits.
- Collisions are a predictable outcome of police pursuits.
- The more police cars involved in a pursuit, the more likely a collision will result.
- The more police cars involved in a pursuit, the more likely an apprehension will be made. Police are successful in apprehending suspects in 72% of pursuits.
- The most frequent reason for the conclusion of a pursuit is the suspect voluntarily stopping.

## #5: Geographical Distribution of Pursuits

- The rate of pursuits ending in collisions is higher for municipal than for county law enforcement agencies.

## #6 Suspect's Opinions

- 47% of the suspects said they would have slowed down "when I felt safe."
- They interpreted this as outdistancing the police by 2.2 blocks on city streets, or 2.5 miles on the freeway.
- 53% of the suspects responded that they were willing to run from the police at all costs.
- 64% believed they would not be caught.

## Questions and/or Final Thoughts?

Let's head to the track!

COH-Sauls01379    10



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   January 3, 2023

Certified Document Number:        105626873 Total Pages:  11

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

Ex. B

| **General Order** | **ISSUE DATE:** | **NO.** |
|---|---|---|
| **Houston Police Department** ⬡ | June 5, 2018 | **600-04** |
| | **REFERENCE:** Supersedes all prior conflicting Circulars and Directives, and General Order 600-04, dated December 20, 2011 | |

**SUBJECT: MOTOR VEHICLE PURSUITS**

## POLICY

The Houston Police Department places the highest value on the life and safety of its officers and the public at large. This value must be accommodated in a police officer's duty to apprehend persons who have committed or are committing a violation of the law. The methods the department establishes to enforce the laws are intended to minimize the risk of injury to officers and citizens alike.

The driver of an authorized emergency vehicle shall drive with due regard for the safety of all persons and is responsible for the consequences of reckless disregard for the safety of others.

This General Order applies to all classified and emergency communication personnel.

## DEFINITION

*Motor Vehicle Pursuit.* A motor vehicle pursuit occurs when an officer operating an emergency vehicle attempts to stop or apprehend a suspect who refuses to stop while operating a motor vehicle. The suspect must exhibit one of the following types of conduct:

a. A willful disregard for personal safety or the safety of others in an attempt to avoid arrest.

b. A refusal to obey an officer's repeated signal to stop.

## 1   AUTHORIZED PURSUITS

The decision to engage in a motor vehicle pursuit is highly dependent on the ability of an officer, supervisor, or commander to continually assess the need to pursue versus the risk of injury involved in engaging in the pursuit.

## 2   OFFICERS' RESPONSIBILITIES

Officers may initiate or continue a pursuit only if all the following requirements are met:

a. An officer in good faith reasonably believes that under the circumstances the need to immediately apprehend the suspect outweighs a clear risk of harm to the public in initiating or continuing the pursuit.

b. As required by department policy and Texas Supreme Court case law, officers must constantly evaluate the risk and factors involved when initiating or continuing a pursuit. Those factors include, but are not limited to:

| General Order #600-04 | ISSUE DATE: June 5, 2018 | PAGE: #2 |

1. The seriousness of the crime to which the officer is responding.

2. Whether an officer's immediate presence is necessary to apprehend a suspect or to prevent injury or loss of life.

3. Alternative courses of action, if any, available to achieve a comparable result.

c. In addition to the above factors, officers shall continually evaluate:

1. Knowledge about the suspect being pursued. If enough information exists to file a warrant, officers shall be expected to discontinue the pursuit.

   An exception to this standard is permissible if a supervisor or commander responsible for overseeing the pursuit authorizes the pursuit to continue based on the assessment of requirements as listed above.

2. The observable driving behavior of the suspect being pursued (e.g., is the suspect driving while intoxicated or is the suspect driving recklessly).

3. Relative performance capabilities of the vehicle being pursued.

4. Road conditions.

5. Weather.

6. Population density.

7. Vehicular and pedestrian traffic.

8. The presence of other persons in the police vehicle.

d. Officers shall continually assess the nature and severity of harm their actions could cause (including injuries to bystanders as well as the possibility a crash would prevent the officer from arriving on the scene or assisting in the apprehension of the suspect), the likelihood any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer.

While evaluating all of the listed factors, officers shall constantly assess the need to immediately apprehend the suspect versus the risk of injuring themselves, the public, or the suspect.

## 3   SUPERVISORS' RESPONSIBILITIES

The designated on-duty field supervisor:

a. Shall be in command of the pursuit. The field supervisor shall immediately advise the dispatcher if the pursuit should continue based on communication and the assessment of the circumstances.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626874 - Page 2 of 11

b. Shall monitor all radio communications related to the pursuit and make every effort to ensure only authorized units participate in the pursuit. Whenever time and air traffic allow, supervisors assigned to a pursuit shall affirmatively break the air and remind officers:

   1. To maintain their professional composure.



c. Shall continually assess the motor vehicle pursuit and its changing circumstances relative to the points stressed by the Texas courts as outlined in section 2 items (b) and (c) above. Also, periodically, as prompted by the dispatcher, the supervisor shall state whether the pursuit should continue or direct the pursuit be terminated.

d. May terminate the pursuit immediately if it is determined officers have sufficient information to establish both probable cause for the criminal activity and the identity of the suspect, making the filing of a to-be warrant feasible.

   However, this does not apply to a case in which the nature of the criminal activity (e.g., deadly weapon involved, serious bodily injury inflicted, hostage taken, or a flagrant DWI) is such that the need to immediately take the suspect into custody justifies the possible risks to the public resulting from the pursuit.

e. Shall order any response necessary, appropriate, and within department policy to terminate the pursuit.

f. May become involved in the pursuit if in close proximity and provided the supervisor's police vehicle has emergency equipment.

g. Shall immediately go to the scene where the pursuit has ended and take command.

h. Shall supplement the original incident report documenting all supervisory actions taken during the pursuit. For pursuits lasting less than fifteen minutes, the supervisor must review all available information from the pursuit and supplement the incident report with any available relevant or pertinent information (e.g., automated vehicle location [AVL] records, unit histories, body worn camera videos) within five *calendar* days following the pursuit.

## 4   MANAGEMENT'S RESPONSIBILITIES

### Shift Commanders

Although the actual management of the pursuit is the responsibility of field supervisors, the designated shift commander shall assess the reasonableness of continuing the pursuit using the same parameters listed in section 2 items (b) and (c) of this General Order.

| General Order #600-04 | ISSUE DATE: June 5, 2018 | PAGE: #4 |

The shift commander shall continue to closely monitor pursuits and maintain contact with field supervisors and dispatchers until the event ends. If at any time the shift commander's assessment indicates the pursuit should not continue, then the shift commander shall order termination of the pursuit.

If the shift commander is unavailable for any reason, another on-duty lieutenant or division commander from the initiating division shall be designated to fulfill this responsibility.

For motor vehicle pursuits that last fifteen minutes or more or if a unit from another jurisdiction becomes involved in the pursuit, the shift commander must review all available information from the pursuit and must supplement the original incident report with any available relevant or pertinent information.

### Night Commander

If a motor vehicle pursuit is initiated any time between the hours of 1800 to 0600, the on-duty Emergency Communications Division (ECD) supervisor shall immediately notify the Command Center who in turn shall contact the on-duty night commander. If, for any reason, a ranking officer from the division initiating the pursuit is not located, the night commander shall assume all the management responsibilities described above.

### Captains' Responsibilities

Captains shall be held accountable for ensuring this General Order is followed. Captains shall ensure compliance through training and counseling, and when obvious and purposeful deviations occur, by initiating an internal affairs investigation.

## 5   VEHICLES ELIGIBLE TO USE IN PURSUITS

### HPD Marked Vehicles

An officer may initiate or continue a pursuit only if all the following requirements are met. The officer's HPD marked police vehicle is:

a.  Equipped with working emergency lights and sirens.

b.  Believed to be in sound mechanical condition including, but not limited to, brakes, steering, and police radio systems.

A pursuit initiated by a solo unit (HPD motorcycle) shall be reassigned to the first arriving marked patrol unit.

Vehicles transporting prisoners, witnesses, suspects, complainants, or other nonpolice personnel shall not be used to initiate or participate in a pursuit.

### HPD Unmarked Vehicles

An officer may initiate or continue a pursuit only if all of the following requirements are met. The officer's HPD unmarked police vehicle is:

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626874 - Page 4 of 11

| General Order #600-04 | ISSUE DATE: June 5, 2018 | PAGE: #5 |
|---|---|---|

a. Equipped with emergency lights (e.g., in the grill or by a light bar on the dash or rear deck) AND sirens.

b. Believed to be in sound mechanical condition including, but not limited to, brakes, steering, and police radio systems.

c. Driven by an officer in uniform or by an officer who is otherwise readily identifiable as an HPD officer.

Officers initiating or continuing a pursuit while in an HPD unmarked police vehicle meeting the criteria listed above shall immediately notify dispatch and yield to the first arriving marked patrol unit.

Officers in an HPD unmarked vehicle that does *not* have emergency lights and sirens shall not initiate a traffic stop or pursuit even if exigent circumstances exist.

### Personal Vehicles and Vehicles Used for Extra Employment

An off-duty officer in a non-HPD vehicle that is equipped with emergency lights and sirens and is clearly marked as a police vehicle, as defined in the Transportation Code Sec. 541201(1)(A), may initiate a traffic stop and a pursuit only if the pursuit is initiated because of suspected felony activity. This does *not* include Evading as a state jail felony. If a pursuit qualified by this policy is initiated, the officer shall immediately notify dispatch and yield *to* the first arriving marked patrol unit.

An off-duty officer in a non-HPD or personal vehicle, even a vehicle equipped with emergency equipment (e.g., temporary light bars and/or siren for use in extra employment), shall *not* initiate a traffic stop or pursuit even if exigent circumstances exist.

## 6  NOTIFYING DISPATCHER

Officers initiating a pursuit shall promptly notify the dispatcher a pursuit situation exists. The dispatcher shall determine if it is necessary to switch the incident to another dispatch channel (e.g., channel 5) or to keep the incident on the existing channel.

If the pursuit remains on the existing channel, all other officers shall immediately refrain from non-emergency radio transmissions on that channel. The information transmitted to the dispatcher should include the following:

a. Unit number.

b. Present location.

c. Where the pursuit began.

d. Direction of travel.

e. Reason for the pursuit.

| General Order #600-04 | ISSUE DATE: June 5, 2018 | PAGE: #6 |
|---|---|---|

f.  Description of the fleeing vehicle (e.g., make, model, color, license number).

g.  Description and number of occupants in the fleeing vehicle.

h.  Estimated speed of the fleeing vehicle.

Whenever possible, the dispatcher shall prompt the supervisor managing the pursuit to confirm that the pursuit is authorized to continue.

## 7   PARTICIPATING UNITS

When notified of a pursuit, the dispatcher shall designate the initial pursuing vehicle as the primary unit. The dispatcher shall also designate a secondary unit and a field supervisory unit.

Unless the field supervisor approves additional units, the primary and secondary units shall be the only police vehicles authorized to pursue the fleeing vehicle. A field supervisor may approve additional units if any of the following situations exist:

a.  There are an insufficient number of officers in the authorized units to safely effect an arrest.

b.  An authorized unit is unable to continue the pursuit or the dispatcher has been informed an authorized unit is terminating its involvement. In this case, the field supervisor shall authorize replacement units as needed.

c.  The Pursuit Intervention Technique (PIT) Maneuver is authorized. There should be at least two units on scene to implement the PIT Maneuver, but three units are ideal. See section 10, *Stopping Techniques*.

d.  There is a likelihood that the suspect has a deadly weapon.

### Canine Unit

Upon learning of a pursuit and if a canine unit has not been designated, the closest on-duty canine unit shall travel toward the area of the pursuit in anticipation of being needed. When practical, the canine unit shall notify the dispatcher of its location and estimated time of arrival.

## 8   RESTRICTIONS

Officers shall not:

a.  Pursue a fleeing vehicle by driving the wrong way on a freeway.

b.  Pursue a fleeing vehicle while operating a vehicle without emergency equipment or without the emergency equipment activated.

c.  Drive along the side or in front of a fleeing vehicle in an attempt to force the vehicle from the roadway, unless authorized as an approved stopping technique (see section 10, *Stopping Techniques*).

| General Order #600-04 | ISSUE DATE: June 5, 2018 | PAGE: #7 |
|---|---|---|

d. Ram or bump a fleeing vehicle in an attempt to force it from the roadway unless trained and authorized to implement the PIT Maneuver (see section 10, *Stopping Techniques*).

e. Continue a pursuit if the primary unit, on-scene police helicopter, or any on-duty supervisor orders the pursuit discontinued.

f. Discharge a firearm to disable or stop a fleeing vehicle (see General Order 600-17, **Response to Resistance**).

g. Use a privately owned vehicle in any part of a pursuit or as a termination technique.

h. Use tire deflation devices on controlled access freeways.

i. Use barricades or other obstructions set across a roadway to stop or prevent the escape of a fleeing vehicle.

## 9   POLICE HELICOPTER

The dispatcher shall assign a police helicopter to all pursuits. If no helicopter is in service, the dispatcher shall contact the department's Air Support Division and have one dispatched to the scene, weather permitting. The following procedures shall be adhered to when a police helicopter is involved in a pursuit:

a. When the helicopter crew has informed the dispatcher the suspect vehicle is in view, the ground units shall modify their speed accordingly, but maintain the use of their emergency equipment.

b. The helicopter crew, under the direction of the field supervisor, shall monitor the pursuit. This includes, but is not limited to, transmitting the suspect vehicle's location and approximate speed, and potential traffic problems. If the aircrew is operating in the Class B Airspace the information given to ground units may be limited. Class B Airspace is the controlled area that extends outward to a radius of 15-30 miles from airports such as Hobby Airport and Bush Intercontinental Airport. The purpose of the airspace is to provide separation from all the aircrafts that operate within it. To operate in this airspace the aircrew must have approval to enter and operate in the airspace prior to entering the boundary.

## 10   STOPPING TECHNIQUES

Before any stopping technique is deployed, officers must be adequately trained by Training Division personnel in its proper use and shall assess the risk of bodily harm to bystanders, any passengers in the suspect's vehicle, themselves, or the suspect as a result of using a stopping technique versus the threat to the public if the pursuit continues.

The following stopping techniques may be used provided the field supervisor authorizes the use and the techniques are used in accordance with current department procedures:

a. **Rolling Roadblocks.** Moving police units placed in front of and behind the fleeing vehicle in an attempt to stop it. This method may be used only if the suspect is not speeding but is

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626874 - Page 7 of 11

General Order #600-04 | **ISSUE DATE:** June 5, 2018 | **PAGE: #8**

willfully failing to stop. Extreme caution is urged prior to using this tactic as it could expose officers to danger if suspects are armed, potentially placing officers in a crossfire situation.

b. **Tire Deflation Devices.** Devices such as Stingers® and Stop Sticks® are designed to cause the controlled deflation of a fleeing vehicle's tires. Any employee who deploys a tire deflation device (a.k.a. "spike strip") shall supplement the original incident report indicating the approximate location where the device was deployed, whether or not the target vehicle or others ran over the device, and if applicable, why the vehicle did not run over the device.

Use of tire deflation devices shall be restricted to those times and incidents that do not place the lives of the officers or citizens in extreme danger while taking into consideration current traffic conditions, road conditions, and weather conditions. See section 8, *Restrictions*, for other restrictions regarding tire deflation devices.

c. 

## 11 TERMINATION OF PURSUITS

Any of the following personnel may terminate a pursuit:

a. Officer in the primary unit.

b. On-duty officer holding the rank of sergeant or above.

c. On-scene Tactical Flight Officer.

The decision to terminate a pursuit by an on-duty supervisor other than the field supervisor managing the pursuit must be made with the same diligence as stated throughout this policy.

The assessment of this information shall be in accordance with the factors and variables listed in section 2, items (b) and (c) of this General Order.

| General Order #600-04 | ISSUE DATE: June 5, 2018 | PAGE: #9 |

## 12  APPREHENSION OF SUSPECTS

Once the pursuit has ended, officers shall utilize appropriate officer safety tactics regarding high-risk vehicle approaches as outlined in General Order 600-34, **High-Risk Vehicle Approaches**. If the PIT Maneuver is utilized and is successful in ending the pursuit, all officers shall be ready for Tactical Vehicle Containment procedures.

If the pursuit is not initiated or is terminated without apprehending a suspect and the identity of the suspect is known, the primary unit shall attempt to obtain a to-be warrant through the appropriate district attorney's office prior to the end of the officer's shift.

## 13  DOCUMENTATION OF A PURSUIT

### Officers' Duties

Officers shall document the pursuit incident in a thorough incident report containing a detailed description of the vehicle, suspect information if possible, other pertinent facts, and witness information. If a decision is made not to pursue a known suspect or a pursuit is terminated in accordance with restrictions set out in this General Order, officers shall still complete a thorough incident report so an officer or investigator can attempt to locate the suspect and file a warrant at a later date.

Anytime the PIT Maneuver is attempted, whether successful or not, the implementing officer or supervisor shall include the following information in the original or supplemental incident report:

a.  Who implemented and who authorized the PIT Maneuver.

b.  Date, time, location, estimated speed, and direction of travel of the suspect at the time of implementation.

c.  The result and any damage to any vehicle.

d.  Any unintended traffic collision and any injuries observed or complained of.

e.  Name of the supervisor who made the scene.

### Supervisors' and Management's Duties

At the conclusion of the pursuit, the field supervisor assigned to the pursuit shall electronically complete a *Houston Police Department Vehicle Pursuit* form by entering the information into the *Vehicle Pursuit* database via the HPD Intranet Portal prior to the end of his shift. The field supervisor assigned to the pursuit shall also adhere to the requirements in General Order 200-10, **Emergency Management**, regarding the process for submitting a *Significant Event Report* to the Command Center for incidents involving vehicle pursuits that meet such criteria.

In addition, the on-duty field supervisor and any involved supervisors must supplement the original incident report documenting all supervisory actions taken during the pursuit and must list all units who participated in the pursuit.

| General Order #600-04 | ISSUE DATE: June 5, 2018 | PAGE: #10 |

In addition to the above reporting guidelines for the PIT Maneuver, supervisors shall ensure digital images and/or photographs are taken of all vehicles and other property affected by the PIT Maneuver. These are intended to show any damage or lack thereof resulting from the intervention. Damage to department vehicles shall be recorded in accordance with established guidelines for reporting vehicle damage. Since the PIT Maneuver is an intentional act, it is not considered a "crash" unless a third party is struck. In the event of an unintended third party crash involving the suspect's vehicle and any vehicle, person, or property, the supervisor shall assign an officer (not the PIT Maneuver officer) to complete a crash report.

If the crash resulted in a fatality or serious bodily injury, the Vehicular Crimes Division shall complete a crash report. Vehicular Crimes Division shall also complete a crash report if the City vehicle is involved in an unintended crash with any vehicle, person, or property.

The shift commander shall supplement the original incident report if the motor vehicle pursuit lasts fifteen minutes or more or if a unit from another jurisdiction becomes involved in the pursuit.

## 14 INTERJURISDICTIONAL PURSUITS

ECD, with the approval of the field supervisor managing the pursuit, shall notify outside law enforcement agencies when this department is involved in a pursuit in the outside agency's jurisdiction. The person notifying the outside agency shall specify whether the call is a request for assistance or a courtesy notification with no participation requested.

Officers may become involved in another agency's pursuit either inside or outside HPD's jurisdiction if an HPD field supervisor authorizes participation and any of the following are true:

a.  The other agency requests assistance.

b.  It is clear the other agency's unit is unable to request assistance.

c.  The emergency nature of the situation dictates the need for assistance.

All department pursuit policies shall be followed whenever an employee is involved in any pursuit.

## 15 PUBLIC STATEMENTS FOLLOWING PURSUITS

After a pursuit has ended, officers shall refer all media requests for a statement to the designated field supervisor involved in the pursuit. Upon request of the media, the designated field supervisor may make a limited statement to the media or defer to a higher-ranking on-scene supervisor. Initial statements shall be limited to preliminary factual information and the statements shall be in compliance with General Order 800-02, **Media Relations**.

An on-duty department public information officer (PIO) shall make all scenes of pursuits that result in a fatality.

| General Order #600-04 | ISSUE DATE: June 5, 2018 | PAGE: #11 |
|---|---|---|

## 16 RELATED GENERAL ORDERS AND REFERENCE MATERIAL

200-08, **Conduct and Authority**
200-10, **Emergency Management**
400-07, **Vehicle Use and Assignment**
400-08, **City Vehicle Crashes**
400-10, **Unit and Radio Numbering**
400-21, **Mobile Computing Devices**
500-01, **Effecting Arrests and Searches**
600-03, **General Broadcasts**
600-05, **Special Threat Situations**
600-17, **Response to Resistance**
600-32, **Ride-Along Program**
600-34, **High-Risk Vehicle Approaches**
800-02, **Media Relations**
800-07, **Criteria for Submitting Incident Reports**
**Critical Incident Review Board (CIRB) Houston Police Department Report #4**

Art Acevedo
**Chief of Police**



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   January 3, 2023

Certified Document Number:        105626874 Total Pages:  11

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

OFFICER CRAIG SARTOR   -   February 6, 2020

For Official Governmental Use Only - Do Not Disseminate to the Public: 10562687S - Page 1 of 6

CAUSE NO. 2019-77138

| | | |
|---|---|---|
| CATRENNIA FOREMAN SAULS, | : | IN THE DISTRICT COURT OF |
| et al., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| VS. | : | HARRIS COUNTY, T E X A S |
| | : | |
| CITY OF HOUSTON | : | |
| | : | |
| Defendant. | : | 113TH  JUDICIAL DISTRICT |

ORAL VIDEOTAPED DEPOSITION OF
OFFICER CRAIG SARTOR
FEBRUARY 6TH, 2020

ORAL VIDEOTAPED DEPOSITION OF OFFICER CRAIG SARTOR, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on February 6th, 2020, from 9:43 a.m. to 12:42 p.m., before Janel R. Wilson, CSR in and for the State of Texas, reported by machine shorthand method, at the offices of City of Houston Legal Department, 900 Bagby, 4th Floor, Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record.

OFFICER CRAIG SARTOR   -   February 6, 2020

Page 2

1                            INDEX

2                                                       PAGE

3  Appearances ..................................4

4  OFFICER CRAIG SARTOR

5       Examination by Mr. Doyle ....................10
        Examination by Ms. Martin ..................146
6       Further Examination by Mr. Doyle ...........152

7  Changes and Signature ........................166

8  Reporter's Certification .....................168

9

10                          EXHIBITS

11

12  EXHIBIT                DESCRIPTION              PAGE

13  Exhibit A       Houston Police Department        46
                    Administrative Information
14                  (COH-Sauls00044)

15  Exhibit 2       CAD Call Activity               53
                    (COH-Sauls00105 and
16                  COH-Sauls00106)

17  Exhibit 3       Letter from Jim Hollis, Texas   21
                    Department of Transportation
18
        Exhibit 5   Field Diagram (COH-Sauls00066)  25
19
        Exhibit 6   Texas Peace officer's Crash     17
20                  Report (COH-Sauls00059 -
                    COH-Sauls00074)
21
        Exhibit 7   Handwritten Notes and Drawing   27
22                  (COH-Sauls00112)

23  Exhibit 7A      Handwritten Notes and Drawing   39
                    (COH-Sauls00112)
24
        Exhibit 8   Audit (COH-Sauls00255 -         65
25                  COH-Sauls00259)

For Official Governmental Use Only - Do Not Disseminate to the Public: l05626875 - Page 2 of 6

OFFICER CRAIG SARTOR   -   February 6, 2020

Page 3

1                         (Index Continued)

2    Exhibit 9        Houston Police Department          79
                      48-Hour Notification Form
3                     (COH-Sauls00108)

4    Exhibit 12       Houston Police Department          82
                      Narrative (COH-Sauls00007)
5

     Exhibit 13       Houston Police Department         103
6                     Administrative Information
                      (COH-Sauls00012 -
7                     COH-Sauls00013)

8    Exhibit 14       Handwritten Notes                  73
                      (COH-Sauls00113)
9

     Exhibit 15       Audit (COH-Sauls00255 -          118
10                    COH-Sauls00259)

11   Exhibit 16       Color Photograph                 121
                      (COH-Sauls00280)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626875 - Page 3 of 6

OFFICER CRAIG SARTOR   -   February 6, 2020

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626875 - Page 4 of 6

Page 4

```
 1                  A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         Mr. Michael Patrick Doyle
           DOYLE RIAL LAWYERS
 5         3401 Allen Parkway, Suite 100
           Houston, Texas 77019
 6         Telephone: (713) 571-1146 - Fax: (713) 571-1148
           E-mail: service@doylelawfirm.com

 7

 8    FOR THE DEFENDANT:

 9         Ms. Christy L. Martin
           CITY OF HOUSTON LEGAL DEPARTMENT
10         900 Bagby, 4th Floor
           Houston, Texas 77002
11         Telephone: (832) 393-6438
           E-mail: christly.martin@houstontx.gov

12

13    THE VIDEOGRAPHER:

14         Mr. Harold Mullins

15
      ALSO PRESENT:
16
           Mr. James Evans (Via Webcast)
17         Mr. Marshall Sauls (Via Webcast)

18

19

20

21

22

23

24

25
```

OFFICER CRAIG SARTOR   -   February 6, 2020

Page 76

1      Q.    Just one?

2      A.    Just one that I can remember.

3      Q.    Did he get there before or after you did?

4      A.    He got there after I did.

5      Q.    About how long?

6      A.    I don't remember what time.

7      Q.    The particular Chad, the Houston Police

8   Officers Union lawyer, did you speak to him at all?

9      A.    Briefly.  And he told me that he would --

10   that he provided --

11              THE REPORTER:  I'm sorry.

12      A.    He informed me that he would have the officer

13   provide a statement per their rules of giving witness

14   statements.

15      Q.    (BY MR. DOYLE) Well, let's talk about witness

16   interviews.  Did you conduct witness interviews?

17      A.    No, I did not.

18      Q.    Zero?

19      A.    Zero.

20      Q.    Now, the way the Houston Police Department

21   investigates officers involved in serious injury or

22   death cases is entirely different from the way it

23   investigates civilians?

24              MS. MARTIN:  Objection; form.

25      A.    That's correct.

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626875 - Page 5 of 6

OFFICER CRAIG SARTOR   -   February 6, 2020

Page  77

1        Q.    (BY MR. DOYLE) What are some of the

2   differences, custom and practices, in the way police

3   officer serious injury or death incidents are

4   investigated that you can share with us?

5        A.    We are required to give them 48 hours notice

6   to be able to respond.  And so they are required to get

7   that time frame to discuss with their lawyers before

8   they give us a statement of what happened.

9        Q.    So, absolutely, positively one custom and

10   practice that you can share with us is, you do not even

11   attempt to interview officers involved in serious

12   injuries or deaths?

13             MS. MARTIN:  Objection; form.

14        A.    Not until they are served with a 48.

15        Q.    (BY MR. DOYLE) At the scene, absolutely,

16   positively do not even attempt to interview officers

17   involved in a serious injury or death vehicular

18   investigation?

19             MS. MARTIN:  Objection; form.

20        A.    Only when they have the 48.  The only thing

21   we're allowed to ask them is what lane they were in and

22   the direction of travel.

23        Q.    (BY MR. DOYLE) When you say "the only thing

24   we're allowed to ask them" --

25        A.    It's just pretty much where they were at the

For Official Governmental Use Only - Do Not Disseminate to the Public: 105626875 - Page 6 of 6



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   January 3, 2023

Certified Document Number:        105626875 Total Pages:  6

Marilyn Burgess, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**