# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF TEXAS

# HOUSTON DIVISION

| | |
|---|---|
| JANICE JACKSON, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF HER LATE HUSBAND MICHAEL WAYNE JACKSON; ARLENE GALLIEN, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF CARL WILEY JR.; CAMILA SIMPSON AS NEXT FRIEND OF XXXXXXX XXXXX, GYNELL HENDERSON, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF RASHAD HENDERSON, AND JOHN HENDERSON JR., INDIVIDUALLY, | CIVIL ACTION NO. 4:23-cv-00052 |
| *Plaintiffs,* | |
| and | |
| COURTNEY LANE, | |
| *Plaintiff- Intervnor* | |
| v. | |
| CITY OF HOUSTON, | |
| *Defendant* | |

## COMPLAINT IN INTERVENTION

Pursuant to Rule 24(c), Intervenor Courtney Lane files this Complaint in Intervention against the City of Houston.

## THE PARTIES

1.      Plaintiff-Intervenor Courtney Lane is a Citizen of Texas.

2.      Plaintiff Janice Jackson is a resident of Harris County Texas. Ms. Jackson is the surviving wife of Michael Wayne Jackson, and no Administrator of the Estate of Michael Wayne Jackson is necessary, nor has one been appointed. Ms. Jackson has standing to maintain this action, including for wrongful death, under Texas Civil Practice & Remedies Code §§ 71.001-71.004 and 71.021.  Ms. Jackson thus brings this action pursuant to section 71.021 of the Texas Civil Practice & Remedies Code, commonly known as the "survival statute," as well as pursuant to the common laws of the State of Texas, for her own benefit as heir of the Estate of Michael Wayne Jackson and on behalf of the Estate of Michael Wayne Jackson, as well as individually under the Texas Wrongful Death Act.

3.      Plaintiff Gynell Henderson is a resident of Texas. Ms. Henderson, is the surviving mother of Rashad Henderson, and no Administrator of the Estate of Rashad Henderson is necessary, nor has one been appointed.  Ms. Henderson has standing to maintain this action, including for wrongful death, under Texas Civil Practice & Remedies Code §§ 71.001-71.004 and 71.021.  Ms. Henderson thus brings this action pursuant to section 71.021 of the Texas Civil Practice & Remedies Code, commonly known as the "survival statute," as well as pursuant to the common laws of the State of Texas, for her own benefit as heir of the Estate of Rashad Henderson and on behalf of the Estate of Rashad Henderson, as well as individually under the Texas Wrongful Death Act.

4.      John Henderson Jr. is a resident Texas. Mr. Henderson is the surviving father of Rashad Henderson. John Henderson Jr. has standing to maintain this action, including for wrongful death, under Texas Civil Practice & Remedies Code §§ 71.001-71.004.   Mr. Henderson thus brings this action as individually under the Texas Wrongful Death Act.

5.      Plaintiff, Arlene Gallien, is a resident Texas. Ms. Gallien, is the surviving mother of Carl Wiley Jr. Ms. Gallien is the administrator of the estate of Carl Wiley Jr.  Ms. Gallien has standing to maintain this action, including for wrongful death, under Texas Civil Practice & Remedies Code §§ 71.001-71.004 and 71.021.  Ms. Gallien thus brings this action pursuant to section 71.021 of the Texas Civil Practice & Remedies Code, commonly known as the "survival statute," as well as pursuant to the common laws of the State of Texas, for her own benefit as heir of the Estate of Carl Wiley Jr. and on behalf of the Estate of Carl Wiley Jr., as well as individually under the Texas Wrongful Death Act.

6.      Camilla Simpson, as Next Friend of Xxxxxxx Xxxxx, is a resident Texas. Xxxxxxx Xxxxx is the surviving child of Carl Wiley Jr. Camilla Simpson as Next Friend of Xxxxxxx Xxxxx has standing to maintain this action, including for wrongful death, under Texas Civil Practice & Remedies Code §§ 71.001-71.004.  Camilla Simpson as Next Friend of Xxxxxxx Xxxxx thus brings this action as individually under the Texas Wrongful Death Act.

7.      Defendant City of Houston is a Texas municipal corporation that operates the Houston Police Department (the "HPD" or "Department"), which in turn sets city-wide policy for police officers employed by the Department.

## JURISDICTION

8.     This court has jurisdiction under 28 U.S.C. § 1332 to hear causes of action brought under the permissive joinder rules of Fed. R. Civ. P. R. 24(b). This case has jurisdiction based on federal question. 28 U.S.C. §§ 1331, 1332, and 1367. Venue is appropriate in the Southern District of Texas.

**I.**
**A long, violent history of targeting by HPD**

1.     Driving while Black in a predominately Black neighborhood should not create ongoing risk to innocent citizens, Houston Police Department (HPD) officers, and public property of unjustified, unreasonably dangerous, and often tragic death and mayhem resulting from HPD high speed pursuit tactics. This is particular true, as revealed by HPD's own internal data outlined further below, when deaths and serious injuries result from HPD approving consistently dangerous chases after "criminals" engaged in such potential offenses as violation of open container laws and minor traffic violations. A careful and fair analysis of what happened to Plaintiffs herein, and others, points to not just unfortunate accidents from HPD's chosen tactics in select neighborhoods in the City of Houston, but more directly, to wholly expected consequences of the same approved tactics resulting in the same consequences to public safety.

2.     This lawsuit is based on the violations of the constitutional rights of innocent bystanders Michael Wayne Jackson, Carl Lee Wiley Jr., and Rashad Henderson, among others unfortunate enough to be driving Black in predominately Black neighborhoods in the City of Houston as HPD officers embarked upon yet another dangerous, unnecessary, and unjustifiable high-risk operation of HPD vehicles.  For years, the policymakers within City

of Houston adopted a custom, practice, pattern, and usage of authorizing police officers to profile Black drivers and racially target predominantly Black neighborhoods when engaging in high-speed pursuits. Ultimately, this policy, custom, practice, and usage was the moving force that caused the death of Jackson, Wiley, and Henderson.

3.      For example, in 2020, the City engaged in approximately 963 high speed chases where HPD reported the race of the driver. For that year, Black citizens made up 22% of the population and 38% of traffic stops. Yet, for high-speed pursuits involving HPD, Black drivers made up 56.39% of the chases. Even worse, during the day time hours – meaning, when the officers could more easily identify the race of drivers — high-speed pursuits of Black drivers made up 65.01% of HPD's chases. But at night – only after visibility and identification of the race of the driver is limited – HPD's chases of Black drivers dropped to 52.07%. This statistically significant difference provides important evidence of the intent and animus of HPD officers in engaging in pursuits and its ongoing approval by the City of Houston's decisionmakers.

4.      Similarly, when determining whether to engage in a pursuit, HPD officers also target Black neighborhoods with these particularly dangerous tactics. Indeed, high-speed pursuits are significantly more likely to occur in neighborhoods that have more Black residents than the general population of Houston. In contrast, HPD shields white neighborhoods – meaning neighborhoods that have more white residents than the general population of Houston – from similar chases. Put simply, HPD has an unwritten but very real, and deadly policy, practice, custom, or usage to target Black neighborhoods and Black drivers with the risk of high-speed vehicle tactics.

5.     Consistent with this targeting, HPD has admitted that "[c]ollisions are a predictable outcome of police pursuits."[1]  High-speed pursuits present substantial risk to the public and minimal risk to HPD officers – indeed, officers suffer only approximately .4% of high-speed chase related injuries in Houston, which might explain why City employees so readily engage in such tactics.[2]  And while HPD has dramatically dropped traffic stops and violations over the last 20 years, HPD has tripled its high-speed pursuits during that same period.

6.     As high-speed chases have increased in the last decade, HPD continues to train, supervise, and discipline its officers consistent with a pattern of approving racially motivated, dangerous high-speed pursuits. By example, as part of its training to evaluate when to initiate a high-speed chase, HPD teaches its officers to evaluate the "social image" of the chase, weigh "urban factors," and evaluate this with their "stresses, attitudes, emotions, prejudices, [and] bias."[3]

7.     HPD's handling of and customs regarding disciplinary matters, further encourages and establishes its pattern of racial profiling.  Put bluntly, HPD applies different rules to evaluating potential misconduct by its officers than the public at large, including: (1) HPD does not question the officer until the officer has spoken with an attorney; (2) the officer is allowed to do an unrecorded "walkthrough" of the scene while accompanied by an attorney; (3) the officer is given forty-eight hours to answer written questions with an

---

[1] Exhibit A, 2016 "Instructor's Lesson Plans" for HPD driving.

[2] St. John Barned-Smith, *Houston police to start using new driving tactic to end vehicle pursuits,* Hou. Chron., Nov. 17, 2017.

[3] Exhibit A.

attorney's assistance, and (4) the officer is provided all written statements and body camera footage prior to giving his or her statement.  This process allows and authorizes officers to adapt their after-the-fact excuses to conceal the racially motivated conduct and, thus, avoid any real discipline.

8.      Not surprisingly, in at least the last 10 years, HPD has never sustained a complaint about racial profiling— much less a high-speed chase complaint related to racial profiling. Based on the data available, HPD has received approximately 47 complaints regarding racial profiling since 2010.[4]  Of those complaints, HPD concluded that 28 were "unfounded," 2 were "pending," 3 were "exonerated," 8 were "not sustained," and 0 were "sustained."  In contrast to the zero sustained findings for racial profiling complaints, HPD generally has sustained approximately 25% of complaints made against officers.   By example, in 2021, HPD sustained 160 of the 654 complaints.

9.      Plaintiffs, the families of Michael Wayne Jackson, Carl Wiley Jr., and Rashad Henderson, file this lawsuit under 42 U.S.C. §1983 and §1988 for the violations of their constitutional rights. Prior to Mr. Jackson, Mr. Wiley, and Mr. Henderson's deaths, the City had created a longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying the use of racial profiling in high-speed pursuits and violating Wiley, Jackson, and Henderson's substantive due process. The final policymakers of the City have communicated to officers, that such violations are authorized

---

[4] *See* Annual racial profiling data. For the year 2017, HPD did not identify any complaint for racial profiling. It is unclear if HPD either did not identify the complaints or that no complaints were made.

and even expected. The City has also communicated that the supervisory and municipal apparatus of the City will defend or cover up this exact type of conduct. Because Houston has tolerated – and even encouraged – this unlawful conduct, it has become customary among HPD police officers to racially profile and violate the right of substantive due process. This conduct was the moving force and cause of Michael Wayne Jackson, Carl Wiley Jr. and Rashad Henderson's deaths.

## V.

## Conditions Precedent

10.     All conditions precedent for Plaintiffs obtaining the relief sought in this cause have been performed or have occurred.

## VI.
## Factual Background

### A.  The known danger of high-speed pursuits in the United States

11.     Law enforcement within the United States, including the City of Houston, have long been aware of the substantial risk of harm caused by high-speed chases. Since 1979, "[m]ore than 5,000 bystanders and passengers have been killed in police car chases" throughout the United States.[5] Even worse, "[p]olice across the USA chase tens of thousands of people each year -- usually for traffic violations or misdemeanors -- often

---

[5] Thomas Frank, *High-speed police chases have killed thousands of innocent bystanders*, USA Today, July 30, 2015.

causing drivers to speed away recklessly."[6] As a result, "far more police vehicle chases occur each year than police shootings."[7]

12.    Undeniably, high-speed chases present a clear risk to the public. Innocent bystanders account for 27% of high-speed chase fatalities.[8] In contrast, law enforcement only account for 1% of fatalities.[9] In other words, law enforcement officers bear only a miniscule amount of the risk of a high-speed chase compared to innocent bystanders or the occupants of the chased vehicles.



---

[6] Id.
[7] Id.
[8] A Review of Police Pursuit Fatalities in the United States from 1982-2004, 11 Prehospital Emergency Care 278, 280 (2007)
[9] Id.
[10] Id.

13.     Recognizing the "major public concern" of high-speed chases, in 1990 the Department of Justice labeled pursuits "the most dangerous of all ordinary police activities" and urged police departments to adopt policies to reduce the incredible risk of harm.[11]  "[N]umerous other government and private studies from 1969 through 1988 have concluded that the incidence of pursuit-related death, injury and property damage is disproportionately high to justify an immediate high-speed chase of a fleeing suspect, particularly where the suspected offense is a misdemeanor or non-violent minor felony."[12]

14.     Ultimately, the Department of Justice made specific recommendations for police departments regarding high-speed chases. The DOJ suggested that the department should "nam[e] the types of offenses for which high-speed pursuit is allowed or not allowed. Pursuit for traffic offenses? Pursuit for any criminal offense? Pursuit for felonies only? Pursuit for violent felonies only?"[13] The DOJ further noted:

> The essential purpose of pursuit is to apprehend a traffic law violator or criminal offender. If this apprehension can be accomplished by means other than high-speed pursuit, then law enforcement should try to use them. When offenders are known, they can probably be apprehended, without chases, in their homes or in places they frequent. Whether or not to engage in a high-speed chase then becomes a question of weighing the danger to the public of the chase itself against the danger to the public of the offender remaining at large. For anyone other than a violent felon, the balance weighs against the high-speed chase.
>
> It is important, then, that a law enforcement agency equip itself with means of identifying a suspect without high-speed pursuit. The most obvious

---

[11] National Institute of Justice, U.S. Dept. of Justice, Restrictive Policies for High-Speed Police Pursuits 6-10 (1989)

[12] *Id.*

[13] *Id.*

solution is to take a photo of the fleeing vehicle, which entails having a camera available and an officer capable of taking a useful photo with it.[14]

15.     The DOJ further concluded that "development of legally sound police vehicle pursuit policies lags behind development of deadly force policies involving firearms." Furthermore, "the most important reason for effective pursuit policies is not minimization of liability. It is to protect life and property-the basic police mission."[15]

**B.  HPD's policies and customs related to high-speed chases**

16.     The City is well aware of the dangers and risks of high-speed chases.  In 2017, the Houston Chronicle noted that approximately five people a year are killed in high-speed chases by HPD.[16] Between 2012 and 2017, HPD high-speed chases caused injuries to 1,000 innocent victims, 6,000 fleeing drivers, and 32 officers.  In other words, HPD's high-speed chases present substantial risk to the public, while presenting a minimal risk to HPD officers – indeed, only approximately .4% of high-speed chase related injuries in Houston.[17]

17.     At the same time, HPD has established – through its general orders – policies and training related to high-speed chases. In General Order 600-04, the City has defined a pursuit or chase as:

> [W]hen an officer operating an emergency vehicle attempts to stop or apprehend a suspect who refused to stop while operating a motor vehicle. The suspect must exhibit one of the following types of conduct:

---

[14] *Id.*

[15] *Id.*

[16] St. John Barned-Smith, *Houston police to start using new driving tactic to end vehicle pursuits*, HOU. CHRON., Nov. 17, 2017.

[17] *Id.*

a. A willful disregard for personal safety or the safety of others in an attempt to avoid arrest.[18]

b. A refusal to obey an officer's repeated signal to stop.

In that same order, HPD mandated that the field supervisor tracks these high-speed chases by completing a "Houston Police Department Vehicle Pursuit" form and submitting the form into HPD's chase database. HPD further requests that even when the officer can identify the suspect and PC for criminal activity, HPD may continue a high-speed chase if the nature of criminal activity "is such that the need to immediately take the suspect into custody justifies the possible risks to the public resulting from the pursuit."[19]

18.     Despite this policy, HPD is well aware of the inherent danger to the public of high-speed chases. As part of its training material, HPD has noted that "[c]ollisions are a predictable outcome of police pursuits."[20]  And the "more police cars involved in a pursuit, the more likely a collision will result."[21]  HPD additionally acknowledged in its 2016 training that "38.7% of police pursuits" resulted in a crash.[22]  Furthermore, HPD's rate of high-speed chases "ending in collisions" is higher than the county law enforcement agencies.[23] Put differently, HPD knows that its policies, customs, and training encourage

---

[18] Exhibit B, General Order 600-04.
[19] *Id.*
[20] Exhibit A.
[21] *Id.*
[22] *Id.*
[23] *Id.*

officers to engage in riskier and more dangerous high-speed chases than other greater Houston area law enforcement.

19.     Despite these policies and general knowledge of the incredible risk of high-speed chases, HPD has dramatically increased the number of high-speed chases over the past two decades.   Based on the available data, the following chart summarizes the high-speed pursuits, as documented by HPD:

| Year | Chases |
|------|--------|
| 2000 | 445 |
| 2011 | 685 |
| 2012 | 572 |
| 2018 | 928 |
| 2020 | 1168 |

20.     Based on HPD's records, high-speed chases have doubled since 2002, and nearly tripled since 2000.  When reviewing these pursuits in 2017, the Houston Chronicle noted that HPD has engaged "more than 4,000 vehicle pursuits" between 2012 and 2017 – an average of approximately 650-675 per year during that time period.[24] Five years later, HPD has nearly doubled these dangerous pursuits.

---

[24] St. John Barned-Smith, *Houston police to start using new driving tactic to end vehicle pursuits,* HOU. CHRON., Nov. 17, 2017.

21.    At the same time that chases have sky-rocketed, HPD has dramatically reduced its traffic stop rate. Based on HPD's documented records for traffic stops, HPD cut traffic stops from 533,858 in 2008 to 217,288 in 2021.[25]



In sum, over the last 13 years, HPD has consistently reduced its traffic stop rate, while doubling its high-speed pursuit rate.

22.    As high-speed chases have increased in the last decade, HPD continues to train, supervise, and discipline its officers consistent with a pattern of approving racially motivated, dangerous high-speed pursuits. By example, as part of its training to evaluate when to initiate a high-speed chase, HPD teaches its officers to evaluate the "social image" of the chase, weigh "urban factors," and evaluate this with their "stresses, attitudes,

---

[25] As of December 8, 2022, HPD has conducted 231,720 traffic stops. This is based on the available information provided by the City of Houston "Police Transparency Hub," available at https://policetransparency-mycity.hub.arcgis.com/.

emotions, prejudices, [and] bias." [26]



Through this, HPD trains its officers when evaluating whether to engage in a high-speed chase, to consider the neighborhood – implicitly, including the racial demographics of the neighborhood – and social image – implicitly, including the race of the drivers.

## C. **As part of its custom, practice, and training, HPD racially profiles and targets Black drivers**

23.     Following the foundation above, HPD has created a custom, pattern, and practice of targeting Black drivers and predominantly Black neighborhoods when engaging in dangerous high-speed chases. By example in 2020, the City engaged in approximately 963 high speed chases where the City reported the race of the driver.  For that year, Black citizens made up 22% of the population and 38% of traffic stops. Yet, for high-speed

---

[26] Exhibit A.

pursuits involving HPD, Black drivers made up 56.39% of the chases.  Similarly, in 2018, 58.64% of the high-speed pursuits by HPD targeted Black drivers.[27]

24.     Even more telling, during the day in 2020 – indeed, when HPD officers are more likely to be able to identify a driver's race prior to a chase – high-speed pursuits of Black drivers made up 65.01% of HPD's chases. But at night in 2020 – only after visibility and identification of the race of the driver is limited – HPD's chases of Black drivers dropped to 52.07%. This difference was more than three times the standard deviation. As a result, the variation between night and day pursuits is statistically significant and not due to random variation. HPD's chases of Hispanic drivers increase during the night and drop during the day, while chases involving white and Asian drivers stay relatively the same.

| 2020 Data | | | | | |
|---|---|---|---|---|---|
| Race of the Driver | Percentage of chases by race in the day | Percentage of chases by race in the night | Difference between day and night | Total Percentage of chases by race | Actual demographics of the City of Houston |
| White | 9.84% | 10.99% | -1.15% | 10.6% | 24% |
| Black | 64.48% | 51.79% | 12.70% | 56.03% | 22% |
| Hispanic | 22.68% | 35.85% | -13.17% | 31445% | 44% |
| Asian | 2.19% | 0.82% | 1.36% | 1.28% | 7% |

---

[27] Plaintiffs have not yet received the high-speed pursuit forms for the years 2019 and 2021, despite making a public records request in June 2022.

Similarly, in 2018, HPD's pursuit rate dropped for Black drivers during the night. Again, this variation was more than two times the standard deviation – meaning the difference was statistically significant and not due to random variation. Likewise, HPD's pursuit rate for Hispanic drivers increased at night, while decreased during the day.

| 2018 Data | | | | | |
|---|---|---|---|---|---|
| Race of the Driver | Percentage of chases by race in the day | Percentage of chases by race in the night | Difference between day and night | Total percentage of chases by race | Actual demographics of the City of Houston for 2018 |
| White | 12.58% | 9.43% | 3.01% | 10.57% | 25% |
| Black | 64.47% | 55.34% | 9.13% | 58.64% | 23% |
| Hispanic | 21.07% | 33.45% | -12.38% | 28.98% | 44% |
| Asian | 1.26% | 1.42% | .16% | 1.36% | 7% |

In all, the data from 2018 and 2020[28] confirms that HPD racially profiles Black drivers as part of their decision-making and evaluation prior to initiating a high-speed chase.

25.     This pattern is consistent with other racial profiling studies throughout the United States that have concluded that the "veil of darkness" reveals racial profiling by policy.[29]

---

[28] To date, HPD has only provided the complete pursuit forms for the years 2018 and 2020. HPD has provided part of 2017.

[29] Emma Pierson, Camelia Simoiu, Jan Overgoor, Sam Corbett-Davies, Daniel Jenson, Amy Shoemaker, Vignesh Ramachandran, Phoebe Barghouty, Cheryl Phillips, Ravi Shroff, and Sharad

By example, in May 2020, a Stanford-University-led study determined that "Black drivers get pulled over by police less at night when their race is obscured by 'veil of darkness.'"[30] The study also found that "when drivers were pulled over, officers searched the cars of [B]lacks and Hispanics more often than whites."[31] Importantly, "[t]his dataset provided a statistically valid sample with two important variables – the race of the driver being stopped, and the darkness of the sky at around 7 p.m. The analysis left no doubt that the darker it got, the less likely it became that a [B]lack driver would be stopped. The reverse was true when the sky was lighter."[32]

26.     As a result, HPD, through its custom, training, lack of discipline, and supervision, has created a pattern, practice, custom, or usage that authorizes and encourages officers to profile Black drivers, when evaluating whether to initiate a high-speed pursuit.

### D.  <u>HPD's pattern and practice of targeting Black Neighborhoods</u>

27.     In addition to the data regarding profiling by race of the driver, the City also has created a pattern, practice, custom, or usage to target Black neighborhoods, as opposed to predominantly white or Hispanic neighborhoods.  Based on the City's responses to public records requests, the City completed approximately 1,141 chase forms in 2020. After filtering and removing chases that either (1) occurred on a freeway or highway (and not a neighborhood), (2) occurred outside the boundaries of the Houston Super Neighborhoods,

---

Goel, *A large-scale analysis of racial disparities in police stops across the United States*, Nature Human Behaviour, March, 6, 2020.
[30] *Id.*
[31] *Id.*
[32] *Id.*

or (3) where HPD did not (or was unable to) report the race of the driver, the totality of the reports make it clear – HPD engages in significantly more chases in predominantly Black neighborhoods.

28.     The City has divided its population into 88 Super Neighborhoods.  Based on the population reported by the City, the City has 2,310,432 residents living in Houston and approximately 2,262,077 residents live withing the boundaries of the 88 Super Neighborhoods. The boundary of the City's Super Neighborhoods is as follows:



29.     Of the pursuits in 2020, twelve neighborhoods had a standard deviation of more than three times between the percentage of actual chases and the percentage of its population within the Super Neighborhoods.  In totality, those neighborhoods, made up

10% of the population, yet at over 31% of all high-speed chases in the dataset. Ten of the twelve neighborhoods were predominantly Black. And notably, two of the neighborhoods, Northside/Northline and Eastex-Jensen directly border majority Black neighborhoods.

| Super Neighborhood ("SN") | High speed chases per 10k (Houston Average 3.61) | Black population of the SN | Difference between SN and the average Black population |
|---|---|---|---|
| Acres Home | 10.90 | 60% | 38% |
| East Little York / Homestead | 7.61 | 68% | 46% |
| Eastex-Jensen | 10.57 | 18% | -4% |
| Greater Fifth Ward | 9.80 | 43% | 21% |
| Greater OST / South Union | 19.79 | 77% | 55% |
| Greater Third Ward | 10.89 | 59% | 37% |
| Independence Heights | 13.25 | 33% | 11% |
| Kashmere Gardens | 10.08 | 59% | 37% |
| Northside / Northline | 6.83 | 8% | -14% |
| South Park | 11.46 | 64% | 42% |
| Sunnyside | 15.17 | 75% | 53% |
| Trinity / Houston Gardens | 14.87 | 63% | 41% |

30.    In addition, a closer look at the predominantly Black neighborhoods of Houston further reveals HPD's pattern of targeting Black communities.  As part of that evaluation, this Petition relies on the review of the following groups of neighborhoods:

**Group 1: Super Neighborhoods with a Black population greater than 50%[33]**

---

[33] This group of neighborhoods makes up approximately 11.33% of the City's super neighborhood population.

- Acres Homes,
- East Houston,
- East Little York / Homestead,
- Fort Bend Houston,
- Greater OST / South Union,
- Greater Third Ward,
- Kashmere Gardens,
- MacGregor,
- Settegast,
- South Acres / Crestmont,
- South Main,
- South Park,
- Sunnyside, and
- Trinity / Houston Gardens



Group 2: Super Neighborhoods with a with a majority/plurality Black population[34]

- The Super Neighborhoods from Group #1,
- Brays Oaks,
- IAH/Airport Area,
- Pleasantville,
- Westchase,
- and Willowbrook



Group #3: Super Neighborhoods with a with a Black population greater than 30%[35]

---

[34] This group of neighborhoods makes up approximately 17.35% of the City's super neighborhood population.

[35] This group of neighborhoods makes up approximately 22.96% of the City's super neighborhood population.

- The Super Neighborhoods from Groups #1 and #2;
- Central Southwest,
- Clinton Park Tri-Community
- Greater Fifth Ward,
- Independence Heights, and
- Minnetex



31.    Notably, Super Neighborhoods in Group #1 – areas with a Black population greater than 50% of the population of the neighborhood– make up approximately 11.52% of the population of the City's super neighborhood in 2020.   Despite that, approximately 30.18% of high-speed chases occurred in these neighborhoods – an amount over 18.66% more than the baseline population.  Tellingly, based on this evaluation, the City has 3.61 high-speed chases per 10,000 residents. Yet in Group #1, the Black majority neighborhoods have 9.46 high-speed chases per 10,000 residents – over 2.5 times the average rate. Further confirming this data, the chases withing Group #1 were 16.96 standard deviations from the average chase for the city of Houston based on the population of Group #1.

32.    Similarly, neighborhoods in Group #2 – neighborhoods with a majority/plurality Black population – make up approximately 16.76% of the population of the City's Super Neighborhoods. Despite that, approximately 34.23% of high-speed chases occurred in these neighborhoods – an amount over 17.47% more than the baseline population.  Even worse, the neighborhoods in Group #2 have 7.38 high-speed chases per 10,000 residents.

Further, the chases within Group #2 were 13.35 standard deviations from the average chase for the city of Houston based on the population of Group #2.

33.     Finally, Group #3 — neighborhoods with a Black population greater than 30% of the population of the neighborhood – also mirrors the same pattern as Groups #1 and #2. More pointedly, Groups #3 makes up 22.21% of the population of the City's Super Neighborhoods. Yet again, approximately 41.47% of high-speed chases occurred in these neighborhoods – an amount over 19.26% more than the percentage of the population. The neighborhoods in Group #3 have 6.74 high-speed chases per 10,000 residents – more than double the city's average. Further confirming this data, the chases within Group #2 were 13.23 standard deviations from the average chase for the City based on the population of Group #2.

| Super Neighborhood Group | High speed chases per 10k (Houston Average 3.59) | The number of standard deviations between (a) the chases and (b) the expected chases based on the mean of the population of the neighborhoods |
|---|---|---|
| Super Neighborhoods where Black residents make up more than 50% of the neighborhood | 9.46 | 16.69 |
| Super Neighborhoods where Black residents make up the largest demographic | 7.38 | 13.36 |
| Super Neighborhoods where Black residents make up more than 30% of the neighborhood | 6.74 | 13.23 |

34.     In comparison to the treatment of Black neighborhoods, Houston's predominantly white neighborhoods were targeted with far fewer chases. Indeed, these neighborhoods saw

two to three times less than the average number of chases in the City. More pointedly, the

complaint also relies on the following white neighborhoods:

| Group 1: Super Neighborhoods with a white population greater than 50%[36] | |
|---|---|
| <ul><li>Afton Oaks / River Oaks,</li><li>Braeswood,</li><li>Clear Lake,</li><li>Greater Heights,</li><li>Greater Uptown,</li><li>Greenway / Upper Kirby,</li><li>Kingwood Area,</li><li>Lake Houston,</li><li>Medical Center Area,</li><li>Memorial,</li><li>Meyerland Area,</li><li>Midtown,</li><li>Museum Park,</li><li>University Place, and</li><li>Washington Avenue Coalition / Memorial Park.</li></ul> |  |
| Group 2: Super Neighborhoods with a with a majority/plurality white population[37] | |

---

[36] This group of neighborhoods makes up approximately 20.08% of the City's super neighborhood population.
[37] This group of neighborhoods makes up approximately 30.31% of the City's super neighborhood population.

- The Super Neighborhoods from Group #1,
- Addicks Park Ten,
- Briar Forest,
- Central Northwest,
- Eldridge / West Oaks,
- Fourth Ward,
- Lazybrook / Timbergrove
- Neartown – Montrose, and
- Near Southwest.



**Group 3: Super Neighborhoods with a with a white population greater than 30%[38]**

- The Super Neighborhoods from Groups #1 and #2;
- Astrodome Area,
- Downtown,
- Spring Branch East,
- Spring Branch North,
- Spring Branch West,
- and Westbury.



35.    Super Neighborhoods in Group #1 – areas with a white population greater than 50%

---

[38] This group of neighborhoods makes up approximately 36.21% of the City's super neighborhood population.

of the population of the neighborhood– make up approximately 20.08% of the population of the City's super neighborhood. Despite that, approximately 7.61% of high-speed chases occurred in these neighborhoods – an amount of 12.47% less than the population.  In contrast to the Black neighborhoods, Black majority neighborhoods have 1.37 high-speed chases per 10,000 residents – over 2.5 times less than the average rate.  Further confirming this data, the chases withing Group #1 were 8.89 standard deviations less than the average chase for the City based on the population of Groups #1. Likewise, neighborhoods with a white population greater than 50% neighborhoods were 7 times less likely than neighborhoods with a Black population greater than 50%.

36.    Like Group #1, Super Neighborhoods in Group #2 – neighborhoods with a majority/plurality white population –make up approximately 30.31 % of the population of the City's Super Neighborhoods.  Despite that, approximately 13.5% of high-speed chases occurred in these neighborhoods – an amount over 16.81% more than the baseline population.  Even worse, the neighborhoods in Group #2 have 1.60 high-speed chases per 10,000 residents.  As a result, chases within Group #2 were 10.44 standard deviations less than the average chase for Houston, based on the population of Group #2.

37.    Group #3 — neighborhoods with a white population greater than 30% of the population of the neighborhood –makes up 36.21% of the population of the City's Super Neighborhoods.  Yet again, approximately 18.16% of high-speed chases occurred in these neighborhoods – an amount over 18.05% less than the percentage of the population.  The neighborhoods in Group #3 have a 1.81 chase rate per 10,000 residents.  Further confirming this data, the chases within Group #2 was 10.72 standard deviations less than the average

chase for Houston, based on the population of Group #2.

| Super Neighborhood Group | High speed chases per 10k (Houston Average 3.59) | Standard Deviation between chases and actual population of the neighborhoods |
|---|---|---|
| Super Neighborhoods where white residents make up the largest demographic | 1.60 | -10.44 |
| Super Neighborhoods where white residents make up more than 50% of the neighborhood | 1.37 | -8.89 |
| Super Neighborhoods where white residents make up more than 30% of the neighborhood | 1.81 | -10.72 |

38.     In contrast, to the white and Black neighborhoods, the Hispanic population – in particular, neighborhoods with greater than 50% Hispanic residents – tracks the numbers of chases for the demographic percentages of those neighborhoods. This is based on the following Super Neighborhoods:

| Group 1: Super Neighborhoods with a Hispanic population greater than 50%[39] |
|---|
| Alief, Braeburn, Carverdale, Clinton Park Tri-Community, Denver Harbor / Port Houston, Eastex - Jensen Area, Edgebrook Area, Eldridge / West Oaks, Fairbanks / Northwest Crossing, Fondren Gardens, Golfcrest / Bellfort / Reveille, Greater Eastwood, Greater Fifth Ward, Greater Greenpoint, Greater Hobby Area,  Greater Inwood, Gulfgate Riverview / Pine Valley, Gulfton, Harrisburg / Manchester, Hidden Valley, Hunterwood, Independence Heights, Langwood, Lawndale / Wayside, Magnolia Park, Meadowbrook / Allendale, Near Northside, Northside/Northline, Park Place, Pecan Park, Pleasantville Area, Second Ward, Sharpstown, South Belt / Ellington, Spring Branch Central, Spring Branch East, Spring Branch West, and Westwood. |

---

[39] This group of neighborhoods makes up approximately 44.17% of the City's super neighborhood population.



39.   Next, Super Neighborhoods with a Hispanic population greater than 50% of the population of the neighborhoods make up approximately 42% of the population of the City's super neighborhood. Despite that, approximately 44.02% of high-speed chases occurred in these neighborhoods – an amount of approximately 1/10 of the standard deviation.   Similarly, these Super Neighborhoods have 3.76 high speed chases per 10,000 residents, while the average rate for the City of Houston is 3.59. As a result, HPD chases track the exact demographics and population for these neighborhoods.

| Super Neighborhood Group | High speed chases per 10k (Houston Average 3.59) | Standard Deviation between chases and actual population of the neighborhoods |
|---|---|---|

| Super Neighborhoods where Hispanic residents make up more than 50% of the neighborhood | 3.77 | 1.06 |
|---|---|---|

40.     In addition, the high-speed chases tracked over the maps of the city of Houston – in particular the Southwest, East, and Northeast Houston areas – also virtually mirror the Black population patterns for those areas. The data below include comparisons of the Black population of Houston on the left compared to the high-speed chases for those same areas to the right.





Put simply, HPD's high-speed pursuits in 2020 occurred largely in the exact same areas as the Black population of Houston.

41.    As a result, HPD, through its custom, training, lack of discipline, and supervision, has created a pattern, practice, custom, or usage that authorizes and encourages officers to profile Black neighborhoods when evaluating whether to initiate a high-speed pursuit.  This

includes evaluating the social image and the population base – an explicit part of HPD's training.

**E.  HPD encourages its officers to racially profile by (1) failing to ever take disciplinary action against officers for allegations of racial profiling, (2) establishing a disciplinary process that encourages profiling, and (3) limiting any meaningful review of allegations of racial profiling**

42.     Combined with the data above, HPD, through its Chief of Police, has established inadequate policies and customs of investigating, punishing, supervising, and disciplining police officers who racially profile either drivers or neighborhoods. As a result, HPD's policy of authorizing racial profiling in high-speed chases has become a persistent and widespread practice of the city and its employees and thus constitutes a custom that represents the City of Houston's policy. In addition, this failure has become a "moving force" behind an unconstitutional use of high-speed chases and deadly vehicle crashes caused by police officers.

43.     This pattern and practice of unconstitutional use of racial profiling is not an accident. Rather, through its policies, enforcement, and investigations of racial profile allegations, HPD has deliberately created and encouraged a pattern of racial profiling by its officers. For example, for any complaints or charges regarding racial profiling and collisions caused by high-speed chases, (1) HPD does not question the officer until the officer has spoken with an attorney; (2) the officer is allowed to do an unrecorded "walkthrough" of the scene, while accompanied by an attorney; (3) and the officer is given forty-eight hours to answer written questions with an attorney's assistance.  Notably, this process is "entirely different" from how HPD investigates vehicle crashes/crimes of

civilians or charges regarding racial related crimes.  As explained by HPD's Corporate

Representative in a different matter:

> 76
> 20   Q.   Now, the way the Houston Police Department
> 21   investigates officers involved in serious injury or
> 22   death cases is entirely different from the way it
> 23   investigates civilians?
> 25      A.   That's correct.
>                     77
> 1   Q.   (BY MR. DOYLE) What are some of the
> 2   differences, custom and practices, in the way police
> 3   officer serious injury or death incidents are
> 4   investigated that you can share with us?
> 5      A.   We are required to give them 48 hours notice
> 6   to be able to respond.  And so they are required to get
> 7   that time frame to discuss with their lawyers before
> 8   they give us a statement of what happened.
> 9      Q.   So, absolutely, positively one custom and
> 10   practice that you can share with us is, you do not even
> 11   attempt to interview officers involved in serious
> 12   injuries or deaths?
> 14      A.   Not until they are served with a 48.
> 15   Q.   (BY MR. DOYLE) At the scene, absolutely,
> 16   positively do not even attempt to interview officers
> 17   involved in a serious injury or death vehicular
> 18   investigation?
> 20      A.   Only when they have the 48.  The only thing
> 21   we're allowed to ask them is what lane they were in and
> 22   the direction of travel.[40]

Furthermore, as part of the "walkthrough," HPD further authorizes the involved officers to

review the body camera footage prior to making a statement. Indeed, before asking written

questions, investigators provide the officers with all of the evidence that HPD has so the

officer can explain away the evidence in the written response, including any written witness

---

[40] Exhibit C.

statements.  In addition, if HPD requests an investigation interview, HPD must conduct the interview either during normal working hours or HPD Must pay the officer overtime.[41]   In other words, unlike civilians, HPD pays its officer when they participate in investigations, including providing interviews to HPD.

44.    Following the above, HPD's handling and customs regarding disciplinary matters, further encourages and establishes the pattern of racial profiling.  Based on this process, police officers are able to modify their version of the story prior to ever making a statement. In contrast, civilians accused of similar misconduct – whether racial crimes or traffic crashes – are certainly not given these evidentiary advantages that HPD provides its law enforcement.

45.    Furthermore, HPD also limits the amount of time that it can impose terms of suspensions on its officers. More pointedly, HPD may only suspend officers if they acted within 180 days from the date it discovered or became aware of the misconduct.  Even worse, for an indefinite suspension HPD is limited to 180 days regardless of when it discovered or became aware of the misconduct.

46.    Not surprisingly, HPD has failed to ever meaningfully discipline any officer for racial profiling related charges. More specifically, in evaluating discipline, HPD includes determinization regarding the "disposition of complaints" as follows:

- Exonerated:  Incident occurred but wawas lawful and proper;

- Never Formalized: Complainants did not submit a formal sworn statement;

---

[41] General order 200-03

- Not Sustained: the evidence was insufficient to either prove or disprove the allegation;

- Sustained: Evidence is sufficient to prove the allegation. Any sustained allegation, regardless of its classification, may form the basis for disciplinary action.

- Unfounded: Evidence is false or not factual.[42]

Yet, in the last 10 years, HPD has never sustained a claim of racial profiling, much less a high-speed chase complaint related to racial profiling. Based on the data available, HPD has received approximately 47 complaints regarding racial profiling since 2010.[43] Of those complaints, HPD concluded that 28 were "unfounded," 2 were "pending," 3 were "exonerated," 8 were "not sustained," and 0 were "sustained."   In contrast to the zero sustained findings for racial profiling complaints, HPD generally has sustained approximately 25% of complaints made against officers.   By example, in 2021, HPD sustained 160 of the 654 complaints.

47.    In addition, as part of its legal obligation under Texas and federal law, HPD mandates that the Chief of Police review the compilation of data regarding racial profiling. In other words, the City's final policy maker is responsible for reviewing and confirming the data regarding racial profiling. This includes the rate of traffic stops and the final determinations regarding racial profiling complaints made against HPD officers.   As part

---

[42] *See* HPD General Order 200-03.
[43] *See* HPD's Annual racial profiling data. For the year 2017, HPD did not identify any complaint for racial profiling. It is unclear if HPD either did not identify the complaints or that no complaints were made.

of that, HPD has represented that "there is no substantial, statistically significant evidence of racial profiling against any race/ethnic group represented in Houston." Even further, "there exists neither evidence of systemic bias in the practices of Houston police officers nor evidence that individual officers in the department have engaged in racial profiling."

48.     The City's final policy maker, HPD's Chief of Police, has reviewed and confirmed the custom, policy, practice, and usage that authorizes and encourages officers to engage in racial profiling. Indeed, HPD's final policymakers are aware that HPD has never sustained a claim of racial profiling. Combined with that, the final policymakers are also aware that the disciplinary process at HPD encourages officers to racially profile drivers and neighborhoods because officers know that they will never be punished for racial profiling.

**F.  HPD's racial profiling causes the death of Carl Wiley**

49.     Just after midnight on February 7, 2022, HPD patrol officers were patrolling near 10400 Richmond Avenue, Houston, Texas – an area in the predominantly Black neighborhood of Westchase.  HPD Officers Trevino and Salazar then spotted a white Cadillac STS parked at a gas station.  HPD saw that the vehicle was operated by a Black man – Cameron Rogers – with another Black man and a Hispanic woman present. The officer then allegedly spotted an open container. Profiling Rogers, the HPD officers turned on their emergency lights and approached the vehicle.  In response, Rogers fled.  HPD then initiated a high-speed chase of the vehicle on Richmond and headed north on Wilcrest.

50.     Instead of taking precaution in light of the minor violation, HPD profiled the driver based on his race (Black) and the neighborhood based on its racial demographics (majority

Black). As a result, HPD initiated a chase of the suspects based on an open containers violation – a minor criminal violation. As HPD chased the driver, the suspect ran through a red light and struck Carl Wiley Jr.'s vehicle. In all, HPD's racial profiling caused the death of Mr. Wiley.



51.     Prior to the chase, HPD knew that nature of criminal activity was not the type of conduct that required "immediately tak[ing] the suspect into custody," when weighed against the "possible risks to the public resulting from the pursuit." Likewise, HPD and other officers driving the vehicle also knew that "[c]ollisions are a predictable outcome of police pursuits."  And that a large portion of pursuits end in collisions, including harm to third parties.   Despite that knowledge, HPD intentionally decided to profile the neighborhood and suspect, knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury. Put differently, HPD maintained

---

44      https://www.khou.com/article/news/crime/innocent-driver-dies-in-police-chase-on-wilcrest-houston/285-a57e3d84-2bf1-46f0-874b-68a9e7c1db8e

a purpose to cause harm – racially profiling the driver and suspect – unrelated to the legitimate object of arrest.  Based on that, HPD's conduct shocks the conscience.

### G.  HPD's racial profiling causes the death of Michael Wayne Jackson

52.     On December 4, 2021, HPD had initiated a high-speed chase of five Black suspects under the age of 18 who had allegedly, stolen a vehicle at 3313 Tangerine Street. Specifically, the suspects stole a women's car at 7510 Belfort Avenue in the parking lot of a Fiesta grocery.  Through the internal GPS on the vehicle, the owner was able to identify to the police that the vehicle was located at Tangerine Street. Ultimately, HPD spotted the truck at 9100 Scott Street, and a chase shortly ensued.

53.     Although the initial chase in pursuit of the suspects had ended, HPD Officer Orlando Hernandez and his partner initiated their own pursuit to join the chase. Notably, Hernandez did not have a visual on the vehicle and was not part of the primary pursuit. Rather, Hernandez was a "participating unit" as defined by general order 600-04.  Even worse, HPD and its field supervisor had not authorized or assigned Hernandez to engage in the pursuit.  And Hernandez had not sought permission to engage in the pursuit. Despite not being in a close proximity to the suspect and not being the primary or secondary response unit, Hernandez still drove his cruiser between 80 to 100 miles per hour down Reed Road in the predominantly Black neighborhood of Sunnyside. In that area, the speed limit is 40 miles per hour. Hernandez recklessly drove at these high speeds despite the slippery condition from a recent rain shower. And although Hernandez activated his windshield wipers as he drove, Hernandez's driving was seriously dangerous based on the conditions of the road.  Furthermore, the primary drivers had already flagged that the chase involved

four-five Black suspects. As a result, Hernandez knew that he was pursing Black suspects and in a predominantly Black neighborhood.

54.     At that same time, Michael Wayne Jackson was walking on a public sidewalk to get a haircut near the intersection of Reed Road and Scott. As Hernandez dangerously and intentionally approached Scott Street at a speed double the legal limit, Hernandez violently swerved at the intersection and veered the car onto the sidewalk. Hernandez then struck and killed Mr. Jackson, who was walking on the sidewalk to his barber. Hernandez then slammed the vehicle into a dumpster.



55.     HPD's internal records confirmed that Hernandez was "traveling at a[n] unsafe speed," "performed a faulty evasive action," which caused him to go "on the sidewalk."



Because of this incident, Hernandez received thirty days suspension and one-year probation.

56.     Prior to the chase, Hernandez understood that he was not the pursuing officer and that driving recklessly in the rain would endanger innocent bystanders. Hernandez also knew that the officers had GPS tracking for the vehicle and that officers were already following the suspects. Put differently, Hernandez did not need to drive at unsafe and reckless rates of speed because he knew the location of the vehicle and knew that the conditions did not justify his conduct.  Despite that knowledge, Hernandez intentionally drove recklessly based on his profiling of the suspects and the neighborhood.

57.     Likewise, HPD and Hernandez knew that "[c]ollisions are a predictable outcome of police pursuits." In addition, Hernandez knew that a large portion of pursuits end in collisions, including harm to third parties. Despite that knowledge, Hernandez and his

partner intentionally decided to profile the neighborhood and suspect, knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury.  Put differently, HPD maintained a purpose to cause harm – racially profiling the driver and suspect – unrelated to the legitimate object of arrest. Based on that, the City's conduct shocks the conscience.

## H.  HPD's racial profiling causes the death of Rashad Henderson

58.    On December 17, 2020, HPD officers received a call a mother reporting that her teenage daughter, a Black 16-year-old girl, had taken her car and was running away from home.  HPD also learned that the teenager may be suffering from a mental breakdown. HPD then spotted the teenager approximately 6 miles north of El Dorado at Highway 3. Knowing the situation, the police saw the car take off at a high rate of speed. Importantly, because the vehicle was owned by the mother, the officers could have simply tracked the car via GPS.  Instead, HPD sent multiple units to chase the 16-year-old in a high-speed pursuit.  HPD's chase lasted approximately one hour. During the unsafe chase, the teenager drove hazardously while also speeding at approximately 100 miles per hour. Also, during the chase, to avoid the officers, the teenager continuously turned her headlights on and off.

59.    At the end of the chase, HPD officer finally accepted what they should have known at the beginning– they had created an incredibly dangerous situation that presented a substantial risk to the public.  Indeed, an HPD officer noted that they were going to stop the chase because "it's not worth it to me. She's driving too crazy."  Another officer further noted "[I]f we can get her while she's stopped, we'll get her while she's stopped."  Despite this knowledge, HPD failed to disclose the call-off notice to officers in assisting

jurisdictions, which caused the teenager to continue to drive in an unsafe, erratic manner.

60.     Ultimately, the teenager turned north on Galveston Road, where she struck Rashad Henderson's vehicle at a high rate of speed, thereby pushing Mr. Henderson's vehicle off the road and into a tree. According to HPD, the teenager "was going at such a high rate of speed that when she hit the vehicle, there was a lot of damage. She hit them going very fast." Ultimately, the wreckage and damage to the vehicle displays the severity of the collision.



As a result, HPD's pattern, practice, custom, or usage caused the death of Mr. Henderson.

61.     Prior to the chase, HPD knew that this chase would endanger innocent bystanders. The officers also knew that HPD had GPS tracking for the vehicle and that a helicopter was already following the suspects. Put differently, HPD did not need to pursue the teenager and cause her to drive at unsafe and reckless rates of speed. Despite that

knowledge, HPD intentionally chose to pursue the vehicle based on their profiling of the driver.

62.     Likewise, HPD and the other officers driving the vehicle also knew that "[c]ollisions are a predictable outcome of police pursuits."  Indeed, the officers involved in the chase knew from HPD's training that the more vehicles that are part of a high-speed chase, the more likely a crash will occur. In addition, HPD knew that a large portion of pursuits end in collisions, including harm to third parties. Despite that knowledge, the officers intentionally decided to profile the driver while knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury.  Put differently, HPD maintained a purpose to cause harm – racially profiling the driver and suspect – unrelated to the legitimate object of arrest.  Based on that, the City's conduct shocks the conscience.

I.   **HPD's racial profiling causes the severe injuries of Intervenor Courtney Lane**

63.     On February 21, 2023, at around 5pm, Terry Rogers, a 26-year old Black man, and Jaya Branch, a 17-year old Black girl, were in a pick-up truck in the historically Black neighborhood of Inwood.  HPD Officer Poteet and Officer Lawrence initiated a stop of Rogers and Branch. Prior to the stop, Officer Poteet and Officer Lawrence knew that Rogers was Black. In response, Rogers fled.  HPD then initiated a high-speed chase in Inwood. Immediately prior to the chase, HPD made the decision to engage a high-speed chase because of the race of the driver (Black) and the neighborhood based on its racial demographics (majority Black).

64.     Instead of taking precaution, HPD profiled the driver based on his race (Black) and

the neighborhood based on its racial demographics (majority Black). As HPD chased the driver, the suspect ran through a red light and struck Courtney who was parked the red light on a motorcycle.  Due the force of the collision, Mr. Lane suffered severe injuries to this knee, ten broken ribs, 3-degree burns, a fractured pelvis and a puncture lung.

65.    Prior to the chase, HPD knew that nature of criminal activity was not the type of conduct that required "immediately tak[ing] the suspect into custody," when weighed against the "possible risks to the public resulting from the pursuit." Likewise, HPD and other officers driving the vehicle also knew that "[c]ollisions are a predictable outcome of police pursuits."  And that a large portion of pursuits end in collisions, including harm to third parties. Despite that knowledge, HPD intentionally decided to profile the neighborhood and suspect, knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury. Put differently, HPD maintained a purpose to cause harm – racially profiling the driver and suspect – unrelated to the legitimate object of arrest.  Based on that, HPD's conduct shocks the conscience.

## VII.

### First Cause of Action: 42 U.S.C. § 1983 by Courtney Lane – Municipal liability for a policy, custom usage, or ratification against the City of Houston for Violations of the 14th Amendment Substantive Due Process Clause

66.    At all times relevant to the allegations in this Complaint in Intervention, the HPD officers identified in this Complaint in Intervention acted under color of state law and within the course and scope of their official duties and employment in their capacities as officers of the Houston Police Department.

67.     Under the Fourteenth Amendment to the United States Constitution, Mr. Lane had an established constitutional right to substantive due process under the Fourteenth Amendment.

68.     The City's violation of the Mr. Lane's substantive due process rights caused his injuries. As a direct and proximate result of the violation of the constitutional rights by the City, Mr. Lane suffered general and special damages as alleged in this Complaint in Intervention and are entitled to relief under 42 U.S.C. §1983, 1988.

69.     The City took its actions based on the policy, practice, custom, and usage of the City, such that the City of Houston is liable. As a matter of both policy and practice, the City – through its final policymakers, including the chiefs of police – encourages and is thereby the moving force behind the very type of misconduct described in this Complaint in Intervention by failing to adequately supervise, control, and discipline its officers such that its failure to do so manifests deliberate indifference.

70.     As a matter of policy, custom, and practice, the City of Houston facilitates the very type of misconduct at issue in this Complaint in Intervention, by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe their actions will never be meaningfully scrutinized. In that way, the City of Houston directly encourages future racial profiling in initiating high-speed chases and violations of subsntiative due process, such as those alleged in this lawsuit.

71.     Generally, as a matter of widespread practice so prevalent as to constitute municipal policy, HPD officers violate – in a manner similar to those alleged by Lane and the other

Plaintiffs – the constitutional rights of individuals on a regular basis.  Nevertheless, the City only investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases and never finds that officers engaged in this misconduct.

72.    It was the custom, practice, or usage of HPD to racially profile drivers and neighborhoods when engaging (or deciding not to engage) high speed chases.  In addition, it was the custom, practice, or usage of HPD to engage in high-speed pursuits and risking harm to innocent by-standers because, officers know that officers have little to no risk of harm when the engage in a high-speed pursuit.

73.    The City's conduct was egregious, deliberately indifferent, and so outrageous that it shocked – and continues to shock – the contemporary conscience. Specifically, the City made the decision to initiate high-speed chases based on racial bias and racial profiling of the drivers and neighborhoods in which its officers were driving. The City also made the decision to initiate the high-speed chases based on the miniscule risk to the officers while knowing that the high-speed chases placed a considerable risk on innocent third-parties like Plaintiffs.  This conduct shocks the conscience.

74.    The City, through its officers, knew that HPD officers had a miniscule risk of harm from the risk of a vehicle crash during a highspeed chase. The City, through its officers, also knew that high speed pursuits created a substantial risk of harm to the public and to the fleeing drivers. Indeed, the City knew that approximately one-third of HPD's pursuits resulted in crashes. By initiating a highspeed chase based on HPD's racial profiling of the fleeing drivers and demographics of the neighborhoods, the City consciously intended to

harm the rights of Plaintiffs and others within the community.  Indeed, the City intended to worsen Plaintiffs' legal rights and the legal rights of the drivers by racial profiling them. Likewise, HPD – and by extension, the City – intentionally acted to initiate high-speed chases for reasons that violated the Constitution, knowing that there was a high probability of harm.

75.    Based on the City's history, the City, through its officers, knew that racially profiling and violating subsntiative due process would exact no consequence for their actions. Indeed, the officers knew that the City frequently turned a blind eye to any allegations of racial profiling or unconstitutional high-speed pursuits.

76.    The City's conduct was not incidental to any legitimate objective of arresting or pursuing the fleeing drivers.  Rather, the City intended to profile and target the fleeing drivers, the neighborhoods, and Courtney  Lane, Michael Wayne Jackson, Carl Wiley Jr. and Rashad Henderson based on their race and the City's racial profiling.

77.    Under Section 34-22 and 34-23 of the Houston City Ordinance, the Chief of Police, is one of the final policy makers for HPD. The Chief of Police ratified, affirmed, and approved this conduct by failing to take disciplinary action for claims of racial profiling or violations of subsntiative due process.

78.    As a result of the City's policies and practices, and the unjustified and unreasonable conduct of the City, Lane has suffered the injuries identified in this Complaint in Intervention, including severe past and future emotional distress, pain and suffering, disfigurement, impairment, lost wages, and medical care.

**VIII.**

**Second Cause of Action: 42 U.S.C. § 1983 – Municipal liability for a policy, custom usage, or ratification against the City of Houston for Violations of the 14th Amendment Equal Protection Clause and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.**

79.     At all times relevant to the allegations in this Complaint in Intervention, the HPD officers identified in this Complaint in Intervention, acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers of the HPD.

80.     Under the Fourteenth Amendments, Mr. Lane had an established constitutional right to equal protection under the 14th amendment and to be free from racial discrimination under Title VI.

81.     Defendants' violation of their rights caused Lane's injuries. As a direct and proximate result of the violation of the constitutional rights by the Defendant, Mr. Lane suffered general and special damages as alleged in this Complaint in Intervention and are entitled to relief under 42 U.S.C. §1983, 1988.

82.     Defendant took their actions based on the policy, practice, custom, and usage of the City of Houston, such that Defendant City of Houston is liable.  As a matter of both policy and practice, the City of Houston, through its final policymakers, including the chiefs of police, encourages, and is thereby the moving force behind, the very type of misconduct described in this Complaint in Intervention, by failing to adequately supervise, control and discipline its officers such that its failure to do so manifests deliberate indifference and intentional conduct.

83.     As a matter of policy, custom, and practice, the City of Houston facilitates the very

type of misconduct at issue in this Complaint in Intervention, by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe their actions will never be meaningfully scrutinized. In that way, the City of Houston directly encourages future racial profiling in high-speed chases and violations of equal protection, such as those alleged in this lawsuit.

84.     Generally, as a matter of widespread practice so prevalent as to constitute municipal policy, HPD officers violate the constitutional rights of individuals in a manner similar to that alleged by Mr. Lane on a regular basis.  Nevertheless, the City of Houston only investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases and never finds that officers engaged in this misconduct.

85.     It was the custom, practice, or usage of HPD to racially profile drivers and neighborhoods when engaging (or deciding not to engage) high speed chases.  In addition, it was the custom, practice, or usage of HPD to engage in high-speed pursuits in neighborhoods that were predominantly Black, while not engaging in high-speed pursuits in neighborhoods that were predominantly white. Therefore, HPD treated similarly situated residents of the city of Houston differently.

86.     Defendant, through its officers, knew that HPD officers had a miniscule risk of harm from the risk of a vehicle crash during a highspeed chase. Defendant, through its officers, also knew that high speed pursuits created a substantial risk of harm to the public and to the fleeing drivers. Indeed, Defendant knew that approximately one-third of pursuits resulted in crashes. By initiating a highspeed chase based on Defendant's racial profiling of the fleeing drivers and demographics of the neighborhoods, Defendant was consciously

intended to harm the rights of Lane, Plaintiffs, and others within the community. Defendant intended to worsen Lane and Plaintiffs' legal rights and the legal rights of the drivers by racial profiling them. Likewise, Defendant intentionally acted to initiate high-speed chases for reasons that violated the Constitution, knowing that there was a high probability of harm.

87.     Defendant's conduct was not incidental to any legitimate objective of arresting or pursuing the fleeing drivers.  Rather, Defendant intended and targeted the fleeing drivers, the neighborhoods, and Lane and Plaintiffs based on their race and Defendant's racial profiling.

88.     Defendant treated Lane, Plaintiffs, and Black residents and drivers of Houston differently from white drivers and residents.  Specifically, Defendant profiled Black drivers when it decided whether to engage or not engage in a high-speed pursuit. Similarly, Defendant profiled Black neighborhoods in Houston, when it decided whether to engage or not engage in a high-speed pursuit.

89.     Under Section 34-22 and 34-23 of the Houston City Ordinance, the Chief of Police, is one of the final policy makers for HPD. The Chiefs of Police ratified, affirmed, and approved this conduct by failing to take disciplinary action for claims of racial profiling or violations of subsntiative due process.

90.     As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendants, Lane has suffered the injuries identified in this Complaint in Intervention, including severe past and future emotional distress, pain and suffering, disfigurement, impairment, lost wages, and medical care. Defendant's

discriminatory intent and pattern, practice, custom, or usage authorizing that discriminatory intent, was the moving force that caused his injuries.

## IX.
## Third Cause of Action: Municipal liability for a policy, custom usage, or ratification against the City of Houston for Violations of 42 USC § 1982

91.    At all times relevant to the allegations in this Complaint in Intervention, the HPD officers identified in this Complaint in Intervention, acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers of the HPD.

92.    Under the Fourteenth Amendments, Lane had an established right under 42 USC § 1982 to be free from discrimination and be treated equally and the right to use public and private property, including the use of their vehicles, sidewalks, and roads in their neighborhoods.  Defendants intentionally discriminated against Lane's right under 42 USC § 1982 to be free from discrimination and be treated equally and the right to use public and private property, including the use of his motorcycle on a public road in his neighborhood. Specifically, HPD's policies were the motivating factor in the injuries to Lane based on HPD's treating of Lane's right to use property differently, including racial profiling of drivers, vehicles, neighborhoods, and roads.

93.    Defendants' violation of their rights caused Lane's injuries. As a direct and proximate result of the violation of the constitutional rights by the Defendant, Lane suffered general and special damages as alleged in this Complaint in Intervention and are entitled to relief under 42 U.S.C. §1983, 1988.

94.     Defendant took their actions based on the policy, practice, custom, and usage of the City of Houston, such that Defendant City of Houston is liable.  As a matter of both policy and practice, the City of Houston, through its final policymakers, including the chiefs of police, encourages, and is thereby the moving force behind, the very type of misconduct described in this Complaint in Intervention, by failing to adequately supervise, control and discipline its officers such that its failure to do so manifests deliberate indifference and intentional conduct.

95.     As a matter of policy, custom, and practice, the City of Houston facilitates the very type of misconduct at issue in this Complaint in Intervention, by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe their actions will never be meaningfully scrutinized. In that way, the City of Houston directly encourages future racial profiling in high-speed chases and violations of equal protection, such as those alleged in this lawsuit.

96.     Generally, as a matter of widespread practice so prevalent as to constitute municipal policy, HPD officers violate the constitutional rights of individuals in a manner similar to that alleged by Lane on a regular basis.  Nevertheless, the City of Houston only investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases and never finds that officers engaged in this misconduct.

97.     It was the custom, practice, or usage of HPD to racially profile drivers and neighborhoods when engaging (or deciding not to engage) high speed chases.  In addition, it was the custom, practice, or usage of HPD to engage in high-speed pursuits in neighborhoods that were predominantly Black, while not engaging in high-speed pursuits

in neighborhoods that were predominantly white. Therefore, HPD treated similarly situated residents of the city of Houston differently.

98.   Likewise, Defendant's conduct was based on racial animus, in that Defendant intended to treat Lane and members of the Black population differently than other residents and occupants of the city of Houston. Defendant treated Lane and Black residents and drivers of Houston differently from white drivers. Specifically, Defendant profiled Black drivers when it decided whether to engage or not engage in a high-speed pursuit. Similarly, Defendant profiled Black neighborhoods in Houston, when it decided whether to engage or not engage in a high-speed pursuit.

99.   Similarly, Defendant intended to discriminate against Lane. Defendant, through its officers, knew that HPD officers had a miniscule risk of harm from the risk of a vehicle crash during a highspeed chase. Defendant, through its officers, also knew that high speed pursuits created a substantial risk of harm to the public and to the fleeing drivers. Indeed, Defendant knew that approximately one-third of pursuits resulted in crashes. By initiating a highspeed chase based on Defendant's racial profiling of the fleeing drivers and demographics of the neighborhoods, Defendant was consciously intended to harm the rights of Lane and others within the community. Defendant intended to worsen Lane's legal rights and the legal rights of the drivers by racial profiling them. Likewise, Defendant intentionally acted to initiate high-speed chases for reasons that violated the Constitution, knowing that there was a high probability of harm.

100.   Defendant's conduct was not incidental to any legitimate objective of arresting or pursuing the fleeing drivers. Rather, Defendant intended and targeted the fleeing drivers,

the neighborhoods, and Lane based on their race and Defendant's racial profiling.

101.    Under Section 34-22 and 34-23 of the Houston City Ordinance, the Chief of Police, is one of the final policy makers for HPD. The Chiefs of Police ratified, affirmed, and approved this conduct by failing to take disciplinary action for claims of racial profiling or violations of subsntiative due process.

102.    As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendants, Lane has suffered the injuries identified in this Complaint in Intervention, including severe past and future emotional distress, pain and suffering, disfigurement, impairment, lost wages, and medical care. Defendant's discriminatory intent and pattern, practice, custom, or usage authorizing that discriminatory intent, was the moving force that caused their injuries.

## X.

### Fourth Cause of Action:  42 U.S.C. § 1983 – Municipal liability for failure to train, supervise, and discipline, and failure to create policies mandating training, supervision, and discipline against the City of Houston for Violations of the 14th Amendment Substantive Due Process Clause

103.    At all times relevant to the allegations in this Complaint in Intervention, HPD officers in the complaint acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers of the HPD. Under the Fourteenth Amendments, Lane had an established constitutional right to substantive due process under the 14th amendment.

104.    Defendants' violation of their substantive due process rights caused Lane's injuries. As a direct and proximate result of the violation of the constitutional rights by the

Defendant, Lane suffered general and special damages as alleged in this Complaint in Intervention and are entitled to relief under 42 U.S.C. §1983, 1988.

105.    In carrying out this misconduct, the City of Houston failed to train, supervise, and discipline, as well as failed to create policies mandating training, supervision, and discipline of officers related to racially profiling neighborhoods and drivers when evaluating whether to engage in a high-speed pursuit. Specifically, Defendant should have mandated that officers not engage in racially motivated factors, including evaluating the neighborhood and evaluating the race of the driver, when deciding to engage in a high-speed chase.  Likewise, Defendant should have mandated and trained regarding safer alternatives regarding high-speed pursuits, including utilizing pursuit reduction technology and limiting pursuits to primary and secondary vehicles responding to violent felonies. As a result of HPD's failure to train above, HPD officers repeatedly racially profiled drivers and neighborhoods and repeatedly utilized high-speed pursuits, despite safter alternatives.

106.    Instead of following these important procedures, HPD created a wide-spread custom and unwritten policy of encouraging racial profiling of neighborhoods and drivers when officers evaluated whether to engage a high-speed chase.

107.    By ignoring these egregious failures, including its lack of adequate policies, supervision, oversight, and training, HPD, through the Chief of Police, was deliberately indifferent that its failure would be the moving force for Constitutional violations. In particular HPD, including the Chief of Police, knew that high-speed pursuits presented substantially greater risk of crashes.  HPD, including the Chief of Police, also knew that officers were more likely to escalate or instigate high speed chases based on racial

profiling, even where such a high-speed chase was not reasonable or safer alternatives existed. HPD also knew that mandating the rules and procedures identified above, would prevent the injuries to innocent by-standers of high-speed pursuits, including Lane.

108.   Because of HPD's approval and ratification of these clear violations was consistent with the HPD policy to refuse to enforce any disciplinary measures and ratification of similar conduct, HPD's approval was also the moving force behind, the violations of subsntiative due process.

109.   Similarly, the City's past ratification, approval, and toleration of similar illegal conduct, caused and was the moving force behind the HPD Defendants' violation of substantive due process against Lane. As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendant, Lane has suffered the injuries identified in this Complaint in Intervention, including severe past and future emotional distress, pain and suffering, disfigurement, impairment, lost wages, and medical care.

## XI.

### Fifth Cause of Action:  42 U.S.C. § 1983 – Municipal liability for failure to train, supervise, and discipline, and failure to create policies mandating training, supervision, and discipline against the City of Houston for Violations of the 14th Amendment Equal Protection Clause and Title VI of the Civil Rights Act of 1964

110.   At all times relevant to the allegations in this Complaint in Intervention, HPD officers at issue in the complaint acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers of the HPD.

Under the Fourteenth Amendment and Title VI of the Civil Rights Act, Lane has an established constitutional right to equal protection and to be free from discrimination.

111.    Defendants' violation of their rights caused Lane's injuries. As a direct and proximate result of the violation of the constitutional rights by the Defendant, Lane suffered general and special damages as alleged in this Complaint in Intervention and are entitled to relief under 42 U.S.C. §1983, 1988.

112.    In carrying out this misconduct, the City of Houston failed to train, supervise, and discipline, as well as failed to create policies mandating training, supervision, and discipline of officers related to racially profiling neighborhoods and drivers when evaluating whether to engage in a high-speed pursuit. Specifically, Defendant should have mandated that officers not engage or evaluate racially motivated factors, including evaluating the neighborhood and evaluating the race of the driver, when deciding to engage in a high-speed chase.  Likewise, Defendant should have mandated and trained regarding safer alternatives regarding high-speed pursuits, including utilizing pursuit reduction technology and limiting pursuits to primary and secondary vehicles responding to violent felonies. As a result of HPD's failure to train above, HPD officers repeatedly racially profiled drivers and neighborhoods and repeatedly utilized high-speed pursuits, despite safter alternatives.

113.    Instead of following these important procedures, HPD created a wide-spread custom and unwritten policy of encouraging racial profiling of neighborhoods and drivers when officers evaluated whether to engage a high-speed chase.  By ignoring these egregious failures, including its lack of adequate policies, supervision, oversight, and training, HPD,

through the Chief of Police, was deliberately indifferent that its failure would be the moving force for Constitutional violations. In particular HPD, including the Chief of Police, knew that high-speed pursuits presented substantially greater risk of crashes. HPD, including the Chief of Police, also knew that officers were more likely to escalate or instigate high speed chases based on racial profiling, even where such a high-speed chase was not reasonable or safer alternatives existed. HPD also knew that mandating the rules and procedures identified above, would prevent the injury of innocent by-standers of high-speed pursuits, including Lane.

114.    Because of HPD's approval and ratification of these clear violations was consistent with the HPD policy to refuse to enforce any disciplinary measures and ratification of similar conduct, HPD's approval was also the moving force behind, the violations of equal protection and the right to be free from discrimination.

115.    Similarly, the City's past ratification, approval, and toleration of similar illegal conduct, caused and was the moving force behind the HPD Defendants' violation of equal protection and the right to be free from discrimination against Lane and Plaintiffs. As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendant, Lane has suffered the injuries identified in this Complaint in Intervention, including severe past and future emotional distress, pain and suffering, disfigurement, impairment, lost wages, and medical care.

**XII.**
**Sixth Cause of Action:  42 U.S.C. § 1983 Municipal liability for failure to train, supervise, and discipline, and failure to create policies mandating training, supervision, and discipline against the City of Houston for Violations of 42 USC § 1982**

116.    At all times relevant to the allegations in this Complaint in Intervention, HPD officers at issue in the complaint acted under color of state law, and within the course and scope of their official duties and employment in their capacities as officers of the HPD. Under 42 USC § 1982, Lane had a right to be free from discrimination and be treated equally and the right to use public and private property, including the use of their vehicles, sidewalks, and roads in their neighborhoods. Defendants intentionally discriminated against Lane's right under 42 USC § 1982 to be free from discrimination and be treated equally and the right to use public and private property, including the use of his motorcycle on a public road in or around his neighborhood.  Specifically, HPD's policies were the motivating factor in the injury to Lane based on HPD's treating of Lane's right to use property differently, including racial profiling of drivers, vehicles, neighborhoods, and roads.

117.    Defendants' violation of their rights caused Lane to suffer severe injuries, including severe past and future emotional distress, pain and suffering, disfigurement, impairment, lost wages, and medical care. As a direct and proximate result of the violation of the constitutional rights by the Defendant, Lane suffered general and special damages as alleged in this Complaint in Intervention and is entitled to relief under 42 U.S.C. §1983, 1988.

118.    In carrying out this misconduct, the City of Houston failed to train, supervise, and discipline, as well as failed to create policies mandating training, supervision, and discipline of officers related to racially profiling neighborhoods, roads, streets, cars, and

drivers when evaluating whether to engage in a high-speed pursuit. Specifically, Defendant should have mandated that officers not engage or evaluate racially motivated factors, including evaluating the neighborhood and evaluating the race of the driver, when deciding to engage in a high-speed chase.  Likewise, Defendant should have mandated and trained regarding safer alternatives regarding high-speed pursuits, including utilizing pursuit reduction technology and limiting pursuits to primary and secondary vehicles responding to violent felonies. As a result of HPD's failure to train above, HPD officers repeatedly racially profiled drivers and neighborhoods and repeatedly utilized high-speed pursuits, despite safer alternatives.

119.    Instead of following these important procedures, HPD created a wide-spread custom and unwritten policy of encouraging racial profiling of neighborhoods, roads, streets, sidewalks, and drivers when officers evaluated whether to engage a high-speed chase.  By ignoring these egregious failures, including its lack of adequate policies, supervision, oversight, and training, HPD, through the Chief of Police, was deliberately indifferent that its failure would be the moving force for Constitutional violations. In particular HPD, including the Chief of Police, knew that high-speed pursuits presented substantially greater risk of crashes.  HPD, including the Chief of Police, also knew that officers were more likely to escalate or instigate high speed chases based on racial profiling, even where such a high-speed chase was not reasonable or safer alternatives existed. HPD also knew that mandating the rules and procedures identified above, would prevent the injury of innocent by-standers of high-speed pursuits, including Lane.

120.    Because of HPD's approval and ratification of these clear violations was consistent

with the HPD policy to refuse to enforce any disciplinary measures and ratification of similar conduct, HPD's approval was also the moving force behind, the violations of Section 1982.

121.    Similarly, the City's past ratification, approval, and toleration of similar illegal conduct, caused and was the moving force behind the HPD Defendants' violation of the right to be free from discrimination against Lane. As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of Defendant, Lane has suffered the injuries identified in this Complaint in Intervention, including severe past and future emotional distress, pain and suffering, disfigurement, impairment, lost wages, and medical care. As a result of the City of Houston's failure, Lane has suffered the injuries identified in this Complaint in Intervention, including severe past and future emotional distress, pain and suffering, disfigurement, impairment, lost wages, and medical care.

## XVII.

### Damages to Mr. Lane

122.    By reason of the incident in question, Mr. Lane sustained bodily injuries, and because of the nature and severity of the injuries sustained, he has suffered physical pain and mental anguish, and of reasonable probability will continue to suffer physical pain and mental anguish in the future. At the time of the incident in question, Mr. Lane was a healthy, able-bodied workingman who sustained and will continue to suffer as a result of the incident physical impairment and disfigurement.

123.    These very painful and disabling injuries have caused Mr. Lane to sustain a loss of earnings and wage-earning capacity in the past and this condition will exist in the future.

Because of the nature and severity of the injuries he has sustained, Mr. Lane has required medical treatment in the past, and in reasonable probability he will require other and additional medical treatment in the future. Charges for such medical treatment that have been made in the past and those which of reasonable probability will be made in the future have been and will be reasonable charges made necessary by the occurrence in question.

124.   Mr. Lane would additionally say and show that he is entitled to recovery of pre-judgment interest in accordance with law and equity as part of his damages herein, and Mr. Lane here and now specifically sues for recovery of pre-judgment interest from the date of the incident made the basis of this suit until the date of the judgment herein, as provided by law and equity, under the applicable provisions of the laws of the State of Texas and the United States of America. Lane is entitled to recover reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §1988 for the prosecution of their claims and this lawsuit against Defendants.

## XIX.

## Prayer for Relief

a.  For compensatory damages for past and future lost wages, medical bills, disfigurement, impairment, mental and emotional distress, pain and suffering,  anxiety, and all other general damages alleged and proved at the time of trial,

b.  Recovery of expert witness fees;

c.  Recovery of attorney fees;

d.  Taxable costs incurred herein;

e.  Pre- and post-judgment interest;

f.  punitive damages; and

g.   all such other and further relief, at law or in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

Doyle Dennis LLP

_____

MICHAEL PATRICK DOYLE (#06095650)
PATRICK M. DENNIS (#24045777)
JEFFREY I. AVERY (#24085185)
The Clocktower Building
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Phone: (713) 571-1146
Fax:  (713) 571-1148
Email: service@doylelawfirm.com
Counsel for Plaintiffs and Intervenor

Reginald E. McKamie, Sr.
Law Office Reginald E. McKamie, Sr., PC
2120 Welch St.
Houston, TX 77019
mckamie@mckamie.com
Co-Counsel for Camilla Simpson, as Next Friend
of Xxxxxxx Xxxxx and Arlene Gallien

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to all counsel of record on this 31st day of May, 2023 via e-service; hand delivery, overnight courier, U.S. Mail, certified mail, return receipt request, electronic mail, or facsimile, pursuant to the Federal Rules of Civil Procedure:

_____

MICHAEL PATRICK DOYLE