**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| JANICE JACKSON, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF HER LATE HUSBAND MICHAEL WAYNE JACKSON; ARLENE GALLIEN, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF CARL WILEY JR.; CAMILA SIMPSON AS NEXT FRIEND OF XXXXXXX XXXXX, GYNELL HENDERSON, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF RASHAD HENDERSON, AND JOHN HENDERSON JR., INDIVIDUALLY, | CIVIL ACTION NO. 4:23-cv-00052 |
| *Plaintiffs*, | |
| V. | |
| CITY OF HOUSTON, | |
| *Defendant*. | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiffs, Janice Jackson, individually and as representative of the estate of her late husband Michael Wayne Jackson; Arlene Gallien, individually and as representative of the estate of Carl Wiley Jr.; Camila Simpson as Next Friend of Xxxxxxx Xxxxx, Gynell Henderson, individually and as representative of the estate Rashad Henderson, and John Henderson Jr., Individually, file this response to the City of Houston's motion for Judgment on the Pleadings

i

**TABLE OF CONTENTS**

Table of Contents .................................................................................................................. ii

Index of Authorities .............................................................................................................. iv

I.      Summary of the Argument ................................................................................................ 1

II.     Factual Background .......................................................................................................... 4

III.    Argument and Authorities ................................................................................................ 5

        1.  Plaintiffs each of capacity to bring survival actions on behalf of the estates ............... 5

        2.  Defendant engaged in governmental action sufficient to trigger Section 1983 ............ 6

        3.  Plaintiffs sufficiently pleaded a Monell claim against the City of Houston for
            municipal liability ...................................................................................................... 6

            a.  Defendant created a policy and custom that encouraged racial profiling and
                violations, and also ensured that its officer knew that HPD would exact no
                consequence for these actions based on a failure to investigate theory ............ 7

            b.  HPD failed to train and supervise its officers  regarding
                proper chase protocols .................................................................................... 10

            c.  Defendant's conduct was the moving force that caused Plaintiffs' deaths ...... 12

        4.  Plaintiffs have sufficiently pleaded that Defendant violated their rights by depriving
            them of substantive due process, violating the equal protection clause and Title VI,
            and violating Section 1982 ........................................................................................ 13

            a.  Plaintiffs have sufficiently pleaded substantive due process claims based on
                the shocks the conscience standard and the state created danger doctrine ...... 13

                i.  Defendant's conduct shocks the conscience and violates the 14th
                    Amendment under the Supreme Court's holding in County of
                    Sacramento v. Lewis, 523 U.S. 833 (1998) .......................................... 14

                ii. Defendant violated the 14th Amendment based on the State Created
                    danger theory .................................................................................... 19

            b.  Plaintiffs have sufficiently pleaded a claim under Section 1982 because (1) the
                Fifth Circuit has found that the use of property is protected and (2) Plaintiff
                sufficiently pleaded racial intent ................................................................... 21

                i.  Section 1982 protects the Use of Property. *United States v. Greer*, 939
                    F.2d 1076, 1091 (5th Cir. 1991) ....................................................... 21

ii.   ii.   City of Houston intentionally discriminated against Plaintiffs and their neighborhoods ....................................................................22

c.   Defendant violated the Equal protection clause and Title VI .........................24

5.   Plaintiffs have sufficiently pleaded the waiver of Governmental Immunity for Jackson and Wiley ............................................................................................................24

6.   Plaintiffs are not seeking punitive damages..................................................................25

IV.   Request for Leave to Amend ............................................................................................25

V.   Conclusion  .......................................................................................................................25

Certificate of Service ...................................................................................................................27

# **INDEX OF AUTHORITIES**

## **Cases**

*Anderson v. Douglas & Lomason Co., Inc.*,
    26 F.3d 1277, 1285 (5th Cir.1994). .................................................................23

*Bennett v. City of Slidell*,
    728 F.2d 762 (5th Cir. 1984) ...........................................................................7

*Boggs v. Home Depot, Inc.*,
    21-CV-06750 (PMH), 2023 U.S. Dist. LEXIS 19726 (S.D.N.Y. Feb. 6, 2023) ..............22

*City of Houston v. Sauls*,
    654 S.W.3d 772 (Tex. App.—Houston [14th Dist.], 2022, pet. filed)..............................25

*Comm. Concerning Cmty. Improvement v. City of Modesto*,
    583 F.3d 690 (9th Cir. 2009) ...........................................................................23

*Connick v. Thompson*,
    563 U.S. 51 (2011)..........................................................................................6

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998)....................................................................................14, 15

*Cripps v. Louisiana Department of Agriculture and Forestry*,
    819 F.3d 221 (5th Cir.) ...................................................................................14

*Cutter v. Metro Fugitive Squad*,
    Case No. CIV-06-1158-GKF, 2008 U.S. Dist. LEXIS 66572
    (W.D. Okl. Aug. 28, 2008) .............................................................................15

*Daveri Dev. Grp., LLC v. Vill. of Wheeling*,
    934 F.Supp.2d 987 (N.D. Ill. 2013) ..................................................................22

*Estate of Baker v. Castro*,
    Civil Action No., H-15-3495, 2018 U.S. Dist. LEXIS 170949
    (S.D. Tex. Aug. 31, 2018).....................................................................2, 7, 8, 11

*Estate of Davis v. City of N. Richland Hills*,
    406 F.3d 375 (5th Cir. 2005) ...........................................................................10

*Forgan v. Howard Cty., Tex.*,
    494 F.3d 518, 522 (5th Cir. 2007) .....................................................................7

*Garcia v. Caremark, Inc.*,
    921 S.W.2d 417 (Tex. App.--Corpus Christi 1996, no writ) ......................................6

*Grandstaff v. Borger*,
    767 F.2d 161, 170 (5th Cir. 1985) .................................................................7

*Hamilton v. Foti*,
    372 F. App'x 480, 485 (5th Cir. 2010) ...........................................................14

*Igwe v. Skaggs*,
    Civil Action No. 16-1403, 2017 U.S. Dist. LEXIS 12136
    (W.D. Pa. Jan. 30, 2017)........................................................................19, 20

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977).......................................................................................22

*Kemp v. City of Houston*,
    Civil Action No. H-10-3111,  2013 U.S. Dist. LEXIS 116104
    (S.D. Tex. Aug. 16, 2013).....................................10, 11, 16, 19, 20

*Monell v. Dep't of Soc. Servs. of N.Y.*,
    436 U.S. 658 (1978).......................................................................................7

*Olzman v. Lake Hills Swim Club, Inc.*,
    495 F.2d 1333 (2d Cir. 1974) .......................................................................22

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) .....................................................................................22

*Pyle v. City of Harlingen*,
    Civil No. 1:13-147, 2014 U.S. Dist. LEXIS 37196
    (S.D. Tex. March 20, 2014) .....................................................................15, 16

*Saenz v. Heldenfels Bros.*,
    183 F.3d 389 (5th Cir. 1999) .......................................................................21

*United States v. Brown*,
    49 F.3d 1162 (6th Cir. 1995) .......................................................................22

*United States v. Greer*,
    939 F.2d 1076, 1091 (5th Cir. 1991) ...........................................................21

*Wolff v. McDonnell*,
    418 U.S. 539 (1974)......................................................................................14

## <u>Statutes</u>

42 USC § 1982...........................................................................3, 13, 21, 22, 24

42 USC § 1983 ................................................................................1, 6, 20

Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq ......................................3, 13, 24

U.S. Const. amend. XIV ..................................................................13, 14, 17, 19, 20

# I.
## SUMMARY OF THE ARGUMENT

This is a Section 1983 lawsuit brought by the families of Rashad Henderson, Carl Wiley Jr. and Michael Wayne Jackson –three black men who were killed as bystanders in vehicle crashes, as a result of HPD officers engaging in high-speed chases. "For years, the policymakers within City of Houston adopted a custom, practice, pattern, and usage of authorizing police officers to profile Black drivers and racially target predominantly Black neighborhoods when engaging in high-speed pursuits."[1] Ultimately, this policy, custom, practice, and usage was the moving force that caused the death of Jackson, Wiley, and Henderson.

Plaintiffs have asserted municipal liability claims against the City because it "established inadequate policies and customs of investigating, punishing, supervising, and disciplining police officers who racially profile . . .  neighborhoods."[2] Specifically, "for any complaints or charges regarding racial profiling and collisions caused by high-speed chases, (1) HPD does not question the officer until the officer has spoken with an attorney; (2) the officer is allowed to do an unrecorded 'walkthrough' of the scene, while accompanied by an attorney; (3) and the officer is given forty-eight hours to answer written questions with an attorney's assistance."[3] HPD then permits its officers to review all evidence, including body camera footage, before giving a statement.[4] Notably, this process is "entirely different" from how HPD investigates vehicle crashes/crimes of civilians or charges regarding racial related crimes.[5]

---

[1] Plaintiff's First Amended Petition at pg. 2, attached as Exhibit 1.
[2] *Id.* at pg. 31.
[3] *Id.*
[4] *Id.*  at 32.
[5] *Id.* at 31 -32.

1

As a direct result of that process, HPD has also "failed to ever meaningfully discipline any officer for racial profiling related charges."[6] Specifically, "in the last 10 years, HPD has never sustained a claim of racial profiling, much less a high-speed chase complaint related to racial profiling."[7] In contrast to these racial related complaints, HPD generally has sustained unrelated complaints at a rate of around 25%.[8] The City's failure to ever sustain a racial profiling complaint is direct evidence of a lack of any meaningful review by HPD. Consistent with Judge Lake's decision in *Baker v. Castro*, "[a] jury could reasonably find that Defendant City had an unofficial policy and custom of turning a blind eye to its officers' [constitutional violations]."[9]

Directly following the encouragement of the City, Plaintiffs have pleaded that "Defendant's conduct was based on racial animus, in that Defendant intended to treat Plaintiffs and members of the Black population differently than other residents and occupants of the city of Houston."[10] More specifically, HPD "engage[d] in high-speed pursuits in neighborhoods that were predominantly Black, while not engaging in high-speed pursuits in neighborhoods that were predominantly white."[11] Put differently, HPD officers "profile[d] Black neighborhoods when evaluating whether to initiate a high-speed pursuit."[12]

As part of their complaint, Plaintiffs analyzed the specific neighborhoods in Houston, and cited to statistics regarding the rate of traffic stops, populations of those areas, and the rates and demographics of chases.  Plaintiffs have specifically cited to and alleged the following: : (1) HPD traffic stops have plummeted from 2008 to 2021;[13] (2) HPD high-speed chases have more than

---

[6] *Id.* at 33.
[6] *Id.* at 34
[7] *Id.* at 32.
[8] *Id.*
[9] *Estate of Baker v. Castro*, Civil Action No., H-15-3495, 2018 U.S. Dist. LEXIS 170949 (S.D. Tex. Aug. 31, 2018).
[10] Plaintiff's First Amended Petition at 51.
[11] *Id.* at 51.
[12] *Id.* at 53.
[13] Id. at 14.

doubled from 2000 to 2020;[14] (3) Black citizens made up 22% of the population, 38% of traffic stops, and 56.39% of high-speed chases;[15] (4) during the daylight in 2020 – when HPD officers are more likely to be able to identify a driver's race prior to a chase – high-speed pursuits of Black drivers made up 65.01% of HPD's chases;[16] (5) during the night in 2020 – only after visibility and identification of the race of the driver is limited – HPD's chases of Black drivers dropped to 52.07%;[17] (6) neighborhoods with a Black population over 30%, over 50% and majority Black, have significantly more high-speed pursuits than their population;[18] (7) Neighborhoods with a white population over 30%, over 50% and majority white, have significantly less high-speed pursuits than their population;[19] and (8) Each of the Plaintiffs, were black and killed as innocent bystanders to police chases.  In other words, the precise type of conduct that HPD encouraged, also occurred and harmed Plaintiffs.

Based on this evidence, combined with the shocking nature of the chases at issue, Plaintiffs have sufficiently pleaded that the City violated (1) their substantive due process rights, (2) equal protection and Title VI, and (3)  Section 1982. Therefore, the City's motion should be denied.

## II.
## FACTUAL BACKGROUND

This lawsuit is brought by innocent bystanders Michael Wayne Jackson, Carl Lee Wiley Jr., and Rashad Henderson – three Black men who were killed based on HPD's racially-motivated and unconstitutional targeting of black drivers and neighborhoods.[20] For years, the policymakers within the City of Houston adopted a custom, practice, pattern, and usage of authorizing police

---

[14] *Id.* at 13
[15] *Id.* at 15.
[16] *Id.* at 15-17.
[17] *Id.*
[18] *Id.* at 18-30.
[19] *Id.* at 18-30.
[20] Exhibit 1, Plaintiff's First Amended Petition at pg. 2.

officers to profile Black drivers and racially target predominantly Black neighborhoods, when deciding whether to engage or participate in high-speed pursuits.[21] Ultimately, this policy, custom, practice, and usage was the moving force that caused the death of Jackson, Wiley, and Henderson.

In particular, the City of Houston has "train[ed] its officers when evaluating whether to engage in a high-speed chase, to consider the neighborhood – implicitly, including the racial demographics of the neighborhood – and social image – implicitly, including the race of the drivers."[22] HPD Further has "train[ed], supervise[d], and fail[ed] to discipline its officers consistent with a pattern of approving racially motivated, dangerous high-speed pursuits.[23]

Sadly, HPD's racial profiling and racial targeting was the moving force of the deaths of Henderson, Wiley, and Jackson.  In more detail, on December 4, 2021, an HPD officer decided to join an on-going pursuit of 4 to 5 Black suspects in the predominantly Black neighborhood of Sunnyside.[24] After the initial chase in pursuit of the suspects had ended, the HPD officers continued to recklessly drive – in effect creating their own pursuit – even though the suspects had fled their car, nearly a mile away.[25]  The officers made this decision based on racial profiling of the neighborhood and suspect. Ultimately, the officer violently swerved at the intersection of Scott and Reed.[26] As the officer veered the SUV onto the sidewalk, the vehicle struck and killed Mr. Jackson, who was walking on the sidewalk to his barber.[27]

On February 7, 2022, HPD patrol officers were patrolling near 10400 Richmond Avenue, Houston, Texas – an area in the predominantly Black neighborhood of Westchase.[28]  HPD spotted

---

[21] *Id.*
[22] *Id.* at pg. 14-15.
[23] *Id* at pg. 14.
[24] *Id.* at 37-40.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.* at 35-37.

and targeted a Black man at a gas station, who had an alleged open container. HPD then initiated a chase of the driver based on his race (Black) and the neighborhood based on its racial demographics (majority Black).[29]  Because of HPD's profiling and chase, the suspect slammed his car into Carl Wiley Jr. and killed him.[30]

Similarly, on December 17, 2020, HPD officers targeted a Black female teenager and chased her at unsafe speeds.[31] "During the unsafe chase, the teenager drove hazardously while also speeding at approximately 100 miles per hour."[32]  HPD made the decision to initiate the chase and engage the driver based on its racial profiling of her, while "knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury."[33] Because of HPD's profiling and chase, the suspect slammed her car into Rashad Henderson and killed him.[34]

Plaintiffs filed their claims together in Harris County District Court.  Defendant removed this lawsuit to this Court.  The City has now moved to dismiss the claims of Wiley, Jackson, and Henderson.

### III.
### ARGUMENT AND AUTHORITIES

**1.  Plaintiffs each have capacity to bring survival actions on behalf of the estates.**

Defendant has challenged the standing of all three Plaintiffs to assert survival claims on behalf of the three estates. As an initial matter, Ms. Henderson is entitled to proceed on behalf of the estate of her son because she has pleaded that "no Administrator of the Estate of Rashad

---

[29] *Id.*
[30] *Id.*
[31] *Id.* at 40-42.
[32] *Id.*
[33] *Id.*
[34] *Id.*

Henderson is necessary, nor has one been appointed." This pleading complies with standing requirements under Texas law.[35] Thus, Defendant's argument lacks merit.

Second, Ms. Jackson has received Letters of Administration and has qualified as Dependent Administratrix of the state of Michael Wayne Jackson.[36] She has posted a bond and given the oath of the administrator.  Therefore, she also has standing under Texas law.

In addition, Ms. Gallien has also received an order appointing her to be qualified as Dependent Administratrix and received letters of administration.[37] She currently is in the process of posting a bond and taking the oath.  Therefore, Ms. Gallien will acquire standing when she meets those requirements, which she anticipates will be in the next 30-days, approximately.

## 2.  The City engaged in governmental action sufficient to trigger Section 1983

In its next argument, the City argues that "Plaintiffs fail to plausibly establish the requisite governmental action to support any federal claim." The City then simply repeats its later arguments regarding causation, requisite intent, and constitutional violations.  The City later addresses each of these issues in detail.  And as a result, Plaintiff incorporates their responses below to this section. But to be clear, Plaintiff has asserted that Defendant's violations of their rights was the moving force of their deaths.  Proving causation, intent, and the requisite violations sufficiently establishes government action by the City to trigger 1983.

## 3.  Plaintiffs sufficiently pleaded a *Monell* claim against the City for municipal liability.

A city may be held liable under Section 1983 only for its own illegal acts, not pursuant to a theory of vicarious liability.[38] To succeed on a claim under Section 1983, the plaintiff must demonstrate that the city "had some inadequate custom or policy that acted as the moving force

---

[35] *Garcia v. Caremark, Inc.*, 921 S.W.2d 417, 421 (Tex. App.--Corpus Christi 1996, no writ) ("
[36] Exhibit A.
[37] Exhibit B.
[38] *Connick v. Thompson*, 563 U.S. 51, 60, (2011).

behind a constitutional violation."[39] "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." The burden on the plaintiff is to "identify the policy, connect the policy to the [municipality] itself and show that the particular injury was incurred because of the execution of that policy."[40]

Plaintiffs have made two separate types of *Monell* claims – (1) the City encouraged violations by failing to investigate or take disciplinary action for prior violations, and (2) failure to supervise and failure to train.  Plaintiffs address each of those theories separately.

### a. Defendant created a policy and custom that encouraged racial profiling and violations, and also ensured that its officer knew that HPD would exact no consequence for these actions based on a failure to investigate theory.

In *Baker v. Castro*, Judge Lake recently addressed whether "inadequate policies and customs of investigating, punishing, and disciplining police officers who shoot civilians could be a moving force behind an unconstitutional use of excessive deadly force by a police officer." Citing to *Grandstaff v. City of Borger, Tex.*,[41]  the court noted that "[w]here a reckless disregard for human life and safety is 'prevalent among the city's police officers [and] threatens the life and security of those whom they encounter, and if that recklessness is attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights."[42] And "[i]f a police officer is aware that his reckless use of deadly force will be met with the approval of city policymakers, the 'moving force' requirement is satisfied."[43]

---

[39] *Forgan v. Howard Cty., Tex.*, 494 F.3d 518, 522 (5th Cir. 2007) (citing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91, (1978)).
[40] *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984).
[41] 767 F.2d 161, 170 (5th Cir. 1985).
[42] *Estate of Baker*, 2018 U.S. Dist. LEXIS 170949 at *36
[43] *Id.*

At the summary judgment stage, Judge Lake then outlined the relevant customs and policies of HPD, as presented by the plaintiffs, including:

> [HPD Internal Affairs] (1) uses fewer classifications than for other types of use of force incidents; (2) does not look at the police officer's complaint history; and (3) gives the police chief the sole final disciplinary determination. Additionally, general HPD custom and policy following the shooting of a civilian provides that the shooting police officer is: (1) not questioned until he has spoken with an attorney; (2) allowed to do an unrecorded "walk-through" of the scene, while accompanied by an attorney; (3) never given a live interview; and (4) given forty-eight hours to answer written questions with an attorney's assistance. It is also noteworthy that it is standard procedure to conduct a live, recorded interview of any shooter in a non-police shooting.[44]

Not surprisingly, the results of that policy were damning – HPD had "deemed justified" 194 of 194 intentional shootings of civilians from 2009 to 2014. Notably, "Eighty-one of these shootings were of unarmed civilians."[45] Based on that, the court found that the "[t]he uniform outcomes of the past police shooting investigations along with the less adversarial treatment of a police shooter raises a fact issue regarding Defendant City's policies and customs . . ."[46] And as a result "[a] jury could reasonably find that Defendant City had an unofficial policy and custom of turning a blind eye to its officers' excessive uses of force."[47]

Here, following *Baker*, the City has also "established inadequate policies and customs of investigating, punishing, supervising, and disciplining police officers who racially profile either drivers or neighborhoods."[48] Specifically, "through its policies, enforcement, and investigations of racial profile allegations, HPD has deliberately created and encouraged a pattern of racial profiling by its officers." [49] Plaintiffs further pleaded the following:

---

[44] *Id.* at 36-37
[45] *Id.* at 37
[46] *Id*
[47] *Id*
[48] First Amended Petition at Pg. 31.
[49] *Id.*

> For example, for any complaints or charges regarding racial profiling and collisions caused by high-speed chases, (1) HPD does not question the officer until the officer has spoken with an attorney; (2) the officer is allowed to do an unrecorded "walkthrough" of the scene, while accompanied by an attorney; (3) and the officer is given forty-eight hours to answer written questions with an attorney's assistance. Notably, this process is "entirely different" from how HPD investigates vehicle crashes/crimes of civilians or charges regarding racial related crimes.
> . . .
> Furthermore, as part of the "walkthrough," HPD further authorizes the involved officers to review the body camera footage prior to making a statement. Indeed, before asking written questions, investigators provide the officers with all of the evidence that HPD has so the officer can explain away the evidence in the written response, including any written witness statements. In addition, if HPD requests an investigation interview, HPD must conduct the interview either during normal working hours or HPD Must pay the officer overtime. In other words, unlike civilians, HPD pays its officer when they participate in investigations, including providing interviews to HPD.[50]

As a result of the process, "police officers are able to modify their version of the story prior to ever making a statement. In contrast, civilians accused of similar misconduct – whether racial crimes or traffic crashes – are certainly not given these evidentiary advantages that HPD provides its law enforcement."[51]

Combined with its investigation process, HPD has also "failed to ever meaningfully discipline any officer for racial profiling related charges."[52] Specifically, "in the last 10 years, HPD has never sustained a claim of racial profiling, much less a high-speed chase complaint related to racial profiling."[53] Indeed, "[b]ased on the data available, HPD has received approximately 47 complaints regarding racial profiling since 2010," and "[o]f those complaints, HPD concluded that 28 were "unfounded," 2 were "pending," 3 were "exonerated," 8 were "not sustained," and 0 were "sustained."[54] "In contrast to the zero sustained findings for racial profiling complaints, HPD

---

[50] *Id.* at 31-32.
[51] *Id.* at 33.
[52] *Id.*
[53] *Id.* at 34.
[54] *Id.*

generally has sustained approximately 25% of complaints made against officers," and [b]y example, in 2021, HPD sustained 160 of the 654 complaints."[55]

Furthermore, the City's conduct was known and encouraged by the final policy decision makers. Specifically, Plaintiffs have alleged:

> In addition, as part of its legal obligation under Texas and federal law, HPD mandates that the Chief of Police review the compilation of data regarding racial profiling. In other words, the City's final policy maker is responsible for reviewing and confirming the data regarding racial profiling. This includes the rate of traffic stops and the final determinations regarding racial profiling complaints made against HPD officers. As part of that, HPD has represented that "there is no substantial, statistically significant evidence of racial profiling against any race/ethnic group represented in Houston." Even further, "there exists neither evidence of systemic bias in the practices of Houston police officers nor evidence that individual officers in the department have engaged in racial profiling."[56]

Based on this evidence, the City created a policy and custom that encouraged racial profiling and violations and ensured that its officer knew that HPD would exact no consequence for these actions. Therefore, the motion should be denied.

### b.  HPD failed to train and supervise its officers regarding proper chase protocols.

Next, Plaintiffs address both the failure to train and failure to supervise claims. For both of these claims, Plaintiffs must show (1) inadequate training or supervision procedures; (2) which caused the injury; and (3) deliberate indifference of municipal policymakers.[57] To satisfy the "deliberate indifference" standard, Plaintiffs "must demonstrate a pattern of violations and that the inadequacy of the training [or supervision] is 'obvious and obviously likely to result in a constitutional violation.'"[58]

---

[55] *Id.*
[56] *Id.* at 34-35.
[57] *Kemp*, 2013 U.S. Dist. LEXIS 116104 at *27
[58] *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005)

In *Kemp v. City of Houston*, this District addressed failure to train in a similar context.[59] The plaintiffs in that case alleged that the City "failed to supervise and train [its officers] on roadblocks and that HPD policies failed to ensure that HPD officers avoid using privately owned and occupied vehicles as part of a stopping technique even though the City and Hurtt were or should have been aware of prior collisions with third-parties due to HPD's motor vehicle pursuit stopping techniques."[60] At summary judgment, the plaintiffs presented evidence that there were "inadequacies in HPD's training programs," including failure related to roadblocks and stopping.[61] The plaintiff further presented evidence that the "inadequacy of training with regard to standard roadblocks should have been obvious to Hurtt, who was the City's policymaker" because there "was a national trend away from using roadblocks in motor vehicle pursuits at the time due to the threat of serious injury and that any reasonable policymaker would have been aware of this trend."[62] In addition, the plaintiff also cited to data provided to the city showing the use of road blocks or spike strips, which led to collisions.[63]  Based on this, the court found that the plaintiffs "have presented enough evidence of potential deliberate indifference with regard to training to present the issue to the jury."[64]

Here, just like *Kemp*, Plaintiffs have identified inadequacies in the training and supervision of the City's officers. Plaintiffs have alleged that "Defendant should have mandated and trained regarding safer alternatives regarding high-speed pursuits, including utilizing pursuit reduction technology and limiting pursuits to primary and secondary vehicles responding to violent

---

[59] *Kemp v. City of Houston,* Civil Action No. H-10-3111,  2013 U.S. Dist. LEXIS 116104 (S.D. Tex. Aug. 16, 2013).
[60] *Kemp,* 2013 U.S. Dist. LEXIS 116104 at *27.
[61] *Id.* at * 35.
[62] *Id.*
[63] *Id.*
[64] *Id.*

felonies."[65] Instead, "HPD officers repeatedly racially profiled drivers and neighborhoods and repeatedly utilized high-speed pursuits, despite safter alternatives."[66]

Plaintiffs have further alleged deliberate indifference. Specifically, "[b]y ignoring these egregious failures, including its lack of adequate policies, supervision, oversight, and training, HPD, through the Chief of Police, was deliberately indifferent that its failure would be the moving force for Constitutional violations." [67] Likewise, "HPD, including the Chief of Police, also knew that officers were more likely to escalate or instigate high speed chases based on racial profiling, even where such a high-speed chase was not reasonable or safer alternatives existed."[68] "HPD also knew that mandating the rules and procedures identified above, would prevent the deaths of innocent by-standers of high-speed pursuits, including Jackson, Wiley, and Henderson."[69]

Therefore, Defendant's motion should be denied.

### c. The City's conduct was the moving force that caused Plaintiffs' deaths

Next, the City has challenged that its conduct was the moving force in Plaintiffs' injuries and death. In *Baker*, Judge Lake explained that "[i]f a police officer is aware that his reckless use of deadly force will be met with the approval of city policymakers, the 'moving force' requirement is satisfied." Likewise, if a municipality "possesses an inadequate policy or custom of investigating, punishing, and disciplining police officers who use excessive deadly force, then that policy or custom could be the "moving force" behind the alleged unconstitutional use of excessive force" in that case.[70]

---

[65] Plaintiff's First Amended Petition at 53.
[66] *Id.*
[67] *Id.* at 53-54.
[68] *Id.*
[69] *Estate of Baker*, 2018 U.S. Dist. LEXIS 170949 at *36-37.
[70] *Id.* at *37.

Here, Plaintiffs have pleaded exactly this.  Specifically, the City's officers knew that their conduct would be authorized, based on the history of lack of punishment and favorable policies, including a walkthrough and legal consultation. More pointedly, "[b]ased on the City's history, the City, through its officers, knew that racially profiling and violating substantive due process would exact no consequence for their actions."[71] "[T]he officers knew that the City frequently turned a blind eye to any allegations of racial profiling or unconstitutional high-speed pursuits."[72] Therefore, by "encourage[ing]" this type of misconduct through lax rules, policies and disciplinary process, Defendant's conduct "is thereby the moving force behind, the very type of misconduct described in this Petition, by failing to adequately supervise, control and discipline its officers such that its failure to do so manifests deliberate indifference and intentional conduct."[73] Just like *Baker*, Defendant's motion should be denied.

### 4.  Plaintiffs have sufficiently pleaded that City violated their rights by depriving them of substantive due process, violating the equal protection clause and Title VI, and violating Section 1982.

Next, the City has also challenged Plaintiffs' three related claims of constitutional violations – (1) substantive due process and stated created danger under the 14th amendment, (2) equal protection and Title VI, and (3) Section 1982. Plaintiffs address each of these arguments.

#### a.  Plaintiffs have sufficiently pleaded substantive due process claims based on the shocks the conscience standard and the state-created danger doctrine.

Plaintiffs have asserted claims against the City for violations of their substantive due process rights under the Fourteenth Amendment. Plaintiffs address two separate types of

---

[71] First Amended Petition at Pg. 45.
[72] *Id.*
[73] *Id.*

substantive due process violations – a shocks the conscience standard under *County of Sacramento v. Lewis*, 523 U.S. 833 (1998) and the state created danger doctrine.

> i. **The City's conduct shocks the conscience and violates the 14th Amendment under the Supreme Court's holding in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).**

"Substantive due process bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."[74] "The touchstone of due process is protection of the individual against arbitrary action of government."[75] Following that, Plaintiffs must show (1) that the defendant deprived them of a constitutionally protected right and (2) that the government action bears no rational relationship to a legitimate government interest.[76]

In *Lewis*, the plaintiff was operating a motorcycle and became involved in a high-speed chase with the police. Ultimately, the motorcycle tipped over. Purportedly because he was unable to brake in time to keep from running over the passenger, the officer struck the plaintiff with his vehicle and killed him. The plaintiff filed a civil rights lawsuit and the Supreme Court found that the officer did not violate substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase. Instead, the Fourteenth Amendment requires that the officer's conduct must shock the conscience.[77]

In explaining the scope of the "shocks the conscience" standard, the *Lewis* court evaluated two competing types of factual scenarios – (1) a situation where an officer may have the opportunity to deliberate prior to taking action and (2) a situation where an official must "act decisively and . . . show restraint at the same moment, and their decisions have to be made 'in

---

[74] *Hamilton v. Foti*, 372 F. App'x 480, 485 (5th Cir. 2010).
[75] *County of Sacramento v. Lewis*, 523 U.S. 833 (1998) (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)).
[76] *Cripps v. Louisiana Department of Agriculture and Forestry*, 819 F.3d 221, 232 (5th Cir.)
[77] *Lewis*, 523 U.S. 833

haste, under pressure, and frequently without the luxury of a second chance."[78] For the former

situation, the court found that the "deliberate indifference" should apply because  "[a]s the very

term 'deliberate indifference' implies, the standard is sensibly employed only when actual

deliberation is practical."[79]  In contrast, for the latter, the court required that the plaintiff must show

that the officer intended to harm them or to worsen their legal plight.

Following *Lewis*, the Western District of Oklahoma further summarized the intent

requirement of *Lewis* and how it changes based on the particular facts of each case. The Court

noted:

> [I]n the middle range of the culpability spectrum, where the conduct is more than
> negligent but less than intentional, there may be some conduct that is egregious
> enough to state a substantive due process claim. Within  this middle range, courts
> must analyze the level of culpability 'by examining the circumstances that surround
> the conduct at issue and the governmental interest at stake.'
>
> The key inquiry is whether the official had the opportunity for deliberation. Courts
> must distinguish between emergency action and action taken after opportunity for
> reflection.  Great deference must be given to decisions that necessarily occur in
> emergency situations. Thus, in emergency situations, only conduct by which the
> official intended to cause harm and in which the state lacks any justifiable interest
> will shock the conscience and result in constitutional liability. 'The intent to harm
> standard is not limited to situations calling for split-second reactions. Rather, it
> applies whenever decisions must be made' in haste, under pressure, and frequently
> without the luxury of a second chance.'
>
> On the other hand, 'where the state actor has the luxury to truly deliberate,
> something less than unjustifiable intent to harm, such as calculated indifference,
> may suffice to shock the conscience.' Courts should employ the 'deliberate
> indifference' standard only when actual deliberation is practical.[80]

After *Lewis*, in *Pyle*, this District addressed the varying standards for a substantive due

process violation.[81]  In that case, the Harlingen police chased a suspect who "had not committed

---

[78] *Id.* at 853.
[79] *Id.* at 851.
[80] *Cutter v. Metro Fugitive Squad*, Case No. CIV-06-1158-GKF, 2008 U.S. Dist. LEXIS 66572 at *54-56 (W.D. Okl. Aug. 28, 2008).
[81] *Pyle v. City of Harlingen*, Civil No. 1:13-147,  2014 U.S. Dist. LEXIS 37196 (S.D. Tex. March 20, 2014).

any crimes nor were any crimes reported to" the officers. The plaintiff pleaded that the officers lacked "probable cause to apprehend the suspect."[82]  During the chase, the plaintiff was asleep at her apartment. Eventually, the Harlingen police attempted to block the suspect via a pit maneuver – a method of hitting the car and disabling the vehicle. Both the officer and suspect's vehicles struck the plaintiff's apartment, and caused her to suffer serious injuries.[83] Citing to *Lewis*, the court held that "Pyle's complaint plausibly pleads a set of circumstances in which sufficient actual deliberation by Harlingen police officers was practical to trigger a deliberate-indifference standard."[84] Put differently, based on those particular facts, the defendant knew of and disregard an excessive risk to the plaintiff's health or safety.

Similarly, Judge Miller also addressed a similar substantive due process case in *Kemp v. City of Houston*.[85]  In denying summary judgment, the court noted that the case involved a roadblock, which it distinguished from a traditional high-speed chase.[86]  Put differently, the court distinguished the particular action at issue in the case – the use of a roadblock – from the high-speed chase that immediately proceeded the use of the spike strip.  Based on that, the court found that "the evidence at least raises a question of fact as to whether the officers were deliberately indifferent to the safety of the individuals who occupied the parked vehicles."[87]  Specifically, the officers knew that using a spike strip at night, during a high-speed chase, created a substantial risk of causing death or serious bodily injury.

Here, Plaintiffs address each of the three incidents separately. For Rashad Henderson, in contrast to *Lewis*, which involved a 75 second chase, "HPD's chase lasted approximately one

---

[82] *Id.* at *3.
[83] *Id.*
[84] *Id.*  at *39.
[85] *Kemp*, 2013 U.S. Dist. LEXIS 116104
[86] *Id.* at *23.
[87] *Id.*

16

hour."[88] Put bluntly, HPD and its officers had plenty of time to deliberate about their action toward this chase.  Furthermore, HPD knew the girl driving the vehicle was 16 years old, that her mother had reported she was running away from home, and that she "may be suffering from a mental breakdown."[89]  And "[p]rior to the chase, HPD knew that this chase would endanger innocent bystanders. The officers also knew that HPD had GPS tracking for the vehicle and that a helicopter was already following the suspects."[90] "Likewise, HPD and the other officers driving the vehicle also knew that "[c]ollisions are a predictable outcome of police pursuits."[91] Yet "HPD maintained a purpose to cause harm – racially profiling the driver and suspect – unrelated to the legitimate object of arrest. Based on that, the City's conduct shocks the conscience.[92] Based on this, Plaintiff has sufficiently pleaded that the City violated Rashad Henderson's 14th Amendment rights.

Next, regarding Michael Jackson, the City's conduct also meets the deliberate indifference standard. First, at the time of the crash, "initial chase in pursuit of the suspects had ended."[93]  In other words, unlike *Lewis*, this case was no longer a "high speed pursuit."  Consistent with that, Officer Hernandez and his partner were "not part of the primary pursuit."[94] "Even worse, HPD and its field supervisor had not authorized or assigned Hernandez to engage in the pursuit," and Hernandez had "not sought permission to engage in the pursuit."[95]  In other words, Hernandez had sufficient time and the "luxury to truly deliberate."

Ignoring the serious risks to bystanders, Hernandez instead chose to drive his vehicle "between 80 to 100 miles per hour down Reed Road in the predominantly Black neighborhood of

---

[88] Plaintiff's First Amended Petition at pg. 40.
[89] *Id.*
[90] *Id.* at 41-42.
[91] *Id.*
[92] *Id.* at 37.
[93] *Id.*
[94] *Id.*
[95] *Id.*

Sunnyside" and "despite the slippery condition from a recent rain shower."[96] As Hernandez dangerously and intentionally approached Scott Street at a speed double the legal limit, Hernandez violently swerved at the intersection and veered the car onto the sidewalk. Hernandez then struck and killed Mr. Jackson, who was walking on the sidewalk to his barber."[97] HPD's internal records confirmed that Hernandez was "traveling at a[n] unsafe speed," "performed a faulty evasive action," which caused him to go "on the sidewalk."[98] In other words, even HPD knew that Hernandez had sufficient opportunity to deliberate prior to his conduct.

Finally, with respect to Carl Wiley, Officers Trevino and Salazar also had sufficient time for deliberation because their decision to pursue the vehicle was based on racial profiling. Specifically, "HPD Officers Trevino and Salazar then spotted a white Cadillac STS parked at a gas station," and "saw that the vehicle was operated by a Black man – Cameron Rogers – with another Black man and a Hispanic woman present."[99] Mr. Rogers allegedly had committed a minor open container violation and fled when the officers approached with their lights flashing.[100] "Instead of taking precaution in light of the minor violation, HPD profiled the driver based on his race (Black) and the neighborhood based on its racial demographics (majority Black)."[101] "HPD initiated a chase of the suspects based on an open containers violation – a minor criminal violation."[102]

"Prior to the chase, HPD knew that nature of criminal activity was not the type of conduct that required "immediately tak[ing] the suspect into custody," when weighed against the "possible

---

[96] Id.
[97] Id. at 38.
[98] Id. at 39.
[99] Id. at 35.
[100] Id.
[101] Id. at 36.
[102] Id.

risks to the public resulting from the pursuit."[103] "Despite that knowledge, HPD intentionally decided to profile the neighborhood and suspect, knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury."[104] This conduct shows that the City had sufficient time to deliberate and its conduct shocks the conscience.

Therefore, Plaintiffs have sufficiently alleged substantive due process claims.

### ii. Defendant violated the 14th Amendment based on the State-Created Danger Theory

To establish a claim for a state-created danger, Plaintiffs must show that the City "used their authority to create a dangerous environment for the plaintiff and that the defendants acted with deliberate indifference to the plight of the plaintiff."[105] To "establish deliberate indifference, the plaintiff must show the 'environment created by the state actors must be dangerous; they must know it is dangerous; and . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur."[106]

In *Igwe v. Skaggs*, the Western District of Pennsylvania addressed the state-created danger doctrine.[107] In that case, the officer joined a high-speed chase, but did not request permission or authorization.[108] The officer drove his vehicle "up to 88 mph in a 35 mph zone on the wrong side of the road and drove through two red lights."[109] "Approximately three minutes after Officer Frisk began this pursuit of a suspected stolen car, Officer Skaggs entered an intersection against a red traffic signal and, after engaging his breaks for half a second, crashed into the driver's side of [the

---

[103] *Id.*
[104] *Id.*
[105] *Kemp*, 2013 U.S. Dist. LEXIS 116104 at *13-14.
[106] *Id.*
[107] *Igwe v. Skaggs*, Civil Action No. 16-1403, 2017 U.S. Dist. LEXIS 12136 (W.D. Pa. Jan. 30, 2017).
[108] *Id.* at *3.
[109] *Id.*

victim's car]" and killed her.[110] In the subsequent lawsuit, the plaintiff pleaded that the officer "voluntarily assume[d] a role as a responding officer in violation of Monroeville policy, knew he could terminate his response at any time, and drove his police car in reckless disregard for the safety of the general public."[111] The Court found this pleading sufficient to deny a motion to dismiss, though the Court granted qualified immunity to the officer.

Here, based on the same facts alleged above, Plaintiffs have presented sufficient evidence that the City violated their Fourteenth Amendment rights under the state-created danger doctrine. Specifically, for Jackson, Henderson, and Wiley, the City created a dangerous situation and was consciously indifferent and reckless toward the harm it could cause Plaintiffs.

In contrast, the City has argued that the Fifth Circuit "has consistently refused to recognize" the state-created danger theory. But as explained in *Kemp*, the Fifth Circuit's decision not to adopt the doctrine occurred "because the allegations in that case did not support the theory."[112]  In contrast, Judge Miller found that "it is appropriate for district courts to entertain the theory even though the Fifth Circuit has not adopted it."[113] By example, the court explained that "in *Scanlon v. Texas A&M University*, the district court dismissed the plaintiffs' claims under the state-created danger theory for failure to state a claim."[114] "On appeal, the Fifth Circuit noted that it had not adopted the theory, yet it remanded the case to the district court because the district court should have found that the plaintiffs had stated a section 1983 claim under the state-created danger theory."[115] In other words, while the "Fifth Circuit has not found a circumstance in which it believed the evidence (as opposed to the pleadings) supported the theory and consequently adopted

---

[110] *Id.*
[111] *Id.* at *10.
[112] *Kemp*, 2013 U.S. Dist. LEXIS 116104 at *13-14.
[113] *Id.* at *14.
[114] *Id.*
[115] *Id.*

the theory, the Fifth Circuit also has not indicated that it would be unwilling to adopt the theory in the appropriate case."[116]

In addition, the City also argues that under the state-created danger theory, the City must be a "known victim." In *Saenz v. Heldenfels Bros*, the Fifth Circuit, in dicta, declined to extend the doctrine, in part, because the defendant in that case was unaware of a known victim.[117]   The court did not address whether knowledge of a general case or general group of people at risk would be sufficient.  Indeed, long after *Saenz*, Judge Miller authorized this type of claim to proceed based on the general knowledge of harm to other vehicles or drivers.  Thus, the City's argument should be rejected.

> **b.  Plaintiffs have sufficiently pleaded a claim under Section 1982 because (1) the Fifth Circuit has found that the use of property is protected and (2) Plaintiffs sufficiently pleaded racial intent.**

As its next challenge, the City has also disputed Plaintiffs' claims under 42 USC § 1982. The City, it appears, has disputed this claim for two reasons – (1) "Section 1982 is limited to the sale or rental of private property, not the "use" of private property or public roads and sidewalks and (2) "Plaintiffs allege no facts to show the City intentionally racially discriminated against them in the sale or rental of real or personal property." The City is wrong on both accounts.

> **i.  Section 1982 protects the Use of Property. *United States v. Greer*, 939 F.2d 1076, 1091 (5th Cir. 1991).**

The Fifth Circuit had directly rejected the City's claim that the use of property is not protected by Section 1982. Specifically, in *United States v. Greer,*  the court held that "the phrase 'to hold' property under the statute can also mean 'to use' property."[118] Indeed, "Courts have . . .

---

[116] *Id.*
[117] *Saenz v. Heldenfels Bros.*, 183 F.3d 389, 391-392 (5th Cir. 1999).
[118] *United States v. Greer*, 939 F.2d 1076, 1091 (5th Cir. 1991)

repeatedly found that discriminatory interference with the **use of property** is actionable under §
1982."[119]

Following that foundation, in *Olzman*, the Second Circuit addressed whether the use of a
public pool sufficiently created a right protected by Section 1982. Relying on the Supreme Court's
broad protection under the Civil Rights Act, the court then made it clear – "[i]t is reasonable to
characterize the freedom of blacks to go and come as guests of a swim club member as sufficiently
pertaining to a condition of property to be a right capable of being held under § 1982."[120] As a
result, Section 1982 protects Plaintiffs' right to use public roads, sidewalks, and their own vehicles.
Therefore, the City's motion fails.

### ii. The City intentionally discriminated against Plaintiffs and their neighborhoods.

Second, Plaintiffs have also sufficiently pleaded that the City "intentionally racially
discriminated against them." To meet this element, a plaintiff must allege the defendant "selected
or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its
adverse effects upon an identifiable group."[121] Stated differently, Plaintiffs' race must have been
a substantial factor in that different treatment.

"Intentional discrimination can be alleged through "either direct or circumstantial
evidence."[122] And "[p]roof of discriminatory motive . . . can in some situations be inferred from
the mere fact of differences in treatment."[123] As a result, the plaintiffs may bolster their case by

---

[119] *Boggs v. Home Depot, Inc.*, 21-CV-06750 (PMH), 2023 U.S. Dist. LEXIS 19726 at *12 (S.D.N.Y. Feb. 6, 2023); *see also United States v. Brown*, 49 F.3d 1162, 1167 (6th Cir. 1995); *Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1339 (2d Cir. 1974).
[120] *Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d at 1339.
[121] *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979).
[122] *Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 934 F.Supp.2d 987, 997 (N.D. Ill. 2013).
[123] *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)

22

introducing historical, individual, or circumstantial evidence.[124] Generally, "proof of disproportionate impact on an identifiable group, such as evidence of "gross statistical disparities," can satisfy the intent requirement where it tends to show that some invidious or discriminatory purpose underlies the policy."[125]

Here, Plaintiffs have alleged the following facts regarding chases and race in Houston: (1) HPD traffic stops have plummeted from 2008 to 2021;[126] (2) HPD high-speed chases have more than doubled from 2000 to 2020;[127] (3) Black citizens made up 22% of the population, 38% of traffic stops, and 56.39% of high-speed chases;[128] (4) during the daylight in 2020 – when HPD officers are more likely to be able to identify a driver's race prior to a chase – high-speed pursuits of Black drivers made up 65.01% of HPD's chases;[129] (5) during the night in 2020 – only after visibility and identification of the race of the driver is limited – HPD's chases of Black drivers dropped to 52.07%;[130] (6) neighborhoods with a Black population over 30%, over 50% and majority Black, have significantly more high-speed pursuits than their population;[131] (7) Neighborhoods with a white population over 30%, over 50% and majority white, have significantly less high-speed pursuits than their population;[132] and (8) Each of the Plaintiffs, were black and killed as innocent bystanders to police chases.[133] Plaintiffs have further pleaded that "HPD intentionally decided to profile the neighborhood and suspect, knowing that the risk to the public

---

[124] *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1285 (5th Cir.1994).
[125] *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009).
[126] Plaintiff's First Amended Petition at Pg. 14.
[127] *Id.* at 13
[128] *Id.* at 15.
[129] *Id.* at 15-17.
[130] *Id.*
[131] *Id.* at 18-30.
[132] *Id.* at 18-30.
[133] *Id.* at 35-42.

was substantial and there was high likelihood of a vehicle crash and potential injury," and that "intentionally decided to profile [Jackson's] neighborhood."[134]

Based on that evidence, Plaintiffs have pleaded that "Defendant's conduct was based on racial animus, in that Defendant intended to treat Plaintiffs and members of the Black population differently than other residents and occupants of the city of Houston."[135] Likewise, "it was the custom, practice, or usage of HPD to engage in high-speed pursuits in neighborhoods that were predominantly Black, while not engaging in high-speed pursuits in neighborhoods that were predominantly white."[136]

Based on these allegations, at the pleading stage, Plaintiffs have sufficiently pleaded that the City acted with racial intent toward them.

### c. The violated the Equal Protection Clause and Title VI

Similar to Section 1982, the City also challenges Plaintiffs' claims based on the Equal Protection Clause and Title VI. For the same reasons as addressed in the Section 1982 section Plaintiffs have also sufficiently pleaded their claims under equal protection clause and Title VI.

The City claims that Plaintiffs failed to plead that the City received financial assistance to qualify under Title VI. However, the City maintains a Title VI plan on its website. [137] To the extent necessary, Plaintiffs request leave to amend to address whether the City received financial assistance to qualify under Title VI.

## 5. Plaintiffs have sufficiently pleaded the waiver of Governmental Immunity for Jackson and Wiley

---

[134] *Id.* at 37 and 40.
[135] *Id.* at 51.
[136] *Id.* at 51.
[137] https://www.houstontx.gov/obo/title-vi.html and https://www.houstontx.gov/obo/title-vi/policy-statement.pdf

Plaintiffs Jackson and Wiley have sufficiently pleaded that the City has waived its immunity regarding their negligence claims.[138] The City instead argues that the defenses of official immunity and the emergency exception to the Texas Tort Claim Act apply. These are defenses that are more appropriately reviewed at the summary judgment or 12(b)(1) stage. Regardless, Plaintiffs pleaded facts that dispute those defenses, including that the City was acting recklessly and violating HPD policy.[139] Based on these facts, Plaintiffs have sufficiently pleaded a claim under the Texas Tort Claim Act.[140]

Finally, the City has argued that Henderson's negligence claim fails.  But, Henderson has not asserted a negligence claim.

## 6.  Plaintiffs are not seeking punitive damages.

Plaintiffs will not seek punitive damages and stipulate to dismiss any claim for punitive damages.

### IV.
### REQUEST FOR LEAVE TO AMEND

To the extent that the Court grants this motion to dismiss, Plaintiffs request leave to amend. To date, this is the City's first substantive motion to dismiss or attack on the viability of Plaintiffs' claims in this lawsuit.

### V.
### CONCLUSION

For the reasons stated in this response brief, Plaintiffs request that the Court deny the City's motion to dismiss under Rule 12(c).

---

[138] Plaintiff's First Amended Petition at 62 and 63.
[139] *Id.*
[140] *See generally, City of Houston v. Sauls*, 654 S.W.3d 772 (Tex. App.—Houston [14th Dist.], 2022, pet. filed).

Respectfully submitted,

**DOYLE DENNIS LLP**

_____
MICHAEL PATRICK DOYLE
State Bar No. 06095650
PATRICK M. DENNIS
State Bar No. 24045777
JEFFREY I. AVERY
State Bar No. 24085185
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Phone: 713.571.1146
Fax:  713.571.1148
service@doylelawfirm.com
**ATTORNEYS FOR PLAINTIFFS**

Reginald E. McKamie, Sr.
Law Office Reginald E. McKamie, Sr. PC
2120 Welch St.
Houston, TX 77019
mckamie@mckamie.com
**CO-COUNSEL FOR PLAINTIFF CAMILLA SIMPSON, AS NEXT FRIEND OF XXXXXXX XXXXX AND ARLENE GALLIEN**

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to counsel of record on this the 10th day of August, 2023, via ECF, hand delivery, overnight courier, U.S. Mail, certified mail, return receipt request, or facsimile, pursuant to the Federal Rules of Civil Procedure:

Melissa Azadeh
City of Houston Legal Department
P.O. Box 368
Houston, TX 77002-0368
Phone: (832) 393-6491
Fax: (832) 393-6259
Email: melissa.azadeh@houstontx.gov
**ATTORNEY FOR DEFENDANT**

_____
Michael Patrick Doyle