**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| JANICE JACKSON, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF HER LATE HUSBAND MICHAEL WAYNE JACKSON; ARLENE GALLIEN, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF CARL WILEY JR.; CAMILA SIMPSON AS NEXT FRIEND OF XXXXXXX XXXXX, GYNELL HENDERSON, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF RASHAD HENDERSON, AND JOHN HENDERSON JR., INDIVIDUALLY, | CIVIL ACTION NO. 4:23-cv-00052 |
| *Plaintiffs*, | |
| V. | |
| CITY OF HOUSTON, | |
| *Defendant*. | |

<u>**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION DISMISS UNDER RULE 12(B)(1)**</u>

Plaintiffs, Janice Jackson, individually and as representative of the estate of her late husband Michael Wayne Jackson; Arlene Gallien, individually and as representative of the estate of Carl Wiley Jr.; Camila Simpson as Next Friend of Xxxxxxx Xxxxx, Gynell Henderson, individually and as representative of the estate Rashad Henderson, and John Henderson Jr., Individually, file this response to the City of Houston's motion to dismiss under 12(b)(1)

## TABLE OF CONTENTS

Table of Contents ........................................................................................................ ii

Index of Authorities .................................................................................................. iv

I.      Summary of the Argument ............................................................................. 1

II.     Factual Background ........................................................................................ 4

III.    Argument and Authorities .............................................................................. 5

        1.   Plaintiffs each of capacity to bring survival actions on behalf of the estates ............... 5

        2.   Defendant engaged in governmental action sufficient to trigger Section 1983 ............ 6

        3.   Plaintiffs sufficiently pleaded a Monell claim against the City of Houston for
             municipal liability ........................................................................................ 6

             a.   Defendant created a policy and custom that encouraged racial profiling and
                  violations, and also ensured that its officer knew that HPD would exact no
                  consequence for these actions based on a failure to investigate theory ............ 7

             b.   HPD failed to train and supervise its officers  regarding
                  proper chase protocols .................................................................. 10

             c.   Defendant's conduct was the moving force that caused Plaintiffs' deaths ...... 12

        4.   Plaintiffs have sufficiently pleaded that Defendant violated their rights by depriving
             them of substantive due process, violating the equal protection clause and Title VI,
             and violating Section 1982 ........................................................................... 13

             a.   Plaintiffs have sufficiently pleaded substantive due process claims based on
                  the shocks the conscience standard and the state created danger doctrine ...... 13

                  i.    Defendant's conduct shocks the conscience and violates the 14th
                        Amendment under the Supreme Court's holding in County of
                        Sacramento v. Lewis, 523 U.S. 833 (1998) ......................................... 14

                  ii.   Defendant violated the 14th Amendment based on the State Created
                        danger theory ................................................................... 19

             b.   Plaintiffs have sufficiently pleaded a claim under Section 1982 because (1) the
                  Fifth Circuit has found that the use of property is protected and (2) Plaintiff
                  sufficiently pleaded racial intent .................................................. 21

                  i.    Section 1982 protects the Use of Property. United States v. Greer, 939
                        F.2d 1076, 1091 (5th Cir. 1991) .................................................... 21

ii.   ii.   City of Houston intentionally discriminated against Plaintiffs and their neighborhoods ..................................................................22

c.   Defendant violated the Equal protection clause and Title VI .........................24

5.   Plaintiffs have sufficiently pleaded the waiver of Governmental Immunity for Jackson and Wiley .............................................................................................24

6.   Plaintiffs are not seeking punitive damages................................................25

IV.   Request for Leave to Amend ............................................................25

V.   Conclusion ...................................................................................25

Certificate of Service ..............................................................................27

## <u>INDEX OF AUTHORITIES</u>

### <u>Cases</u>

*Anderson v. Douglas & Lomason Co., Inc.*,
    26 F.3d 1277, 1285 (5th Cir.1994). ...............................................................13

*Bennett v. Spear*,
    520 U.S. 154, 168 (1997)...............................................................................4, 5

*Boggs v. Home Depot, Inc.*,
    21-CV-06750 (PMH), 2023 U.S. Dist. LEXIS 19726 (S.D.N.Y. Feb. 6, 2023) .............13

*City of Pasadena v. Belle*,
    297 S.W.3d 525 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ................................23

*Comm. Concerning Cmty. Improvement v. City of Modesto*,
    583 F.3d 690 (9th Cir. 2009) .........................................................................14

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998)..............................................................................15, 16

*Cripps v. Louisiana Department of Agriculture and Forestry*,
    819 F.3d 221 (5th Cir.) ...............................................................................15

*Cutter v. Metro Fugitive Squad*,
    Case No. CIV-06-1158-GKF, 2008 U.S. Dist. LEXIS 66572
    (W.D. Okl. Aug. 28, 2008) ...........................................................................17

*Daveri Dev. Grp., LLC v. Vill. of Wheeling*,
    934 F.Supp.2d 987 (N.D. Ill. 2013) ...............................................................13

*Dews v. Town of Sunnyvale*,
    109 F. Supp. 2d 526 (N.D. Tex. 2000) ............................................................5

*Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*,
    968 F.3d 357 (5th Cir. 2020) .........................................................................4

*Estate of Baker v. Castro*,
    Civil Action No., H-15-3495, 2018 U.S. Dist. LEXIS 170949
    (S.D. Tex. Aug. 31, 2018).......................................................................2, 6, 7

*Gomez v. City of Houston*,
    587 S.W.3d 891 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ....................23, 24

*Grandstaff v. Borger*,

iv

767 F.2d 161, 170 (5th Cir. 1985) ...........................................................................6

*Hamilton v. Foti*,
372 F. App'x 480, 485 (5th Cir. 2010) ..................................................................15

*Heck v. Humphrey*,
512 U.S. 477 (1994)...............................................................................................10

*Igwe v. Skaggs*,
Civil Action No. 16-1403, 2017 U.S. Dist. LEXIS 12136
(W.D. Pa. Jan. 30, 2017)........................................................................................21

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977)...............................................................................................13

*Kemp v. City of Houston*,
Civil Action No. H-10-3111,  2013 U.S. Dist. LEXIS 116104
(S.D. Tex. Aug. 16, 2013)...............................................................................18, 21, 22

*Lambert v. Hartman*,
517 F.3d 433 (6th Cir. 2008) ............................................................................5, 7

*League of United Latin Amer. Citizens v. City of Boerne*,
659 F.3d 421 (5th Cir. 2011) ..................................................................................5

*Olzman v. Lake Hills Swim Club, Inc.*,
495 F.2d 1333 (2d Cir. 1974) ................................................................................13

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ...............................................................................................13

*Pyle v. City of Harlingen*,
Civil No. 1:13-147, 2014 U.S. Dist. LEXIS 37196
(S.D. Tex. March 20, 2014) ....................................................................................17

*Saenz v. Heldenfels Bros.*,
183 F.3d 389 (5th Cir. 1999) .................................................................................22

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*,
73 F.3d 546 (5th Cir. 1996) .....................................................................................5

*Toll Bros., Inc. v. Township of Readington*,
555 F.3d 131 (3d Cir. 2009).....................................................................................4

*United States v. Brown*,
49 F.3d 1162 (6th Cir. 1995) .................................................................................13

*United States v. Greer*,
   939 F.2d 1076, 1091 (5th Cir. 1991) ...............................................................12

*Wolff v. McDonnell*,
   418 U.S. 539 (1974).........................................................................................15

### **Statutes**

42 USC § 1982 ...........................................................................................1, 9, 12, 13

42 USC § 1983 ...........................................................................................1, 5, 10, 22

Tex. Civ. Prac. & Rem. Code 101.055(2) ...............................................................23

Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq ..................1, 9, 10, 12

U.S. Const. amend. XIV ...........................................................9, 10, 15, 16, 19, 20

# I.
## SUMMARY OF THE ARGUMENT

Mirroring its 12(c) motion for judgment on the pleadings, Defendant has again challenged Plaintiffs' claims in this lawsuit and made many of the same legal arguments. This time, Defendant has framed its motion as a challenge regarding standing.  Again, this is a Section 1983 lawsuit brought by the families of Rashad Henderson, Carl Wiley Jr. and Michael Wayne Jackson –three black men who were killed as bystanders in vehicle crashes, as a result of HPD officers engaging in high-speed chases.  The policymakers of the City of Houston have "adopted a custom, practice, pattern, and usage of authorizing police officers to profile Black drivers and racially target predominantly Black neighborhoods when engaging in high-speed pursuits."[1] Ultimately, this policy, custom, practice, and usage was the moving force that caused the death of Jackson, Wiley, and Henderson.

To be clear, Plaintiffs have alleged that (1) Defendants violated Plaintiffs' own Constitutional rights. Put differently, Plaintiffs are not asserting any derivative Constitutional rights of other people. Rather, Defendant's conduct, including their intentional racial discrimination against Plaintiffs based on the demographic makeup of their neighborhoods, is a violation of Section 1982, Title VI, and the Equal Protection Clause.

Likewise, Plaintiffs have suffered an injury that is "fairly traceable" to the conduct of Defendant, including their violations of  Section 1982, Title VI, the Equal Protection Clause, and Subsntiative Due Process. Indeed, the City has "established inadequate policies and customs of investigating, punishing, supervising, and disciplining police officers who racially profile . . . neighborhoods."[2] Specifically, "for any complaints or charges regarding racial profiling and

---

[1] Plaintiff's First Amended Petition at pg. 2, attached as Exhibit 1.
[2] *Id.* at pg. 31.

1

collisions caused by high-speed chases, (1) HPD does not question the officer until the officer has spoken with an attorney; (2) the officer is allowed to do an unrecorded 'walkthrough' of the scene, while accompanied by an attorney; (3) and the officer is given forty-eight hours to answer written questions with an attorney's assistance."[3] HPD then permits its officers to review all evidence, including body camera footage, before giving a statement.[4] Notably, this process is "entirely different" from how HPD investigates vehicle crashes/crimes of civilians or charges regarding racial related crimes.[5]

As a direct result of that process, HPD has also "failed to ever meaningfully discipline any officer for racial profiling related charges."[6] Specifically, "in the last 10 years, HPD has never sustained a claim of racial profiling, much less a high-speed chase complaint related to racial profiling."[7] In contrast to these racial related complaints, HPD generally has sustained unrelated complaints at a rate of around 25%.[8] The City's failure to ever sustain a racial profiling complaint is direct evidence of a lack of any meaningful review by HPD. Consistent with Judge Lake's decision in *Baker v. Castro*, "[a] jury could reasonably find that Defendant City had an unofficial policy and custom of turning a blind eye to its officers' [constitutional violations]."[9]

Directly following the encouragement of the City, "Defendant's conduct was based on racial animus, in that Defendant intended to treat Plaintiffs and members of the Black population differently than other residents and occupants of the city of Houston."[10] More specifically, HPD "engage[d] in high-speed pursuits in neighborhoods that were predominantly Black, while not

---

[3] *Id.*
[4] *Id.* at 32.
[5] *Id.* at 31 -32.
[6] *Id.* at 33.
[6] *Id.* at 34
[7] *Id.* at 32.
[8] *Id.*
[9] *Estate of Baker v. Castro*, Civil Action No., H-15-3495, 2018 U.S. Dist. LEXIS 170949 (S.D. Tex. Aug. 31, 2018).
[10] Plaintiff's First Amended Petition at 51.

engaging in high-speed pursuits in neighborhoods that were predominantly white."[11] Put differently, HPD officers "profile[d] Black neighborhoods when evaluating whether to initiate a high-speed pursuit."[12]

As part of their complaint, Plaintiffs analyzed the specific neighborhoods in Houston, and cited to statistics regarding the rate of traffic stops, populations of those areas, and the rates and demographics of chases. Plaintiffs have specifically cited to and alleged the following: : (1) HPD traffic stops have plummeted from 2008 to 2021;[13] (2) HPD high-speed chases have more than doubled from 2000 to 2020;[14] (3) Black citizens made up 22% of the population, 38% of traffic stops, and 56.39% of high-speed chases;[15] (4) during the daylight in 2020 – when HPD officers are more likely to be able to identify a driver's race prior to a chase – high-speed pursuits of Black drivers made up 65.01% of HPD's chases;[16] (5) during the night in 2020 – only after visibility and identification of the race of the driver is limited – HPD's chases of Black drivers dropped to 52.07%;[17] (6) neighborhoods with a Black population over 30%, over 50% and majority Black, have significantly more high-speed pursuits than their population;[18] (7) Neighborhoods with a white population over 30%, over 50% and majority white, have significantly less high-speed pursuits than their population;[19] and (8) Each of the Plaintiffs, were black and killed as innocent bystanders to police chases. In other words, the precise type of conduct that HPD encouraged, also occurred and harmed Plaintiffs.

---

[11] *Id.* at 51.
[12] *Id.* at 53.
[13] *Id.* at 14.
[14] *Id.* at 13
[15] *Id.* at 15.
[16] *Id.* at 15-17.
[17] *Id.*
[18] *Id.* at 18-30.
[19] *Id.* at 18-30.

Based on this evidence, combined with the shocking nature of the chases at issue, Plaintiffs have sufficiently pleaded standing and alleged that Defendant was negligent. Therefore, this Motion to Dismiss should be denied.

## II.
## FACTUAL BACKGROUND

To avoid repetition, Plaintiffs incorporate their Factual Background from their Response to Defendant's motion for judgment on the pleadings.

## III.
## ARGUMENT AND AUTHORITIES

**1.  Plaintiffs have alleged that they suffered an injury that is fairly traceable to the City.**

In its first argument, the City challenges Plaintiffs' Article III standing. Specifically, the city argues that Plaintiffs have not suffered an injury that is fairly traceable to the challenged conduct.  Put simply, Defendant is wrong.

Under federal law, for an injury to be fairly traceable to the actions of a defendant, the injury may not be the result of "the independent action of some third party not before the court." But the Supreme Court has made it clear – this does not require that the defendant's actions be the "very last step in the chain of causation." Rather, Article III's traceability requirement "need not be as close as the proximate causation needed to succeed on the merits of a tort claim."[20] An indirect causal relationship will suffice, so long as "there is a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant.  And "[w]hile the injury cannot be the result of an independent action of some third party not before the court, standing exists if the injury is produced by the determinative or coercive effect of a defendant's actions upon the

---

[20] *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 142 (3d Cir. 2009); *see also Bennett v. Spear,* 520 U.S. 154, 168 (1997) (proximate cause of harm is not equivalent with fairly traceable requirement for standing purposes); *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 369 n.4 (5th Cir. 2020) ("'fairly traceable' requirement does not require tort-like causation with its proximate cause requirement").

actions of someone else." [21]  In order to be fairly traceable, the defendant's actions must contribute to the injury, but they do not have to be the sole cause of the injury.[22]

For example, the Sixth Circuit in *Lambert v. Hartman* addressed a similar third-party criminal issue.[23]  In that case,  the municipal defendant posted the plaintiff's social security number and driver's license number on its public website.  A third-party criminal then stole her personal information. Despite that act, the Court explained that the plaintiff  "alleged sufficient facts to show that her injuries were fairly traceable to the publication of her personal information by the Clerk."[24]  The Court noted that the city was not the "direct cause" of the injury, but still found that the standing was met so long as, the injury is fairly traceable to the defendant's acts or omissions.[25]

The Fifth Circuit has explained that this "causation element does not require a party to establish proximate cause, but only requires that the injury be 'fairly traceable' to the defendant."[26] In light of that, sufficiently pleading that a policy or custom was the "moving force" of Plaintiffs' injuries, would establish both causation under Section 1983 and also meet Plaintiff's standing requirements under Article III.

Following that, the Court in *Baker* addressed the more stringent moving force/causation standard under Section 1983. In that case, the Court addressed whether "inadequate policies and customs of investigating, punishing, and disciplining police officers who shoot civilians could be a moving force behind an unconstitutional use of excessive deadly force by a police officer."[27] Citing to *Grandstaff v. City of Borger, Tex.*,[28]  the court noted that "[w]here a reckless disregard

---

[21] *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 561 (N.D. Tex. 2000) (*citing Bennett v. Spear*, 520 U.S. 154 (1997)).
[22] *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 558 (5th Cir. 1996)
[23] *Lambert v. Hartman*, 517 F.3d 433 (6th Cir. 2008).
[24] *Id.* at 438.
[25] *Id.*
[26] *League of United Latin Amer. Citizens v. City of Boerne*, 659 F.3d 421, 431 (5th Cir. 2011).
[27] *Estate of Baker v. Castro*, Civil Action No., H-15-3495, 2018 U.S. Dist. LEXIS 170949 at * 35 (S.D. Tex. Aug. 31, 2018).
[28] 767 F.2d 161, 170 (5th Cir. 1985).

for human life and safety is 'prevalent among the city's police officers [and] threatens the life and security of those whom they encounter, and if that recklessness is attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights."[29] And "[i]f a police officer is aware that his reckless use of deadly force will be met with the approval of city policymakers, the 'moving force' requirement is satisfied."[30]

At the summary judgment stage, Judge Lake then outlined the relevant customs and policies of HPD, as presented by the plaintiffs, including:

> [HPD Internal Affairs] (1) uses fewer classifications than for other types of use of force incidents; (2) does not look at the police officer's complaint history; and (3) gives the police chief the sole final disciplinary determination. Additionally, general HPD custom and policy following the shooting of a civilian provides that the shooting police officer is: (1) not questioned until he has spoken with an attorney; (2) allowed to do an unrecorded "walk-through" of the scene, while accompanied by an attorney; (3) never given a live interview; and (4) given forty-eight hours to answer written questions with an attorney's assistance. It is also noteworthy that it is standard procedure to conduct a live, recorded interview of any shooter in a non-police shooting.[31]

Not surprisingly, the results of that policy were damning – HPD had "deemed justified" 194 of 194 intentional shootings of civilians from 2009 to 2014. Notably, "Eighty-one of these shootings were of unarmed civilians."[32] Based on that, the court found that the "[t]he uniform outcomes of the past police shooting investigations along with the less adversarial treatment of a police shooter raises a fact issue regarding Defendant City's policies and customs . . ."[33] And  "[i]f a police officer is aware that his reckless use of deadly force will be met with the approval of city policymakers, the 'moving force' requirement is satisfied."[34] Likewise, if a municipality "possesses an

---

[29] *Estate of Baker*, 2018 U.S. Dist. LEXIS 170949 at *36
[30] *Id.*
[31] *Id.* at 36-37
[32] *Id.* at 37
[33] *Id*
[34] *Id.* at *35-36.

inadequate policy or custom of investigating, punishing, and disciplining police officers who use excessive deadly force, then that policy or custom could be the "moving force" behind the alleged unconstitutional use of excessive force" in that case.[35]

Here, following *Baker* and *Lambert*, Plaintiffs have established that the City's inadequate customs and policies were the moving force in their injuries.  The City has "established inadequate policies and customs of investigating, punishing, supervising, and disciplining police officers who racially profile either drivers or neighborhoods."[36] Specifically, "through its policies, enforcement, and investigations of racial profile allegations, HPD has deliberately created and encouraged a pattern of racial profiling by its officers." [37] Plaintiffs further pleaded the following:

> For example, for any complaints or charges regarding racial profiling and collisions caused by high-speed chases, (1) HPD does not question the officer until the officer has spoken with an attorney; (2) the officer is allowed to do an unrecorded "walkthrough" of the scene, while accompanied by an attorney; (3) and the officer is given forty-eight hours to answer written questions with an attorney's assistance. Notably, this process is "entirely different" from how HPD investigates vehicle crashes/crimes of civilians or charges regarding racial related crimes.
> . . .
> Furthermore, as part of the "walkthrough," HPD further authorizes the involved officers to review the body camera footage prior to making a statement. Indeed, before asking written questions, investigators provide the officers with all of the evidence that HPD has so the officer can explain away the evidence in the written response, including any written witness statements. In addition, if HPD requests an investigation interview, HPD must conduct the interview either during normal working hours or HPD Must pay the officer overtime. In other words, unlike civilians, HPD pays its officer when they participate in investigations, including providing interviews to HPD.[38]

As a result of the process, "police officers are able to modify their version of the story prior to ever making a statement. In contrast, civilians accused of similar misconduct – whether racial crimes

---

[35] *Id.* at *37.
[36] First Amended Petition at Pg. 31.
[37] *Id.*
[38]  *Id.* at 31-32.

or traffic crashes – are certainly not given these evidentiary advantages that HPD provides its law enforcement."[39]

Combined with its investigation process, HPD has also "failed to ever meaningfully discipline any officer for racial profiling related charges."[40] Specifically, "in the last 10 years, HPD has never sustained a claim of racial profiling, much less a high-speed chase complaint related to racial profiling."[41] Indeed, "[b]ased on the data available, HPD has received approximately 47 complaints regarding racial profiling since 2010," and "[o]f those complaints, HPD concluded that 28 were "unfounded," 2 were "pending," 3 were "exonerated," 8 were "not sustained," and 0 were "sustained."[42] "In contrast to the zero sustained findings for racial profiling complaints, HPD generally has sustained approximately 25% of complaints made against officers," and [b]y example, in 2021, HPD sustained 160 of the 654 complaints."[43]

Furthermore, the City's conduct was known and encouraged by the final policy decision makers. Specifically, Plaintiffs have alleged:

> In addition, as part of its legal obligation under Texas and federal law, HPD mandates that the Chief of Police review the compilation of data regarding racial profiling. In other words, the City's final policy maker is responsible for reviewing and confirming the data regarding racial profiling. This includes the rate of traffic stops and the final determinations regarding racial profiling complaints made against HPD officers. As part of that, HPD has represented that "there is no substantial, statistically significant evidence of racial profiling against any race/ethnic group represented in Houston." Even further, "there exists neither evidence of systemic bias in the practices of Houston police officers nor evidence that individual officers in the department have engaged in racial profiling."[44]

---

[39] *Id.* at 33.
[40] *Id.*
[41] *Id.* at 34.
[42] *Id.*
[43] *Id.*
[44] *Id.* at 34-35.

Based on this evidence, the City created a policy and custom that encouraged racial profiling and violations and ensured that its officer knew that HPD would exact no consequence for these actions.

Through this, Plaintiffs have alleged that the City violated their rights under the 14th Amendment, Title VI, and Section 1982.  In other words, just like *Lambert*, even though a third-party struck Henderson and Wiley, they still have alleged that the underlying policy (and failure to discipline/train) was the moving force behind the chase that caused those collisions. Specifically, Plaintiffs have pleaded that "this failure has become a "moving force" behind an unconstitutional use of high-speed chases and deadly vehicle crashes caused by police officers." Indeed, the City's officers knew that their conduct would be authorized, based on the history of lack of punishment and favorable policies, including a walkthrough and legal consultation. And "[b]ased on the City's history, the City, through its officers, knew that racially profiling and violating substantive due process would exact no consequence for their actions."[45] "[T]he officers knew that the City frequently turned a blind eye to any allegations of racial profiling or unconstitutional high-speed pursuits."[46] Therefore,  by "encourage[ing]" this type of misconduct through lax rules, policies and disciplinary process, Defendant's conduct "is thereby the moving force behind, the very type of misconduct described in this Petition, by failing to adequately supervise, control and discipline its officers such that its failure to do so manifests deliberate indifference and intentional conduct."[47] Just like *Baker*, Defendant's motion should be denied.

---

[45] First Amended Petition at Pg. 45.
[46] *Id.*
[47] *Id.*

Furthermore, related to the Jackson case, Defendant was the direct cause of his injuries. Indeed, Defendant's officer struck Mr. Jackson has he was walking on the sidewalk.[48]  There is simply no doubt that Mr. Jackson's death was caused by Defendant.

Finally, Defendant argues that Plaintiffs cannot seek claims against the city under *Heck v. Humphrey*, 512 U.S. 477 (1994) because the third parties have been criminally charged.  This misses the point. Plaintiff is not arguing that the Constitutional violations that harmed them are derivative of the Constitutional violations against the third parties.  Thus, whether the third parties could file a Section 1983 claim is of no moment to Plaintiffs' rights.

## 2.  Plaintiffs have only asserted that their own Constitutional rights have been violated, not any derivative rights of others.

Next, Defendant argues that "Plaintiffs lack standing to vicariously assert deprivations of Equal Protection or Substantive Due Process under the Fourteenth Amendment, or Title VI claims."  To be clear, Plaintiffs have alleged that their own rights have been violated – not derivative rights of third parties. To the extent that Plaintiff's reference and cite to racial discrimination against third parties, Plaintiffs have pleaded that information to further support the foundation that Defendant engaged in unlawful racial discrimination and that Defendant's conduct shocks the conscience.  Therefore, Defendant's motion should be denied because Plaintiffs are not alleging a vicarious deprivation of their rights.

Defendant also argues that "Plaintiffs lack standing to sue based on the unidentified general demographics of the unidentified neighborhoods where they were walking or driving, the use of vehicles, streets, sidewalks, and neighborhoods." This ignores Plaintiffs' actual claims in this lawsuit. To be clear, Plaintiffs have argued that "HPD trains its officers when evaluating whether

---

[48] Exhibit 1 at Pg. 38.

to engage in a high-speed chase, to consider the neighborhood – implicitly, including the racial demographics of the neighborhood."[49] And "[f]ollowing the foundation above, HPD has created a custom, pattern, and practice of targeting . . . predominantly Black neighborhoods when engaging in dangerous high-speed chases."[50] As part of this, HPD also knew the risk to the community of engaging in high-speed chases, and intentionally discriminated against predominantly Black neighborhoods when deciding to engage in these reckless ventures. Specifically, Plaintiffs have alleged:

> Prior to the chase, HPD knew that nature of criminal activity was not the type of conduct that required "immediately tak[ing] the suspect into custody," when weighed against the "possible risks to the public resulting from the pursuit." Likewise, HPD and other officers driving the vehicle also knew that "[c]ollisions are a predictable outcome of police pursuits." And that a large portion of pursuits end in collisions, including harm to third parties. Despite that knowledge, HPD intentionally decided to profile the neighborhood and suspect, knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury. Put differently, HPD maintained a purpose to cause harm – racially profiling the driver and suspect – unrelated to the legitimate object of arrest. Based on that, HPD's conduct shocks the conscience.[51]

And importantly, "the final policymakers are also aware that the disciplinary process at HPD encourages officers to racially profile . . . neighborhoods because officers know that they will never be punished for racial profiling."[52]

Furthermore, Plaintiff has specifically identified neighborhoods based on the identification created by the City of Houston – the super neighborhood designation.  Indeed, Plaintiff further identified that Mr. Wiley was killed "in the predominantly Black neighborhood of Westchase,"[53] and  Mr. Jackson was killed in the "predominantly Black neighborhood of Sunnyside."[54] As part

---

[49] *Id.* at pg. 15.
[50] *Id.* at pg. 15.
[51] *Id.* at pg. 35.
[52] *Id.* at pg. 35.
[53] *Id.* at pg. 35.
[54] *Id.* at pg. 37.

of the complaint, Plaintiffs have further pleaded that Sunnyside has a Black population of 75%[55] and Westchase has a majority/plurality Black population.[56] In other words, these are not unidentified neighborhoods and unidentified demographics. Rather, Jackson and Wiley have specifically identified the geographic region, the demographics, and that Defendant racially profiled predominantly Black neighborhoods s when deciding to engage in high-speed pursuits. Therefore, Wiley and Jackson – two Black residents who were killed in predominantly Black neighborhoods because of this policy – have standing to assert violations under Title VI, Section 1982, and the Equal Protection Clause.

**3. Plaintiffs were intentionally discriminated against in violation of Section 1982**

Mirroring its 12(c) motion, the City has also Plaintiffs' claims under 42 USC § 1982. The City, it appears, has disputed this claim for two reasons – (1) "Section 1982 is limited to the sale or rental of private property, not the "use" of private property or public roads and sidewalks and (2) "Plaintiffs allege no facts to show the City intentionally racially discriminated against them in the sale or rental of real or personal property." The City is wrong on both accounts.

**a. Section 1982 protects the Use of Property. *United States v. Greer*, 939 F.2d 1076, 1091 (5th Cir. 1991)**

The Fifth Circuit had directly rejected the City's claim that the use of property is not protected by Section 1982. Specifically, in *United States v. Greer,* the court held that "the phrase 'to hold' property under the statute can also mean 'to use' property."[57] Indeed, "Courts have . . .

---

[55] *Id.* at pg. 21.
[56] *Id.* at pg. 20.
[57] *United States v. Greer*, 939 F.2d 1076, 1091 (5th Cir. 1991)

repeatedly found that discriminatory interference with the **use of property** is actionable under § 1982."[58]

Following that foundation, in *Olzman*, the Second Circuit addressed whether the use of a public pool sufficiently created a right protected by Section 1982. Relying on the Supreme Court's broad protection under the Civil Rights Act, the court then made it clear – "[i]t is reasonable to characterize the freedom of blacks to go and come as guests of a swim club member as sufficiently pertaining to a condition of property to be a right capable of being held under § 1982."[59] As a result, Section 1982 protects Plaintiffs' right to use public roads, sidewalks, and their own vehicles. Therefore, the City's motion fails.

**b.  The City intentionally discriminated against Plaintiffs and their neighborhoods.**

Second, Plaintiffs have also sufficiently pleaded that the City "intentionally racially discriminated against them." To meet this element, a plaintiff must allege the defendant "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[60]  Stated differently, Plaintiffs' race must have been a substantial factor in that different treatment.

"Intentional discrimination can be alleged through "either direct or circumstantial evidence."[61] And "[p]roof of discriminatory motive . . . can in some situations be inferred from the mere fact of differences in treatment."[62] As a result, the plaintiffs may bolster their case by introducing historical, individual, or circumstantial evidence.[63]  Generally, "proof of

---

[58] *Boggs v. Home Depot, Inc.*, 21-CV-06750 (PMH), 2023 U.S. Dist. LEXIS 19726 at *12 (S.D.N.Y. Feb. 6, 2023); *see also United States v. Brown*, 49 F.3d 1162, 1167 (6th Cir. 1995); *Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1339 (2d Cir. 1974).

[59] *Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d at 1339.

[60] *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979).

[61] *Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 934 F.Supp.2d 987, 997 (N.D. Ill. 2013).

[62] *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)

[63] *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1285 (5th Cir.1994).

13

disproportionate impact on an identifiable group, such as evidence of "gross statistical disparities," can satisfy the intent requirement where it tends to show that some invidious or discriminatory purpose underlies the policy."[64]

Here, Plaintiffs have alleged the following facts regarding chases and race in Houston: (1) HPD traffic stops have plummeted from 2008 to 2021;[65] (2) HPD high-speed chases have more than doubled from 2000 to 2020;[66] (3) Black citizens made up 22% of the population, 38% of traffic stops, and 56.39% of high-speed chases;[67] (4) during the daylight in 2020 – when HPD officers are more likely to be able to identify a driver's race prior to a chase – high-speed pursuits of Black drivers made up 65.01% of HPD's chases;[68] (5) during the night in 2020 – only after visibility and identification of the race of the driver is limited – HPD's chases of Black drivers dropped to 52.07%;[69] (6) neighborhoods with a Black population over 30%, over 50% and majority Black, have significantly more high-speed pursuits than their population;[70] (7) Neighborhoods with a white population over 30%, over 50% and majority white, have significantly less high-speed pursuits than their population;[71] and (8) Each of the Plaintiffs, were black and killed as innocent bystanders to police chases.[72] Plaintiffs have further pleaded that "HPD intentionally decided to profile the neighborhood and suspect, knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury," and that "intentionally decided to profile [Jackson's] neighborhood."[73]

---

[64] *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009).
[65] Plaintiff's First Amended Petition at Pg. 14.
[66] *Id.* at 13
[67] *Id.* at 15.
[68] *Id.* at 15-17.
[69] *Id.*
[70] *Id.* at 18-30.
[71] *Id.* at 18-30.
[72] *Id.* at 35-42.
[73] *Id.* at 37 and 40.

Based on that evidence, Plaintiffs have pleaded that "Defendant's conduct was based on racial animus, in that Defendant intended to treat Plaintiffs and members of the Black population differently than other residents and occupants of the city of Houston."[74] Likewise, "it was the custom, practice, or usage of HPD to engage in high-speed pursuits in neighborhoods that were predominantly Black, while not engaging in high-speed pursuits in neighborhoods that were predominantly white."[75]

Based on these allegations, at the pleading stage, Plaintiffs have sufficiently pleaded that the City acted with racial intent toward them.

**4.  Plaintiffs have sufficiently pleaded substantive due process claims based on the shocks the conscience standard and the state-created danger doctrine.**

Plaintiffs have asserted claims against the City for violations of their substantive due process rights under the Fourteenth Amendment. Plaintiffs address two separate types of substantive due process violations – a shocks the conscience standard under *County of Sacramento v. Lewis*, 523 U.S. 833 (1998) and the state created danger doctrine.

**a.  The City's conduct shocks the conscience and violates the 14th Amendment under the Supreme Court's holding in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).**

"Substantive due process bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."[76] "The touchstone of due process is protection of the individual against arbitrary action of government."[77] Following that, Plaintiffs must show (1) that the defendant deprived them of a constitutionally protected right and (2) that the government action bears no rational relationship to a legitimate government interest.[78]

---

[74] *Id.* at 51.
[75] *Id.* at 51.
[76] *Hamilton v. Foti*, 372 F. App'x 480, 485 (5th Cir. 2010).
[77] *County of Sacramento v. Lewis*, 523 U.S. 833 (1998) (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)).
[78] *Cripps v. Louisiana Department of Agriculture and Forestry*, 819 F.3d 221, 232 (5th Cir.)

In *Lewis*, the plaintiff was operating a motorcycle and became involved in a high-speed chase with the police. Ultimately, the motorcycle tipped over.  Purportedly because he was unable to brake in time to keep from running over the passenger, the officer struck the plaintiff with his vehicle and killed him.  The plaintiff filed a civil rights lawsuit and the Supreme Court found that the officer did not violate substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase. Instead, the Fourteenth Amendment requires that the officer's conduct must shock the conscience.[79]

In explaining the scope of the "shocks the conscience" standard, the *Lewis* court evaluated two competing types of factual scenarios – (1) a situation where an officer may have the opportunity to deliberate prior to taking action and (2) a situation where an official must "act decisively and . . . show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance."[80] For the former situation, the court found that the "deliberate indifference" should apply because  "[a]s the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical."[81]  In contrast, for the latter, the court required that the plaintiff must show that the officer intended to harm them or to worsen their legal plight.

Following *Lewis*, the Western District of Oklahoma further summarized the intent requirement of *Lewis* and how it changes based on the particular facts of each case. The Court noted:

> [I]n the middle range of the culpability spectrum, where the conduct is more than negligent but less than intentional, there may be some conduct that is egregious enough to state a substantive due process claim. Within  this middle range, courts

---

[79] *Lewis*, 523 U.S. 833

[80] *Id.* at 853.

[81] *Id.* at 851.

must analyze the level of culpability 'by examining the circumstances that surround the conduct at issue and the governmental interest at stake.'

The key inquiry is whether the official had the opportunity for deliberation. Courts must distinguish between emergency action and action taken after opportunity for reflection.  Great deference must be given to decisions that necessarily occur in emergency situations. Thus, in emergency situations, only conduct by which the official intended to cause harm and in which the state lacks any justifiable interest will shock the conscience and result in constitutional liability. 'The intent to harm standard is not limited to situations calling for split-second reactions. Rather, it applies whenever decisions must be made' in haste, under pressure, and frequently without the luxury of a second chance.'

On the other hand, 'where the state actor has the luxury to truly deliberate, something less than unjustifiable intent to harm, such as calculated indifference, may suffice to shock the conscience.' Courts should employ the 'deliberate indifference' standard only when actual deliberation is practical.[82]

After *Lewis*, in *Pyle*, this District addressed the varying standards for a substantive due process violation.[83]  In that case, the Harlingen police chased a suspect who "had not committed any crimes nor were any crimes reported to" the officers. The plaintiff pleaded that the officers lacked "probable cause to apprehend the suspect."[84]  During the chase, the plaintiff was asleep at her apartment. Eventually, the Harlingen police attempted to block the suspect via a pit maneuver – a method of hitting the car and disabling the vehicle. Both the officer and suspect's vehicles struck the plaintiff's apartment, and caused her to suffer serious injuries.[85] Citing to *Lewis*, the court held that "Pyle's complaint plausibly pleads a set of circumstances in which sufficient actual deliberation by Harlingen police officers was practical to trigger a deliberate-indifference standard."[86] Put differently, based on those particular facts, the defendant knew of and disregard an excessive risk to the plaintiff's health or safety.

---

[82] *Cutter v. Metro Fugitive Squad*, Case No. CIV-06-1158-GKF, 2008 U.S. Dist. LEXIS 66572 at *54-56 (W.D. Okl. Aug. 28, 2008).
[83] *Pyle v. City of Harlingen*, Civil No. 1:13-147,  2014 U.S. Dist. LEXIS 37196 (S.D. Tex. March 20, 2014).
[84] *Id.* at *3.
[85] *Id.*
[86] *Id.*  at *39.

Similarly, Judge Miller also addressed a similar substantive due process case in *Kemp v. City of Houston*.[87]   In denying summary judgment, the court noted that the case involved a roadblock, which it distinguished from a traditional high-speed chase.[88]   Put differently, the court distinguished the particular action at issue in the case – the use of a roadblock – from the high-speed chase that immediately proceeded the use of the spike strip.   Based on that, the court found that "the evidence at least raises a question of fact as to whether the officers were deliberately indifferent to the safety of the individuals who occupied the parked vehicles."[89]   Specifically, the officers knew that using a spike strip at night, during a high-speed chase, created a substantial risk of causing death or serious bodily injury.

Here, Plaintiffs address each of the three incidents separately. For Rashad Henderson, in contrast to *Lewis*, which involved a 75 second chase, "HPD's chase lasted approximately one hour."[90] Put bluntly, HPD and its officers had plenty of time to deliberate about their action toward this chase.   Furthermore, HPD knew the girl driving the vehicle was 16 years old, that her mother had reported she was running away from home, and that she "may be suffering from a mental breakdown."[91]   And "[p]rior to the chase, HPD knew that this chase would endanger innocent bystanders. The officers also knew that HPD had GPS tracking for the vehicle and that a helicopter was already following the suspects."[92] "Likewise, HPD and the other officers driving the vehicle also knew that "[c]ollisions are a predictable outcome of police pursuits."[93] Yet "HPD maintained a purpose to cause harm – racially profiling the driver and suspect – unrelated to the legitimate

---

[87] *Kemp v. City of Houston,* Civil Action No. H-10-3111,  2013 U.S. Dist. LEXIS 116104 (S.D. Tex. Aug. 16, 2013)
[88] *Id.* at *23.
[89] *Id.*
[90] Plaintiff's First Amended Petition at pg. 40.
[91] *Id.*
[92] *Id.* at 41-42.
[93] *Id.*

object of arrest. Based on that, the City's conduct shocks the conscience.[94] Based on this, Plaintiff has sufficiently pleaded that the City violated Rashad Henderson's 14th Amendment rights.

Next, regarding Michael Jackson, the City's conduct also meets the deliberate indifference standard. First, at the time of the crash, "initial chase in pursuit of the suspects had ended."[95]  In other words, unlike *Lewis*, this case was no longer a "high speed pursuit."  Consistent with that, Officer Hernandez and his partner were "not part of the primary pursuit."[96] "Even worse, HPD and its field supervisor had not authorized or assigned Hernandez to engage in the pursuit," and Hernandez had "not sought permission to engage in the pursuit."[97]  In other words, Hernandez had sufficient time and the "luxury to truly deliberate."

Ignoring the serious risks to bystanders, Hernandez instead chose to drive his vehicle "between 80 to 100 miles per hour down Reed Road in the predominantly Black neighborhood of Sunnyside" and "despite the slippery condition from a recent rain shower."[98] As Hernandez dangerously and intentionally approached Scott Street at a speed double the legal limit, Hernandez violently swerved at the intersection and veered the car onto the sidewalk. Hernandez then struck and killed Mr. Jackson, who was walking on the sidewalk to his barber."[99] HPD's internal records confirmed that Hernandez was "traveling at a[n] unsafe speed," "performed a faulty evasive action," which caused him to go "on the sidewalk."[100] In other words, even HPD knew that Hernandez had sufficient opportunity to deliberate prior to his conduct.

---

94 *Id.* at 37.
95 *Id.*
96 *Id.*
97 *Id.*
98 *Id.*
99 *Id.* at 38.
100 *Id.* at 39.

Finally, with respect to Carl Wiley, Officers Trevino and Salazar also had sufficient time for deliberation because their decision to pursue the vehicle was based on racial profiling. Specifically, "HPD Officers Trevino and Salazar then spotted a white Cadillac STS parked at a gas station," and "saw that the vehicle was operated by a Black man – Cameron Rogers – with another Black man and a Hispanic woman present."[101] Mr. Rogers allegedly had committed a minor open container violation and fled when the officers approached with their lights flashing.[102] "Instead of taking precaution in light of the minor violation, HPD profiled the driver based on his race (Black) and the neighborhood based on its racial demographics (majority Black)."[103] "HPD initiated a chase of the suspects based on an open containers violation – a minor criminal violation."[104]

"Prior to the chase, HPD knew that nature of criminal activity was not the type of conduct that required "immediately tak[ing] the suspect into custody," when weighed against the "possible risks to the public resulting from the pursuit."[105] "Despite that knowledge, HPD intentionally decided to profile the neighborhood and suspect, knowing that the risk to the public was substantial and there was high likelihood of a vehicle crash and potential injury."[106] This conduct shows that the City had sufficient time to deliberate and its conduct shocks the conscience.

Therefore, Plaintiffs have sufficiently alleged substantive due process claims.

---

[101] *Id.* at 35.
[102] *Id.*
[103] *Id.* at 36.
[104] *Id.*
[105] *Id.*
[106] *Id.*

**b. Defendant violated the 14ᵗʰ Amendment based on the State-Created Danger Theory**

To establish a claim for a state-created danger, Plaintiffs must show that the City "used their authority to create a dangerous environment for the plaintiff and that the defendants acted with deliberate indifference to the plight of the plaintiff."[107] To "establish deliberate indifference, the plaintiff must show the 'environment created by the state actors must be dangerous; they must know it is dangerous; and . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur."[108]

In *Igwe v. Skaggs*, the Western District of Pennsylvania addressed the state-created danger doctrine.[109] In that case, the officer joined a high-speed chase, but did not request permission or authorization.[110] The officer drove his vehicle "up to 88 mph in a 35 mph zone on the wrong side of the road and drove through two red lights."[111] "Approximately three minutes after Officer Frisk began this pursuit of a suspected stolen car, Officer Skaggs entered an intersection against a red traffic signal and, after engaging his breaks for half a second, crashed into the driver's side of [the victim's car]" and killed her.[112] In the subsequent lawsuit, the plaintiff pleaded that the officer "voluntarily assume[d] a role as a responding officer in violation of Monroeville policy, knew he could terminate his response at any time, and drove his police car in reckless disregard for the safety of the general public."[113] The Court found this pleading sufficient to deny a motion to dismiss, though the Court granted qualified immunity to the officer.

---

[107] *Kemp*, 2013 U.S. Dist. LEXIS 116104 at *13-14.
[108] *Id.*
[109] *Igwe v. Skaggs*, Civil Action No. 16-1403, 2017 U.S. Dist. LEXIS 12136 (W.D. Pa. Jan. 30, 2017).
[110] *Id.* at *3.
[111] *Id.*
[112] *Id.*
[113] *Id.* at *10.

Here, based on the same facts alleged above, Plaintiffs have presented sufficient evidence that the City violated their Fourteenth Amendment rights under the state-created danger doctrine. Specifically, for Jackson, Henderson, and Wiley, the City created a dangerous situation and was consciously indifferent and reckless toward the harm it could cause Plaintiffs.

In contrast, the City has argued that the Fifth Circuit "has consistently refused to recognize" the state-created danger theory. But as explained in *Kemp*, the Fifth Circuit's decision not to adopt the doctrine occurred "because the allegations in that case did not support the theory."[114]   In contrast, Judge Miller found that "it is appropriate for district courts to entertain the theory even though the Fifth Circuit has not adopted it."[115] By example, the court explained that "in *Scanlon v. Texas A&M University*, the district court dismissed the plaintiffs' claims under the state-created danger theory for failure to state a claim."[116] "On appeal, the Fifth Circuit noted that it had not adopted the theory, yet it remanded the case to the district court because the district court should have found that the plaintiffs had stated a section 1983 claim under the state-created danger theory."[117] In other words, while the "Fifth Circuit has not found a circumstance in which it believed the evidence (as opposed to the pleadings) supported the theory and consequently adopted the theory, the Fifth Circuit also has not indicated that it would be unwilling to adopt the theory in the appropriate case."[118]

In addition, the City also argues that under the state-created danger theory, the City must be a "known victim." In *Saenz v. Heldenfels Bros*, the Fifth Circuit, in dicta, declined to extend the doctrine, in part, because the defendant in that case was unaware of a known victim.[119]   The

---

[114] *Kemp*, 2013 U.S. Dist. LEXIS 116104 at *13-14.
[115] *Id.* at *14.
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Saenz v. Heldenfels Bros.*, 183 F.3d 389, 391-392 (5th Cir. 1999).

court did not address whether knowledge of a general case or general group of people at risk would be sufficient.  Indeed, long after *Saenz*, Judge Miller authorized this type of claim to proceed based on the general knowledge of harm to other vehicles or drivers.  Thus, the City's argument should be rejected.

**5.   The Emergency exception does not apply to the Jackson Plaintiff's claims.**

Next, Defendant argues that the emergency exception applies to prevent the Jackson family from recovering for their negligence claim.  Based on Tex. Civ. Prac. & Rem. Code 101.055(2), this defense  requires the City to prove it was "[1] responding to an emergency call or reacting to an emergency situation, [2] if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others."[120] Here, the City cannot meet this requirement.

In the context of an emergency responder's liability under Section 546.005, proof of "reckless disregard" requires the plaintiff to show that the defendant committed an act or omission which he knew or should have known posed a high degree of risk of serious injury.[121]

The Houston Court of Appeals recently addressed the reckless standard in enc banc, in *Gomez v. City of Houston*.[122]   In that case, an HPD officer collided with a motorist, while responding to the scene of a robbery in progress.[123] The motorist sued the City. After the city filed a plea to the jurisdiction, the Trial Court dismissed the case.[124]  After a panel of the court decided the appeal, the court reconsidered the issue en banc.[125]

---

[120] Tex. Civ. Prac. & Rem. Code 101.055(2).
[121] *City of Pasadena*, 297 S.W.3d 525, 534-35. (Tex. App.—Houston [14th Dist.] 2009, no pet.)
[122] *Gomez v. City of Houston*, 587 S.W.3d 891 (Tex. App.—Houston [14th Dist.] 2019, pet. denied)
[123] *Id.* at 894.
[124] *Id.* at 896.
[125] *Id.* at 894.

As part of its analysis reversing the trial court, this Court found sufficient evidence of recklessness because the officer "decided to (1) not slow his speed below the posted speed limit to compensate for the wet conditions, (2) not use his patrol car's emergency lights and siren, and (3) not maintain visual contact with the road as he approached the intersection."[126] Based on these reasons, the Court noted that "evidence of this combination of decisions could support a finding that [the officer] acted recklessly."[127] Therefore, the Court reversed the trial court.

This case presents an even stronger argument for recklessness than *Gomez*. Specifically, Hernandez, on behalf of the City, did not obtain permission or have authority to engage in the pursuit. Likewise, Hernandez was in violation of HPD policy by even engaging in the pursuit. Furthermore, Hernandez (1) was driving at unsafe speeds for the conditions, (2) unlawfully and dangerously maneuvered the vehicle at a high rate of speed, onto the sidewalk, (3) knew that the suspects had abandoned their vehicle, (4) failed to slow down his vehicle, despite seeing brake lights, (5) failed to maintain visual contact with his surroundings, and (6) participated in the pursuit without receiving authority to engage, in violation of HPD policy. Following *Gomez* and *Maspero*, Jackson has sufficiently disputed the Emergency Exception.

### 6.  Wiley's injury was caused by the operation of an officer's use of the motor vehicle

Next, regarding the Wiley Plaintiffs, Defendant first argue that Wiley seeks damages for injuries "caused by independent third parties. . . not employed by the City, defeating their ability to overcome the City's immunity from any state law claim as a matter of law."  Citing to the Supreme Court of Texas, it further argues that "government employee must have been actively operating the vehicle at the time of the incident." This ignores that Plaintiff's negligence claim

---

[126] *Id.* at 903.
[127] C.R. 102 (Declaration of White at Par. 10.)

relates to the operation of the officer's vehicle, including the unreasonable pursuit that caused Mr.

Wiley's death.  Specifically, Plaintiff has pleaded:

> At the time of the crash and negligence of Defendant, Defendant was acting recklessly because he (1) initiated and engaged the pursuit, based on the public consumption of alcohol – a minor crime, (2) targeted the vehicle based on the driver's race, and (3) targeted the neighborhood. Plaintiffs suffered damages due to the wrongful death of Mr. Wiley caused by Defendant's negligence.

Based on this, the Wiley Plaintiffs have sufficiently pleaded a negligence claim.

**7.  The Henderson Plaintiffs have not asserted a claim for negligence.**

Finally, the City has argued that Henderson's negligence claim fails.  But, Henderson has

not asserted a negligence claim.

**IV.**
**REQUEST FOR LEAVE TO AMEND**

To the extent that the Court grants this motion to dismiss, Plaintiffs request leave to amend.

To date, this is the City's first substantive motion to dismiss or attack on the viability of Plaintiffs'

claims in this lawsuit.

**V.**
**CONCLUSION**

For the reasons stated in this response brief, Plaintiffs request that the Court deny the

City's motion to dismiss under Rule 12(b)(1).


Respectfully submitted,

**DOYLE DENNIS LLP**

_____
MICHAEL PATRICK DOYLE
State Bar No. 06095650
PATRICK M. DENNIS
State Bar No. 24045777

25

JEFFREY I. AVERY
State Bar No. 24085185
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Phone: 713.571.1146
Fax:  713.571.1148
service@doylelawfirm.com
**ATTORNEYS FOR PLAINTIFFS**

Reginald E. McKamie, Sr.
Law Office Reginald E. McKamie, Sr. PC
2120 Welch St.
Houston, TX 77019
mckamie@mckamie.com
**CO-COUNSEL FOR PLAINTIFF CAMILLA SIMPSON, AS NEXT FRIEND OF XXXXXXX XXXXX AND ARLENE GALLIEN**

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to counsel of record on this the 15th day of August, 2023, via ECF, hand delivery, overnight courier, U.S. Mail, certified mail, return receipt request, or facsimile, pursuant to the Federal Rules of Civil Procedure:

Melissa Azadeh
City of Houston Legal Department
P.O. Box 368
Houston, TX 77002-0368
Phone: (832) 393-6491
Fax: (832) 393-6259
Email: melissa.azadeh@houstontx.gov
**ATTORNEY FOR DEFENDANT**

_____
Michael Patrick Doyle